1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3      ARMANDO HERNANDEZ,              )
                                       )
 4                Plaintiff,           )
                                       )
 5                v.                   )  No. 13 CV 00153
                                       )
 6      CHICAGO POLICE OFFICER HERNANDEZ,)  Chicago, Illinois
        et al.,                        )  May 27, 2014
 7                                     )  3:55 p.m.
                  Defendants.          )
 8

 9                    EXCERPT TRANSCRIPT OF PROCEEDINGS

10         BEFORE THE HONORABLE HARRY D. LEINENWEBER AND A JURY

11      APPEARANCES:

12      For the Plaintiff:          ROBINSON SHAPIRO & SCHWARTZ, LLC
                                    BY:  MR. JAMES A. SHAPIRO
13                                  Suite 1750
                                    208 South LaSalle Street
14                                  Chicago, Illinois 60604
                                    (312) 782-4615
15                                  jshapiro@rss-lawyers.com

16                                  SHILLER PREYAR LAW OFFICES
                                    BY:  MS. MARY J. GRIEB
17                                  Suite B401
                                    1100 West Cermak Road
18                                  Chicago, Illinois 60608
                                    (312) 226-4590
19                                  maryjgrieb@gmail.com

20

21

22

23

24

25
```

```
 1    For the Defendants:        JOHNSON & BELL, LTD.
                                 BY:  MR. BRIAN P. GAINER
 2                                    MS. ALEXANDRIA L. BELL
                                 Suite 2700
 3                               33 West Monroe Street
                                 Chicago, Illinois 60603
 4                               (312) 372-0770
                                 gainerb@jbltd.com
 5                               bella@jbltd.com

 6    Court Reporter:           Judith A. Walsh, CSR, RDR, CRR
                                 Official Court Reporter
 7                               219 S. Dearborn Street, Room 1944
                                 Chicago, Illinois 60604
 8                               (312) 702-8865
                                 judith_walsh@ilnd.uscourts.gov
 9

10

11    NOTE:  THIS IS AN EXCERPT OF PROCEEDINGS.  PAGE NUMBERING WILL

12    NOT CORRESPOND TO ANY COMPLETE TRIAL TRANSCRIPT THAT MAY BE

13    PREPARED.

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2    WITNESS                          DX    CX    RDX    RCX

3    OFFICER VERNELL OATS

4      By Mr. Shapiro                 4            23

5      By Ms. Bell                          14

6    OFFICER MARK HERNANDEZ

7      By Mr. Shapiro                 26           104

8      By Mr. Gainer                        75

9    OFFICER JOY McCLAIN

10     By Mr. Shapiro                117           149

11     By Ms. Bell                         135

12   SERGEANT PATRICK BOYLE

13     By Mr. Shapiro                153           183

14     By Ms. Bell                         164

15   LIEUTENANT EVE GUSHES

16     By Mr. Shapiro                188           203

17     By Mr. Gainer                       196

18

19

20

21

22

23

24

25

1      (Proceedings held which are not herein transcribed.)

2      (Proceedings heard in open court:)

3           MR. SHAPIRO:  The plaintiff would call Vernell Oats.

4           THE COURT:  Come forward.

5           MR. GAINER:  I have to go across the hall and get

6  him.

7           THE COURT:  All right.

8      (Pause.)

9           THE COURT:  Please raise your right hand.

10     (Witness sworn.)

11          THE COURT:  Please be seated.

12          Mr. Shapiro, you may question the witness.

13          MR. SHAPIRO:  Thank you, your Honor.

14        OFFICER VERNELL OATS, PLAINTIFF'S WITNESS, SWORN

15                       DIRECT EXAMINATION

16  BY MR. SHAPIRO:

17  Q.  Good afternoon.  Could you state your name, please, and

18  spell it for the record?

19  A.  It's Officer Oats, Vernell Oats; V-e-r-n-e-l-l, it's

20  O-a-t-s.  Star No. 11653.

21          THE COURT:  Would you move forward and speak more

22  into the mike, sir?

23          THE WITNESS:  11653.

24  BY MR. SHAPIRO:

25  Q.  And did you say it was Officer Oats?

Oats - direct

5

1   A.  Yes.

2   Q.  I just want to address you by your correct title, Officer

3   Oats.  And what's your -- so you're a Chicago police officer;

4   is that right?

5   A.  Yes.

6   Q.  And what's your -- in what capacity do you work as a

7   Chicago police officer?  What's your normal job?

8   A.  Currently I'm working the lockup on second watch in the

9   7th District.

10  Q.  What about back on July 22nd, 2012, what was your

11  responsibilities then -- what were your responsibilities then?

12  A.  I was working the lockup.

13  Q.  Okay.  And what does working the lockup mean?  What are

14  your responsibilities in working the lockup?

15  A.  Officers making an arrest, after they finish processing,

16  they bring them back to me.  And it's my job to process them,

17  fingerprint them and photo them and get them ready for court.

18  Q.  Did you -- did you, in fact -- you, in fact, take photos

19  of the accused when they come into the lockup?

20  A.  Yes.

21          MR. SHAPIRO:  Okay.  Your Honor, can I request the

22  defense exhibit photos back from the jury, please?  They may

23  be lying on a chair.

24          THE COURT:  Sure.

25          MR. SHAPIRO:  Thank you very much.

Oats - direct

1    BY MR. SHAPIRO:

2    Q.  Officer Oats, I'm going to show you what's been previously

3    marked and admitted into evidence as Defendants's Exhibit

4    Group 1.  Can I ask you to take a look at that group exhibit,

5    Officer Oats, let me know when you're through?

6    A.  Okay.

7    Q.  Okay.  Are you finished?

8    A.  Yes.

9    Q.  Did you take those photos?

10   A.  Yes.

11   Q.  And what kind of lighting did you use for these photos?

12   A.  It's whatever the system is set up.  I don't know.  It's

13   nothing that I control.

14   Q.  What kind of system was it?  Was it a digital camera?

15   A.  It's a, right, digital camera attached to the print

16   machine.

17   Q.  Okay.  Was there any outside lighting other than the

18   digital camera itself?

19   A.  I believe it's a light over the -- where the prisoner

20   stands.

21   Q.  Okay.  What I'm getting at is, there appear to be, if I

22   show them to you again, a lot of yellow marks on these

23   pictures.  Could I ask you to look at those again?

24          Let me spread them out in front of you.  There's a

25   lot of yellow on the photos, not over his whole body.  Do you

Oats - direct

 1   see the yellow on the photos?

 2   A.  Yes.

 3   Q.  Do you know why there's yellow on the photos?

 4   A.  No.

 5   Q.  Does that have to do with the lighting, do you know?

 6   A.  I don't know.

 7          MR. GAINER:  Objection, asked and answered.

 8          THE COURT:  Overruled.

 9   BY MR. SHAPIRO:

10   Q.  Is that normal for photos to come out with yellowing on

11   them?

12   A.  No.  They don't appear like that on the -- once I -- on my

13   computer once we take them.

14   Q.  Okay.  Did those -- did those photos truly and accurately

15   depict -- first, strike that.  Let me turn back.

16          Turning your attention to the morning of July 22nd,

17   2012, do you recall seeing Armando Hernandez that day?

18   A.  Yes.

19   Q.  Okay.  And do those photos truly and accurately depict

20   Armando Hernandez that morning?

21   A.  Yes.

22   Q.  Yellow skin and all?

23   A.  Outside of the yellow --

24          MR. GAINER:  Argumentative.

25          THE WITNESS:  -- I don't know.

1   BY MR. SHAPIRO:

2   Q.  Okay.  And you thought that Mr. Hernandez was acting kind

3   of strange that day; is that right?

4   A.  Yes.

5   Q.  Okay.  And he had a bruise on his forehead, didn't he?

6   A.  Yes.

7   Q.  Okay.  Is that bruise depicted on any of those photos?

8   A.  I can see it on this first, this one here.

9   Q.  On the first one.  Okay.  For the record, he is -- Officer

10  Oats has pointed out Bates Stamp No. 11, part of Group Exhibit

11  No. 1.

12          And could you hold it up and point to the jury where

13  the bruising is on there?

14  A.  It appears to be right here.

15  Q.  Okay.  Pointing to the, what would be the right side of

16  Mr. Hernandez's forehead; is that right?

17  A.  Yes.

18  Q.  Okay.  And -- and you were going to send Mr. Hernandez to

19  the hospital because you saw that bruise on his head and also

20  his eye was a little swollen; is that right?

21  A.  Yes.

22  Q.  And you also think he had some blood on his shirt, do you

23  not?

24  A.  Yes.  It appeared to be what looks like a couple of drops

25  of blood on his shirt.

Oats - direct

9

1    Q.  A couple of drops of blood on his shirt?

2    A.  Yes.

3    Q.  Okay.  Let me show you what's been previously marked as --

4            MR. SHAPIRO:  Is this No. 12, the shirt?

5            MS. BELL:  49.

6    BY MR. SHAPIRO:

7    Q.  49.  Thank you.  Let me show you what's been previously

8    marked and admitted into evidence as Plaintiff's Exhibit

9    No. 49, Officer Oats.

10           Is this the shirt you saw Mr. Hernandez wearing on

11   July 22nd?

12   A.  I don't know.

13   Q.  You don't know.  Are these the spots that you saw, the

14   blood spots that you saw on that night?

15           MR. GAINER:  Objection to foundation, your Honor.

16           THE COURT:  Overruled.

17   BY MR. SHAPIRO:

18   Q.  Can you answer the question, sir?

19   A.  I don't know if that's the shirt, so I don't know.

20   Q.  Okay.  Well, let me ask you this.  If you don't know this

21   is the shirt, are these the spots that you saw that night?

22   A.  I mean, the one at the top appears to be something that I

23   recall.

24   Q.  The one at the top indicating, that I'm pointing to the

25   left-hand side of the shirt --

Oats - direct

10

```
 1   A.  Yes.

 2   Q.  -- as I hold it up?  Okay.

 3           What about the, the spot more in the middle of the

 4   shirt that I'm pointing out here?  What about -- it's hard to

 5   hold up -- that spot there?

 6   A.  I don't recall a big spot like that.

 7   Q.  You don't recall a big spot like this?

 8   A.  No.

 9   Q.  Okay.  So you don't recognize this as the shirt that

10   Mr. Hernandez was wearing that night?

11   A.  I'm not sure if that's it.

12           MR. GAINER:  Asked and answered.

13           MR. SHAPIRO:  Okay.

14           THE COURT:  Overruled.

15           MR. SHAPIRO:  Thank you, your Honor.

16   BY MR. SHAPIRO:

17   Q.  And you also thought that Mr. Hernandez was faking a

18   seizure, did you not?

19   A.  Yes.

20   Q.  Okay.  But you called an ambulance anyway even though you

21   thought he was faking a seizure, right?

22   A.  Yes.

23   Q.  Okay.  And you did that because what if he wasn't faking

24   it and he was really having a seizure?

25   A.  Correct.
```

1    Q.  Okay.  You just suspected that he was faking a seizure?

2    A.  Yes.

3    Q.  Okay.  And after the ambulance came, the paramedics

4    decided that they were going to take Mr. Hernandez to the

5    hospital, did they not?

6    A.  Yes.

7    Q.  And you left it up to the paramedics to decide whether to

8    do that, right?

9    A.  Well, they were going to take him regardless.  If we call

10   for them, normally they take them.

11   Q.  Okay.  If you call for them, they were going to take him.

12   So you made the decision that Mr. Hernandez needed to go to

13   the hospital; is that right?

14   A.  Because he needed to go to court.

15   Q.  Because he needed to go to court?

16   A.  Right.

17   Q.  And the court wouldn't have taken him in that condition;

18   is that right?

19   A.  Right.  With that bruise showing, they wouldn't accept him

20   without a medical clearance.

21   Q.  With the bruise showing, they wouldn't have taken him

22   without medical clearance from a hospital?

23   A.  Yes.

24   Q.  And what about the swollen eye?  Would they have taken him

25   with that?

Oats - direct

12

1    A.  Like I said, the eye thing was more red than swollen.

2    Q.  Okay.  So it was mainly the bruise that concerned you?

3    A.  Right.

4    Q.  And you felt that the court would not even have taken him

5    in without medical clearance from a hospital; is that right?

6    A.  Correct.

7    Q.  Okay.  And Mr. Hernandez -- you know, actually, let me --

8    if you don't mind, I'm like to refer to him as Armando because

9    there are two Hernandezes in this case.  So to avoid

10   confusion, I'd like to refer to him by his first name, not for

11   familiarity reasons.  But let's call him Armando and the other

12   Hernandez, Officer Hernandez.

13        Armando did not want to go to the hospital, did he?

14   A.  No.

15   Q.  And you told him that he could not stay in lockup without

16   seeking some kind of medical attention, did you not?

17   A.  I told him he wasn't going to be able to be released from

18   custody without having had medical clearance and going to

19   court.

20   Q.  Okay.  Because the court wouldn't accept him with that

21   bruise on his forehead, right?

22   A.  Right.

23   Q.  All right.  And you told him that he had to go to the

24   hospital because he had that bruise, right?

25   A.  Yes.

Oats - direct

13

1    Q.  Okay.  And also his eye was red, right?

2    A.  Right.

3    Q.  Okay.  And -- strike that.

4         And you felt Mr. Hernandez was intoxicated, did you

5    not?

6    A.  Yes.

7    Q.  Okay.  Had you ever seen Mr. Hernandez intoxicated before?

8    A.  No.

9    Q.  Had you ever seen Mr. Hernandez, period, before?

10   A.  No.

11   Q.  Okay.  And in addition to the intoxication and the

12   swelling to his forehead and his right eye, you also indicated

13   that he had scratches on the back of his neck, did you not?

14   A.  Yes.

15   Q.  And you never heard Armando Hernandez -- Armando using any

16   racial slurs with you, did you?

17   A.  No.

18   Q.  He never said the "N" word?

19   A.  No.

20        MR. SHAPIRO:  Okay.  One second, your Honor.

21        No further questions, your Honor.  Thank you.

22        THE COURT:  All right.  Cross?  Ms. Bell, you may

23   question the witness.

24        MS. BELL:  Thank you, your Honor.

25                    CROSS-EXAMINATION

Oats - cross

14

1    BY MS. BELL:

2    Q.   Officer Oats, how long have you been a Chicago police

3    officer?

4    A.   Approximately 23 years.

5    Q.   And how long have you been working in the lockup?

6    A.   Steadily for ten years, on and off for up to 15.

7    Q.   Officer, can you please tell us, what is the typical

8    process, walk us through the typical process when you receive

9    a prisoner what a lockup keeper does.

10   A.   When you first enter the lockup, it's a desk that's about

11   15 feet from the door.  Normally I sit at the desk and make

12   the prisoner walk to me so I can observe them to see if they

13   have any injury in their walking or whatever.

14          I'm doing a visual inspection to see if I see any

15   injury.  If there's something that looks like a serious

16   injury, I won't accept them.  They have to take them out and

17   take them back to the hospital unless they've already been to

18   the hospital and have a medical clearance.

19          In the case of Armando, he stepped in, I noticed he

20   had the bruise on his head.  I saw the blood.  I saw what

21   looked like some minor swelling in his eye and it was red.  I

22   asked him was he -- there was a series of questions that are

23   on the computer.

24   Q.   Do you remember those questions that you asked him?

25   A.   Yes.  Are you sick or injured?  Are you taking any kind of

Oats - cross

 1  medication?

 2  Q.  When you asked him the question was he sick or injured,

 3  what did he say?

 4  A.  "No."

 5  Q.  What -- go ahead.

 6  A.  Are you taking any type of medication?  He said no.  Have

 7  you ever tried to kill yourself?  No.  Are you receiving any

 8  mental or medical treatment?  No.

 9       And recently they added another one at the bottom,

10  it's, are you a transsexual.  He said no.

11       Then the last thing I said, are you going to make a

12  phone call?  He told me yes.  I wrote the number down on the

13  transportation copy the officers supplied me when they bring

14  him in.  After that --

15  Q.  Let me stop you for a second, Officer.  In the process

16  when the prisoner comes to a lockup, what happens, can you

17  tell us at what point of time does a prisoner actually come to

18  the lockup after -- kind of like tell us the process how it

19  has worked within the Chicago Police Department as far as what

20  happens first, second, and when eventually a prisoner hits the

21  lockup?

22  A.  He's arrested.  He's brought into the station into a

23  processing room.  And there the arresting officers process an

24  arrest report and whatever other paperwork they need.  That's

25  taken up to a supervisor who goes into the computer and

Oats - cross

16

1    approves it.

2              Once the supervisor approves it, it hits my queue in

3    the lockup.  They call back and let me know they have a

4    prisoner, tell me the name.  I look and see if it's on the

5    computer.  If I see it, I tell them they can bring the

6    prisoner back.  After that they bring the prisoner back to the

7    lockup to me.

8    Q.  So the lockup is the last kind of juncture where the

9    prisoner being brought up before either going to court or

10   whatever is going to happen to the prisoner, correct?

11   A.  Yes.

12   Q.  So and you said that, please describe to us when you saw

13   Armando Hernandez, please describe his appearance to us.  What

14   did you see?

15   A.  Well, like I said, when he walked in, the first thing I

16   noticed was the minor swelling or redness on his head.  Like I

17   said --

18   Q.  Did you see any blood on his face?

19   A.  No, not on his face.  Like I said, the only thing I

20   recollect is the spots on his shirt that I saw.

21   Q.  And what happened after -- you mentioned to us that you

22   took his pictures.  You fingerprinted him.  What happened

23   after that?

24   A.  The first, he walked up to me.  I asked him all those

25   questions.  He answered "no" to everything.  I asked the

Oats - cross

17

1    officer about the bruises, whoever brought him back.  I don't

2    recall.  I know Officer Hernandez was one of them.  I don't

3    recall who else was with him.

4            But I asked him, was that bruise something that he

5    had just received because if it is something old, then you

6    don't have to worry about it but if it's recent, then he has

7    to get a medical clearance.

8            He told me that they had to take him to the ground

9    when they arrested him.  So I said, he will have to get a

10   medical clearance.

11           I took him into the, what's a large cell called the

12   group holding cell.  That's where I searched him.  That's when

13   I noticed the scratch on his neck.  Also I could smell the

14   alcohol on him.  He had slurred speech.

15           At this point I didn't realize -- I didn't know if

16   the eye was from something, an injury or if it was from being

17   intoxicated.

18   Q.  And how were you to transport Mr. Hernandez to the

19   hospital at that time?

20   A.  Well, once I finished with the search, I fingerprinted and

21   photoed him and then I let him use the phone and then I put

22   him in the -- back in the cell, closed the door and called up

23   front to let them know to send a car in to transport him to

24   the hospital because he needed a medical clearance.

25   Q.  When you say "a car in," would that be just a regular

Oats - cross

1   police squad car?

2   A.  A regular squad car, yes.

3   Q.  And you said that you let Mr. Hernandez to make a phone

4   call.  Do you know, who did he call?

5   A.  The number is on the arrest report.  I just dialed the

6   number for him.  I usually do it on a speaker so I can hear

7   the phone ring.  I let the prisoner know when they pick up,

8   you pick up.

9           And a female answered the phone.  He picked up the

10  phone, and he started talking to her.

11  Q.  What happened after Mr. Hernandez talked to the female on

12  the phone?

13  A.  While he was on the phone, he started crying.  He started

14  getting upset.  Like I said, at this point it seemed like it

15  was getting worse.  So I told him he had to cut the phone call

16  short so I could put him up and send him to the hospital.

17  Q.  What happened after the conversation?

18  A.  After he got off the phone, I put him in the cell, closed

19  the door.  That's when I went to the desk to my phone by the

20  computer and called up front to let them know to send a car in

21  to take him to the hospital.

22          At this point I'm sitting there watching him.  He was

23  walking around the cell.  Then he sat down.  He sat in the

24  corner.  There's a concrete bench that comes out from the wall

25  that goes to the back of the cell and on the left side.  He

Oats - cross

 1    was sitting in the corner.  And he started hugging himself,

 2    and he was rocking back and forth.

 3    Q.  What did you think of observing -- at that time when you

 4    observed Mr. Hernandez, what did you think of his behavior

 5    rocking back and forth?

 6    A.  He was acting kind of strange to me but it's like -- it

 7    all seemed like after the phone call.  So then maybe five

 8    minutes later, I was sitting at the desk watching him.  He was

 9    rocking back and forth.  And at some point he fell on the

10    floor and started shaking.

11         So I stood up and looked at him for about ten

12    seconds.  And I realized he was acting like he was having a

13    seizure.  So I got back on the phone, I called up front and I

14    told him, I said, "This guy Hernandez" --

15    Q.  Let me stop you, Officer, there.  When you observed

16    Mr. Hernandez fall on the floor, had you -- let me back up for

17    a second.

18         Have you seen people having seizures before?

19    A.  Yes.

20    Q.  When you observed Mr. Hernandez on the floor like you said

21    shaking like he was, was he having a seizure, in your opinion?

22    A.  No.

23    Q.  Did you -- was he faking a seizure?

24    A.  It appeared to be --

25         MR. SHAPIRO:  Objection, your Honor.

1          MS. BELL:  I'll strike that.

2    BY MS. BELL:

3    Q.  So after you observed that, what happened?

4    A.  I called back up front and told him, "This guy's back here

5    acting like he's having a seizure."  I said, "Send an

6    ambulance just in case."

7          About five minutes later, I think the paramedics came

8    in and the lieutenant came in because after I called up front,

9    then I called a lieutenant also to let her know, I said, "The

10   guy Hernandez that's in custody, they just brought him back."

11   I said, "He's back here acting like he's having a seizure."

12         I said, "Originally I called a car for him to get a

13   medical clearance," I said, "but now he's acting like he's

14   having a seizure."  So I called for an ambulance just to be

15   safe.

16   Q.  And then what happened?

17   A.  Maybe five minutes later, the paramedics showed up and the

18   lieutenant.  About the same time, the both of them walked in.

19   They came in.  I talked to the paramedics to let them know

20   that this guy is, he came in for us, acting like he's having a

21   seizure and he's been drinking.  I said he needed to go to the

22   hospital to get a medical clearance.

23   Q.  Was -- at that time when the paramedics came into the

24   station, how -- what was Mr. Hernandez's behavior at that

25   time?

Oats - cross

1  A.  Well, after the seizure thing, he sat up and sat back on

2  the bench and started rocking back and forth again.  So I

3  said, once the paramedics and everybody came, I opened the

4  door and let everybody in.  I was telling him, I said,

5  "They're here to take you to the hospital," you know.  "You

6  have to get a medical clearance."

7       He said he didn't want to go to the hospital, he

8  wanted to go home.

9       I said, "Well, you can't go home."  I said, "To get

10 released from custody, you're going to have to see a judge and

11 you have to get your bond."  I said, "They're not going to

12 take you in court with that bruise on your head.  So you're

13 going to have to go see somebody to get medical clearance for

14 that bruise."

15      He kept saying he didn't want to go to the hospital,

16 he wanted to go home.

17      That's when I told him, I said, "Well, if you don't

18 want to go to the hospital," I said, "you can go there and

19 then tell the doctor you don't want any treatment.  You can

20 refuse and then they'll send you back and then you can go

21 see -- maybe you'll make it to court today."

22      I said, "But you have to go to the hospital."  I

23 said, "You can't stay here without getting a medical

24 clearance."

25 Q.  Was he cooperative with the paramedics?

Oats - cross

1   A.   When they went in to try to take him out, he started

2   sliding around the bench along the wall, kept getting away

3   from them, telling them he didn't want to go.

4         At one point we tried to hold him because they were

5   trying to check his -- I think they were trying to check his

6   vitals or whatever, and he wouldn't be still.  I mean, he

7   wasn't really combative, but he wasn't cooperating with them.

8   Q.   When they were eventually able to put him in a chair, what

9   happened then?

10   A.   Well, eventually, like I said -- well, Lieutenant Gushes

11   talked to him.  We kept -- I kept talking to him.  And then

12   finally he went on and sat in the chair.  They strapped him in

13   and they rolled him out and they took him in the ambulance.

14   And whatever officers came in, they followed him on to the

15   hospital.  I don't know what happened after that.

16   Q.   How long was he in your custody?

17   A.   Maybe 30 to 45 minutes.

18   Q.   During that entire time that he was in your custody for

19   those, you know, half an hour or so, at any time did you see

20   any blood on him?

21   A.   Just what I saw on his shirt.

22   Q.   What about on his face?

23   A.   No.

24   Q.   Did -- at any time did he spit blood on the floor at any

25   time when he was in your custody?

1   A.  No.

2   Q.  At any time when he was with you, did he ask for medical

3   attention?

4   A.  No.  He actually -- like I say, he refused it.  He didn't

5   want to go.  We had to make him go to the hospital.

6   Q.  Officer Oats, just to be clear, you were never on the

7   street when Armando Hernandez was Hernandez -- was arrested,

8   correct?

9   A.  No.

10  Q.  You did not see what happened to Armando Hernandez on the

11  street --

12  A.  No.

13  Q.  -- when he was arrested?

14  A.  No.

15          MS. BELL:  Just a moment, your Honor.

16    (Pause.)

17          MS. BELL:  Nothing further at this time.

18          THE COURT:  Anything further?

19          MR. SHAPIRO:  Briefly, your Honor, as briefly as I

20  can, a few questions.

21                    REDIRECT EXAMINATION

22  BY MR. SHAPIRO:

23  Q.  Officer Oats, you just testified that you weren't on the

24  street when Armando Hernandez was arrested, right?

25  A.  Right.

Oats - redirect

1    Q.  But Officer Hernandez did tell you that Armando Hernandez

2    sustained a bruise to his forehead during the takedown, did he

3    not?

4    A.  I believe that's who told me.

5    Q.  You believe that --

6    A.  Yes.

7    Q.  -- that's who told you.  But you're not sure?

8    A.  Right.

9    Q.  And you believe that Armando was faking the seizure,

10   right?

11   A.  Yes.

12   Q.  Based on what you'd seen of seizures before that?

13   A.  Yes.

14   Q.  Okay.  But you didn't want to take any chances; is that

15   right?

16   A.  Yes.

17   Q.  And so you called the ambulance just in case it was a real

18   seizure, right?

19   A.  Yes.

20   Q.  All right.  And you testified that Armando started rocking

21   back and forth in the jail cell; is that right?

22   A.  Yes.

23   Q.  And that was after the phone call that he had?

24   A.  Yes.

25   Q.  And the phone call that he had was with his wife, was it

1  not?

2  A.  I don't know.

3  Q.  You don't know who he was speaking to?

4  A.  Correct.

5  Q.  But it was after the phone call with whoever he was

6  speaking to, right?

7  A.  Right.

8  Q.  And -- thank you.  And Officer Oats, you told them that --

9  you told Armando that if he didn't want any treatment that he

10  could refuse treatment at St. Bernard's Hospital; is that

11  right?

12  A.  At whatever hospital.  I don't know what hospital they

13  took him to, yes.

14  Q.  I apologize, Officer Oats.  You didn't testify to the name

15  of the hospital.  Whatever hospital they took him to, that he

16  could refuse treatment, right?

17  A.  Right.

18  Q.  And that he could be sent back to lockup after refusing

19  treatment, right?

20  A.  Right.

21  Q.  Okay.  You're not aware that that's exactly what he did,

22  that he refused treatment, are you?

23  A.  No, I don't know.

24       MR. SHAPIRO:  No further questions, your Honor.

25       THE COURT:  Step down.

M. Hernandez - direct

26

1     (Witness excused.)

2          THE COURT:  Call your next witness.

3          MR. SHAPIRO:  Your Honor, at this time the plaintiff

4     would call Officer Hernandez.

5          THE COURT:  All right.

6          Please raise your right hand.

7     (Witness sworn.)

8          THE COURT:  Please be seated.

9          You may question the witness.

10         OFFICER MARK HERNANDEZ, PLAINTIFF'S WITNESS, SWORN

11                        DIRECT EXAMINATION

12    BY MR. SHAPIRO:

13    Q.  Good afternoon, Officer.

14    A.  Good afternoon.

15    Q.  Could you state your full name and spell your entire name

16    for the record, please?

17    A.  Officer Hernandez, H-e-r-n-a-n-d-e-z, Star No. 12289.

18    Q.  Okay.  And your first name, sir?

19    A.  Mark, M-a-r-k.

20    Q.  Common spelling.  And you're a Chicago police officer,

21    right?

22    A.  Yes, I am.

23    Q.  And you joined the police department to serve, protect,

24    and help people to give -- and to give to the community, did

25    you not?

M. Hernandez - direct

27

 1    A.  Yes.

 2    Q.  And when you first noticed Armando Hernandez, you were

 3    driving southbound on Ashland Avenue, were you not?

 4    A.  Yes.

 5    Q.  And he was walking northbound, correct?

 6    A.  Yes.

 7    Q.  And he was on the east side of the street?

 8    A.  Yes.

 9    Q.  When you saw him walking, he was at the curb and grassy

10    area by the street, right?

11    A.  Yes, on the east side of the street.

12    Q.  On the east side of the street.

13    A.  Correct.

14    Q.  And you looked at him, right?

15    A.  I did.

16    Q.  And then you stopped the car, right?

17    A.  I -- yes.

18    Q.  Okay.  And he looked back -- he looked at you back after

19    you looked at him?

20    A.  Can you rephrase the question?

21    Q.  Sure.  After you stopped, he looked back at you?

22    A.  Yes, he did look at me at some point.

23    Q.  Okay.  And he said to you, "Fuck you, nigger;" is that

24    right, is that your testimony?

25    A.  When I asked him what he was doing --

M. Hernandez - direct

1   Q.  You --

2   A.  -- after I observed him shouting, "Fuck you, nigger" to

3   passing motorists --

4   Q.  So you --

5   A.  -- I did ask him, "What are you doing out here?"  And

6   that's when he said, "Fuck you, nigger," to me.

7   Q.  And you -- you're not African-American, are you?

8   A.  No, I'm not.

9   Q.  Okay.  And you asked him what he was doing out there?

10  A.  Yes.

11  Q.  And you asked him that because he was a Latino man in a

12  predominantly African-American neighborhood; is that right?

13  A.  Well, not only that, but it was the middle of the night

14  and he was shouting those "N" words to passing motorists.  He

15  was causing motorists to slow down.  And he was in a

16  predominantly African-American neighborhood.  So all those

17  reasons are as to why I asked him that question.

18  Q.  Thank you, Officer.  There's nothing illegal about

19  shouting the "N" word out at night, is there?

20  A.  When you're causing motorists to slow down and impeding

21  traffic, that caused me to want to talk to him.

22  Q.  Okay.  And you only saw him on the curb and the sidewalk

23  area, didn't you?

24  A.  The curb and then the grass.

25  Q.  Okay.  And the grass area.  You never saw him wander out

```
 1   in the middle of the street, did you?

 2   A.  I didn't see him in the street, but my partner did.

 3         MR. SHAPIRO:  Well, I'd object, your Honor, and move

 4   to strike as to what his partner did.  And it's speculative.

 5         THE COURT:  Well, all right.  Strike that.

 6         MR. SHAPIRO:  Thank you, your Honor.

 7   BY MR. SHAPIRO:

 8   Q.  But you didn't see him walking out in the middle of the

 9   street, did you?

10   A.  I did not, no.

11   Q.  Okay.  And you were driving the car -- well, you were

12   driving the SUV, weren't you?

13   A.  I was driving.

14   Q.  And -- and your -- his fists were balled up, you said, you

15   testified, right?

16   A.  Yes, his fists were balled up.

17   Q.  And anything illegal about his fists being balled up?

18   A.  Nothing illegal about his fists being balled up, no.

19   Q.  All right.  And then he said after you spoke to him, he

20   said something to the effect of, "What the fuck are you

21   looking at?  What are you looking at, nigger?"  Is that what

22   he said?

23   A.  He said that in an aggressive manner.  He didn't say it.

24   He yelled it and shouted it.

25   Q.  He yelled it and shouted it?
```

M. Hernandez - direct

30

1    A.  Yes.

2    Q.  At you?

3    A.  Well, I'm here.  He's there.  My partner is next to me.

4    So he said it to both of us.

5    Q.  Okay.  Was he looking in your direction?

6    A.  Yes.  He looked right at us.

7    Q.  Okay.  And there's nothing illegal about what he said, is

8    there?

9    A.  Nothing illegal.

10   Q.  Okay.  You weren't going to arrest him for that, were you?

11   A.  No, but his behavior was bizarre.

12   Q.  Okay.

13   A.  And we wanted to investigate.

14   Q.  Okay.

15   A.  His behavior was also potentially dangerous.

16   Q.  Okay.  Well, were you going to arrest him for bizarre

17   behavior?

18   A.  No, but I was going to talk to him and ask him, why are

19   you acting this way because this is simply not normal

20   behavior.

21   Q.  Okay.  Being a Latino man in a predominantly

22   African-American neighborhood like Englewood, right?  And

23   that -- I'm sorry.  Let me let you answer.  Is that right?

24   A.  No, no, you keep going.

25   Q.  I want an answer to my question.  That was one thing,

M. Hernandez - direct

31

1   right, being a Latino man in a predominantly African-American

2   neighborhood, right?

3   A.  Yes.

4   Q.  And then yelling, dropping the "F" bomb and yelling the

5   "N" word in a predominantly African-American neighborhood,

6   right?

7   A.  Correct.

8   Q.  And then as far as you could tell, being on the grassy or

9   curb area and causing traffic to swerve to avoid hitting him,

10  right?

11  A.  Yes.

12  Q.  Okay.

13  A.  It's also the middle of the night, and there were also

14  several people out that night on the corner of 69th and

15  Ashland.

16  Q.  Okay.  By "several," do you mean three?

17  A.  I mean more to the effect of 50 to 75 --

18  Q.  Okay.

19  A.  -- at 3:40 in the morning.

20  Q.  And that's what you mean by "several"?

21  A.  Yes.

22  Q.  Okay.  And so this was 2:00 or 3:00 in the morning?

23  A.  This was around 3:40 in the morning.

24  Q.  3:40 in the morning?

25  A.  3:30, 3:40.

M. Hernandez - direct

32

1   Q.  And so there were a lot of people out that morning, right;

2   there were 50 to 70 people, I think you said?

3   A.  I said 50 to 75, yes.

4   Q.  50 to 75.  Thank you for correcting me.

5           And so there's nothing illegal about him being

6   outside at 3:00, 3:00 or 4:00 in the morning, was there?

7   A.  There's nothing illegal, but it was potentially dangerous.

8   Q.  Was it also potentially dangerous for the other 50 or 75

9   people out at that time in the morning?

10  A.  Well, they weren't shouting obscenities at passing

11  motorists.  They weren't causing vehicles to slow down at the

12  time.  They weren't near the curb --

13  Q.  Okay.

14  A.  -- so --

15  Q.  But those are just -- those were just words, weren't they?

16  A.  They were words and they were actions and they were

17  shouting.

18  Q.  Okay.  But he was -- they were shouted words; isn't that

19  right?

20  A.  Shouted words in an aggressive manner with his fists

21  balled up at the curb, saying "fuck you, N word," to passing

22  motorists, yes.

23  Q.  Did he take a swing at anyone?

24  A.  No.

25  Q.  Okay.  Did he take a swing at you?

M. Hernandez - direct

33

 1    A.   A swing, no.

 2    Q.   Did he take a swing at your partner, Officer McClain?

 3    A.   No.

 4    Q.   He never did that, did he?

 5    A.   No, he never did.

 6    Q.   Okay.  So he had his fists balled up in an aggressive

 7    manner, right?

 8    A.   Correct.

 9    Q.   And he was yelling, dropping the "F" bomb and yelling the

10    "N" word, right?

11    A.   Yes.

12    Q.   At passing motorists, right?

13    A.   Yes.

14    Q.   And they were slowing down?

15    A.   Yes.

16    Q.   And about a minute passed between you first noticing him

17    and you pulling up to him; is that right?

18    A.   About a minute or two.

19    Q.   Okay.  What happened in that whole minute or two between

20    when you first saw him and when you drove up to him?

21    A.   When I first saw him, we were at 69th and Ashland.  And we

22    began to turn southbound.  And that's when we observed him on

23    the east side of the street.  And that's when we saw him

24    walking with his fists, and he was balled up like this

25    walking.  And he was by the curb, by the grass.

M. Hernandez - direct

34

```
 1              And he was shouting.  As I got closer, I was able to
 2   figure out what he was shouting at passing motorists.  But at
 3   the same time, I was driving.  I was driving.  I didn't want
 4   to get into an accident.  So I was looking in my rearview
 5   mirror, looking in my side mirrors.
 6   Q.  So you were -- you were observing him during this entire
 7   one to two minutes?
 8   A.  No.  That's what I just said, I wasn't -- I couldn't
 9   observe him for one to two minutes --
10   Q.  Because you were driving?
11   A.  -- because I was driving.  And I was looking in my
12   mirrors, my rearview mirrors and my side mirrors.  We were on
13   Ashland Avenue, which is a busy street.
14   Q.  Sure.
15   A.  Even at 3:30 in the morning, it's busy.
16   Q.  And then you made -- did you make a U-turn on Ashland
17   Avenue, is that what you did?
18   A.  Yes, I did.
19   Q.  Okay.  And you didn't have a video in your car, did you?
20   A.  No.
21   Q.  If you had a video in your car, it would have captured
22   what happened next, wouldn't it have?
23              MR. GAINER:  Objection, calls for speculation.
24              THE COURT:  Objection sustained.  You can argue.
25   BY MR. SHAPIRO:
```

M. Hernandez - direct

1   Q.  Okay.  You didn't see -- again, you didn't see yourself

2   Mr. Hernandez walking in and out of traffic, did you?

3   A.  No, I didn't see him walking in and out of traffic.

4   Q.  And you just noticed him by street, by the curb; is that

5   right?

6   A.  By the curb shouting the profanities, the racial slurs --

7   Q.  Okay.

8   A.  -- with his fists balled up --

9   Q.  You've answered my question, Officer Hernandez.  I was

10  just asking where he stood, not what he was saying.

11  A.  Okay.

12  Q.  Okay.  You noticed him standing by the street or by the

13  curb, correct?

14  A.  Walking, yes.

15  Q.  Walking.  Okay.

16  A.  Not standing.

17  Q.  And your testimony is that he was walking like he just got

18  beat up or got in a fight; is that right?

19  A.  Yes.

20  Q.  Okay.  Because you could tell that he was on edge by his

21  expression, by his fists being balled up; isn't that correct?

22  A.  His expression, his fists being balled up, his yelling,

23  his belligerentness, and his walking like this.

24  Q.  Okay.

25  A.  So there were a few things.

M. Hernandez - direct

36

```
 1   Q.  You didn't see any cars swerving out of the way to avoid

 2   him, did you?

 3   A.  No, I didn't see swerving.

 4   Q.  They were just slowing down and driving; isn't that right?

 5   A.  Yes.

 6   Q.  And you thought Mr. Hernandez was out of place, did you

 7   not?

 8   A.  Yes.

 9   Q.  And by that, you meant an Hispanic guy in an all-black

10   neighborhood; isn't that right?

11   A.  Shouting racial slurs, yes.

12   Q.  Okay.  Well, aside from shouting racial slurs, you thought

13   Mr. Hernandez was out of place just because he was a Hispanic

14   guy in an all-black neighborhood, right?

15   A.  Yes.

16   Q.  Okay.  And to you that's out of place, correct?

17          MR. GAINER:  Asked and answered multiple times.

18          THE COURT:  Objection sustained.

19   BY MR. SHAPIRO:

20   Q.  Okay.  Now, Officer, there's nothing illegal about being

21   Hispanic in an all-black neighborhood, is there?

22   A.  Nothing illegal, no.

23   Q.  Okay.  In fact, I don't know -- are you aware that

24   Mr. Armando Hernandez actually lives in an all-black

25   neighborhood?
```

M. Hernandez - direct

 1    A.   I'm not sure where he lives.

 2    Q.   Okay.  You just felt he was out of place, right?

 3    A.   He was out of place for his actions that I repeatedly

 4    explained.  And he was out of race -- out of place for being a

 5    male Hispanic doing the actions that I explained a few times

 6    already --

 7    Q.   Okay.

 8    A.   -- in a predominantly African-American neighborhood.  Yes,

 9    to me that's out of place.

10    Q.   Okay.  So if a black or Hispanic person was on the north

11    side in Lincoln Park, you would stop him too; is that right?

12              MR. GAINER:  Objection, argumentative.

13              THE COURT:  Objection sustained.

14    BY MR. SHAPIRO:

15    Q.   Then your partner -- you and your partner ordered him to

16    take his hands out of his pocket; is that correct?

17    A.   Yes, we did.

18    Q.   And you weren't going to arrest him; there's nothing

19    illegal about putting your hands in your pocket, is there?

20    A.   No, but it was a safety concern.

21    Q.   I understand.  You weren't going to arrest him for putting

22    his hands in his pocket, were you?

23    A.   Not for putting his hands in his pocket.

24    Q.   And he didn't take his hands out of his pockets, did he?

25    A.   No, he didn't.

M. Hernandez - direct

38

```
 1  Q.  And that made you upset, didn't it?
 2  A.  No.  It made me concerned for my safety and my partner's
 3  safety because I didn't know what he was concealing in his
 4  pockets.
 5  Q.  Okay.  And you weren't upset by that as well?
 6  A.  No.  I was concerned.
 7  Q.  And he didn't walk toward you, did he?
 8  A.  No, he didn't.  He stood there.
 9  Q.  You just wanted to make sure he wasn't reaching for a
10  weapon; is that correct?
11  A.  I wanted to make sure he wasn't concealing a weapon, yes.
12  Q.  But he didn't have a gun or a knife on him, did he?
13  A.  No, he didn't.
14  Q.  You thought he was drunk, did you not?
15  A.  I wasn't sure what he was.
16  Q.  Okay.
17  A.  I wasn't sure.
18  Q.  You didn't think he was drunk?
19  A.  Initially, I wasn't sure.
20  Q.  Okay.  You didn't -- you didn't perform a breathalyzer on
21  Armando at any time, did you?
22  A.  No, I didn't.
23  Q.  Okay.  And Armando never punched you, did he?
24  A.  Punched me, no.
25  Q.  And you say he mule kicked you; is that right?
```

M. Hernandez - direct

1   A.   Yes.

2   Q.   Okay.  And by mule kick, you mean kicking, kicking

3   backwards with his legs --

4   A.   Yes.

5   Q.   -- is that right?

6        We're going to get to that a little bit later.

7   A.   Okay.

8   Q.   You never completed a contact card for anyone on July

9   22nd, did you?

10  A.   I don't remember.

11  Q.   You don't remember?

12  A.   No.

13  Q.   Let me show you your request to admit facts, see if that

14  refreshes your recollection if I can turn to it here.

15        THE COURT:  Why don't you just read it to him.

16        MR. SHAPIRO:  Thank you, your Honor.  I will.

17        No. 42, counsel.

18  BY MR. SHAPIRO:

19  Q.   Okay.  No. 42 reads:  "You did not complete a contact card

20  for any individual on July 22nd, 2012."  Response, "admitted."

21        Do you recall signing that, those requests to admit,

22  Officer?

23  A.   I don't understand what you're asking, to be honest with

24  you.

25  Q.   I guess my question is just, you didn't complete a contact

M. Hernandez - direct

 1   card for any individual on July 22nd, 2012, did you?

 2   A.  Not that I recall.  I worked 12 hours that day.

 3   Q.  Okay.  That's all I was asking.

 4        And he never -- Armando never fled from arrest, did

 5   he?

 6   A.  No.

 7   Q.  Okay.  And you and your partner, Officer McClain, took

 8   Armando's hands out of his pocket when he refused to do so

 9   himself; isn't that correct?

10   A.  Yes.

11   Q.  And once you got his hands out of his -- once you got his

12   hands out of his pockets, you and Officer McClain, I should

13   say, you cuffed him; is that right?

14   A.  Yes.

15   Q.  And you cuffed him because he refused to take his hands

16   out of his pockets, right?

17   A.  I cuffed him because at that time I didn't know what he

18   had in his pockets when I pulled his hands out.  There could

19   have still been a weapon in there for all I knew.  So I cuffed

20   him for my safety and my partner's safety.

21   Q.  But the reason you cuffed him is because he refused to

22   take his hands out of his pockets; isn't that right?

23   A.  I --

24        MR. GAINER:  Objection, asked and answered, Judge.

25        MR. SHAPIRO:  Okay.  If that's his answer, then Page

M. Hernandez - direct

41

1   36, Lines 9 through 10.

2   BY MR. SHAPIRO:

3   Q.  Officer Hernandez, question -- do you remember giving a

4   deposition in this case?

5   A.  Yes.

6   Q.  And you remember being sworn to tell the truth, the whole

7   truth, and nothing but the truth just like you were today?

8   A.  Yes, I do.

9   Q.  And you remember a court reporter being present at the

10  deposition just like there is one here today?

11  A.  Yes, I do.

12  Q.  And do you remember being asked this question and giving

13  this answer:

14          "After you and your partner were able to get his

15      hands out of his pockets, what happened then?"

16          "And once -- and then once we got them out, I cuffed

17      him.  I put handcuffs on him."

18          MR. GAINER:  Objection.

19          MR. SHAPIRO:  Is that right?

20          MR. GAINER:  Not impeaching, your Honor, not even

21  close.

22          MR. SHAPIRO:  Well --

23          THE COURT:  That's exactly what he testified, I

24  think, isn't it?

25          MR. SHAPIRO:  I don't think so, your Honor.

M. Hernandez - direct

 1          THE COURT:  Pretty close.

 2          MR. SHAPIRO:  Well --

 3          THE COURT:  I'll let it stand.  The jurors can --

 4          MR. SHAPIRO:  I'm sorry.  You know what, I apologize.

 5  You know, I read the wrong -- I was reading from the wrong

 6  deposition.  My apologies, your Honor.  It should be Page 40,

 7  Lines 2 through 4.  I apologize.

 8  BY MR. SHAPIRO:

 9  Q.  And the question is, on Page 40, Line 2, Officer:

10          "Why did you decide to handcuff him?

11          "Answer:  Because he wasn't complying with taking his

12    hands out of his pockets."

13  A.  Right, which made me unsafe, which made me feel unsafe for

14  me and my partner.

15  Q.  Okay.  I understand the reason, Officer Hernandez.  But

16  I'm just asking you, didn't you decide to handcuff him because

17  he wasn't complying with taking his hands out of his pockets?

18  A.  Yes, and --

19  Q.  Okay.

20  A.  -- in addition --

21  Q.  You've answered the question, Officer Hernandez.  Thank

22  you very much.  That's the only thing I was asking you.

23          MR. GAINER:  Your Honor, I'd like the witness to be

24  allowed to finish what he was saying.

25          THE COURT:  Frankly, I didn't see where there was any

M. Hernandez - direct

1   difference between what he testified.

2          MR. SHAPIRO:  Well, your Honor, originally I was on

3   the wrong page, wrong question, wrong page of the deposition.

4   The next --

5          THE COURT:  Okay.  Let's move on.

6          MR. SHAPIRO:  Thank you, your Honor.

7   BY MR. SHAPIRO:

8   Q.  And he stiffened his body when you cuffed him, did he not?

9   A.  He stiffened when I pulled -- when we pulled his arms out.

10  And then once we put him in cuffs, he was moving a little bit,

11  shifting around.

12  Q.  Okay.  But you never checked the box on the tactical

13  response report that he stiffened, did you?

14  A.  I don't -- I don't believe I did.

15  Q.  I'm sorry?

16  A.  What was your question?

17  Q.  My question was, you never checked the box on the tactical

18  response report that he stiffened up, did you?

19  A.  Well, the tactical response report is -- documents the

20  actions that I took when Armando Hernandez began to kick me.

21  Q.  Okay.  Well, let me again turn your attention to Page 110,

22  Lines 18 through 20, Counsel, of your deposition.

23          And this time I think I have the right page and line

24  numbers.  Did you -- were you asked this question and you gave

25  this answer:

 1            "And stiffened," in quote, parenthesis, "dead weight,

 2      is not checked; is that correct?"

 3            "Correct, on the tactical response -- on the TRR."

 4            Did you give that answer to that question?

 5   A.  Yes.  I didn't --

 6            MR. GAINER:  That's not impeaching, your Honor.

 7   That's exactly what he said.

 8            THE COURT:  I'll let it stand.

 9            MR. SHAPIRO:  Thank you, your Honor.

10   BY MR. SHAPIRO:

11   Q.  So you didn't check the box on the tactical response form,

12   did you?

13   A.  I didn't because the tactical response report documents

14   the actions --

15   Q.  Officer Hernandez, please answer my question.  I'm not

16   asking you why you didn't.

17   A.  Okay.

18   Q.  I'm just asking you that you didn't, right?

19   A.  Okay.

20   Q.  And you don't know why you didn't check that box, do you?

21   A.  I thought I just explained that the reason I didn't is

22   because it's -- it documents what I did when Armando Hernandez

23   began to kick me.

24   Q.  Counsel, Page 111, Lines 1 through 2.  Question --

25   actually, Page -- the bottom of Page 110 to the top of Page

M. Hernandez - direct

1    111:

2              "Question:  So why did you not check the box for

3       stiff and dead weight?

4              "Answer:  I don't know.  I don't know."

5              Did you give that answer to that question, Officer

6    Hernandez?

7    A.  I probably did say I didn't know.

8    Q.  Okay.  But now you know?

9    A.  I may have been confused at the time when you were asking.

10   Q.  What was confusing about the question, why did you not

11   check the box for stiff and dead weight?

12   A.  Well, because at the time when I was giving the

13   deposition, Ms. Grieb, she was pointing to the TRR, the

14   tactical response report, but at the same time asking me the

15   events that happened prior to Armando Hernandez kicking me and

16   my partner.

17             So I thought I understood the question at the time

18   but it -- it's a report that documents when he started

19   kicking.

20   Q.  Well, if you were confused by the question at the time, do

21   you recall Ms. Grieb asking you at the beginning of the

22   deposition that if there were any questions that you didn't

23   hear or understand to please ask her to restate it or rephrase

24   it?

25   A.  As I said, I thought I understood it at the time --

M. Hernandez - direct

46

1   Q.  Okay.

2   A.  -- that I answered it.

3   Q.  But you didn't?

4   A.  No, I must not have understood it completely.

5   Q.  And you didn't consider Mr. -- or Armando Hernandez,

6   rather, to be under arrest at that point, did you?

7   A.  At what point, sir?

8   Q.  At the point that you put the handcuffs on him.

9   A.  No.  We were still trying to figure out what his deal was.

10  Q.  Okay.  And part of trying to figure out what his deal was,

11  was putting the handcuffs on him because he refused to take

12  his hands out of his pockets, right?

13  A.  Yes.

14          MR. GAINER:  Object to form, asked and answered.

15          THE COURT:  I think we have gone over all of that.

16          MR. SHAPIRO:  I'm sorry, your Honor?

17          THE COURT:  Go ahead.

18          MR. SHAPIRO:  Thank you, your Honor.

19  BY MR. SHAPIRO:

20  Q.  You -- at the time you put the cuffs on him because he

21  didn't take his hands out of his pockets, you didn't consider

22  him to be under arrest, did you?

23          MR. GAINER:  Asked and answered --

24          THE COURT:  Yes.

25          MR. GAINER:  -- just now.

                          M. Hernandez - direct
                                                                        47

     1              THE COURT:  He answered that.

     2              MR. SHAPIRO:  I didn't hear the answer, your Honor.

     3      Did he --

     4              THE COURT:  He said he did not consider him at that

     5      point.

     6              MR. SHAPIRO:  I'm sorry.  I didn't -- thank you, your

     7      Honor.  I did not hear that.

     8      BY MR. SHAPIRO:

     9      Q.  And was he -- was he free to leave at that point after you

    10      had the cuffs on him?

    11      A.  At that point, we were concerned about his safety.

    12      Q.  Okay.

    13      A.  Okay.

    14      Q.  But my question -- that wasn't my question, Officer

    15      Hernandez.  I understand you want to answer the question that

    16      you want to answer.  And your lawyer will probably give you an

    17      opportunity to do that after I'm through.  But my question

    18      was --

    19              MR. GAINER:  Your Honor, I object, arguing --

    20              THE COURT:  Let's just proceed with the questions.

    21              MR. SHAPIRO:  I'm trying to, your Honor, but I'm not

    22      getting an answer to my question.

    23      BY MR. SHAPIRO:

    24      Q.  Officer Hernandez, was Armando Hernandez free to leave

    25      after you put the cuffs on him?

1   A.  I didn't even think about allowing him to go.  That wasn't

2   even -- I wasn't saying, okay, he can leave or he's got to

3   stay.  Our concern was, what is his deal, what's causing this

4   because this was such bizarre behavior.

5   Q.  Okay.  So is that a no?

6   A.  It's -- I don't know.  I didn't think about it.  I

7   didn't -- that wasn't even a question in my mind.

8   Q.  Okay.  Was -- my question was a simple one, Officer

9   Hernandez, I think.  Was he free to leave after you put the

10  cuffs on him?

11          THE COURT:  I think he's answered the best he can and

12  you'll have to live with that.

13          MR. SHAPIRO:  I didn't think I got an answer, your

14  Honor, to be honest with you.

15          THE COURT:  He said he didn't think about it whether

16  he was free to leave or not.

17  BY MR. SHAPIRO:

18  Q.  Okay.  You didn't think it?

19  A.  That question --

20          THE COURT:  He had handcuffs on --

21          THE WITNESS:  -- didn't even cross my mind at the

22  time.

23  BY MR. SHAPIRO:

24  Q.  Okay.  Well, thinking about it now, was he free to leave

25  after you put the cuffs on him?

 1          MR. GAINER:  Your Honor, in addition to the speeches

 2    counsel is making, I think --

 3          THE COURT:  I think he's answered the question, so

 4    let's move on.

 5          MR. SHAPIRO:  I will move on, your Honor.

 6    BY MR. SHAPIRO:

 7    Q.  And at that point, I sort of asked you about Armando

 8    Hernandez mule kicking you.  He started mule kicking you, is

 9    that right, after you put the cuffs on him; is that right?

10    A.  Yes.

11    Q.  And by mule kicking, you mean like a mule or a donkey

12    would kick, kick you behind; is that right?

13    A.  Yes.

14    Q.  Okay.  And he was mule kicking, your testimony is that he

15    was mule kicking both you and your partner, Officer McClain;

16    is that right?

17    A.  He began to mule kick me.  And my partner alerted me to

18    it.  She's like, "Mark, he's kicking me."

19          And then at that point I felt a kick like brush my

20    pant leg.  And I seen him kicking.

21    Q.  Okay.  You saw him mule kicking you; is that right?

22    A.  Yes.

23    Q.  And he brushed your pant leg with one of his mule kicks?

24    A.  Yes.

25    Q.  Okay.  But he didn't hit you flush on the leg with any of

M. Hernandez - direct

50

1   his mule kicks?

2   A.  No, he didn't.

3   Q.  Okay.  And at that point you grabbed his leg; is that

4   right?

5   A.  Yes, I did.

6   Q.  Okay.  You grabbed around the knee area, is that where you

7   grabbed?

8   A.  No, I grabbed his ankle.

9   Q.  You grabbed his ankle.  Okay.

10  A.  While it was still in the air kicking me.

11  Q.  Okay.  In the middle of one of his mule kicks?

12  A.  Yes.

13  Q.  Okay.  And that's, you did that so you and your partner

14  wouldn't get mule kicked any more; is that right?

15  A.  Correct.

16  Q.  And then you grabbed his back or shoulder area; is that

17  right?

18  A.  Yes.  With my left hand, I grabbed his -- one of his

19  ankles.  I don't recall which one.  And then with my right

20  hand, I grabbed his shoulder or back area.  I don't recall.

21  Q.  Okay.  That was my question.  With the other hand, you

22  grabbed his back or shoulder area, you don't recall which,

23  right?

24  A.  Correct.  I don't recall.

25  Q.  Okay.  And then you proceeded to escort him to the ground;

M. Hernandez - direct

51

```
 1   is that right?
 2   A.  I took him -- yes, I took him to the ground.
 3   Q.  Okay.  You escorted him to the ground?
 4   A.  Yes.
 5   Q.  Those are your words, right?
 6   A.  Yes.
 7   Q.  And you did that so you and your partner would not get
 8   kicked anymore; is that right?
 9   A.  Yes.
10   Q.  And you're 5 foot 11, aren't you?
11   A.  Yes.
12   Q.  All right.  And you weigh 230 pounds?
13   A.  Yes.  I think I was 220 at the time of the incident.
14   Q.  So you put on a little weight since then.
15   A.  Okay.
16   Q.  A couple of pounds in the last couple of years.
17   A.  Sure.
18   Q.  But you were 220 at the time?
19   A.  Yes.
20   Q.  Fighting weight.
21   A.  I guess if that's what you want to call it.
22            MR. GAINER:  Objection.
23   BY MR. SHAPIRO:
24   Q.  Withdrawn.  And he never tried to take a swing at he, did
25   he, Mr. Hernandez, Armando Hernandez?
```

M. Hernandez - direct

52

1        MR. GAINER:  That's been asked and answered three

2    times, your Honor.

3        MR. SHAPIRO:  Well, I don't know about three times,

4    your Honor.  I'll withdraw the question.

5    BY MR. SHAPIRO:

6    Q.  He never pushed you, did he?

7    A.  No.

8    Q.  And he never tried to punch your partner, Officer McClain,

9    did he?

10   A.  No.

11   Q.  And when you escorted Mr. -- Armando Hernandez to the

12   ground, you came down with your knee first to try and pad his

13   fall; is that right?

14   A.  Yes.

15   Q.  Okay.  And you -- when you escorted him to the ground by

16   grabbing his leg and his shoulder or back area and going to

17   your right; is that correct?

18   A.  Yes.

19   Q.  Towards your right?

20   A.  Yes, to my right.

21   Q.  Sort of a spinning motion?

22   A.  A pivoting motion, I guess.

23   Q.  Pivoting motion.  Okay.  You never warned him that you

24   were going to bring him to the ground, did you?

25   A.  No.

M. Hernandez - direct

53

```
1   Q.  Okay.  And you never swept his feet out from under him?

2   A.  No.

3   Q.  And he was in handcuffs when you escorted him down, wasn't

4   he?

5   A.  Yes, he was.

6   Q.  And you came down with your knee first to try and pad the

7   fall, did you not?

8   A.  Yes.

9   Q.  And his whole upper torso area hit the ground; is that

10  right?

11  A.  Yes, his front.

12  Q.  But you never saw Mr. Hernandez's face hit the ground; is

13  that right?

14  A.  I did not.

15  Q.  Okay.  And this was in the grass --

16  A.  Yes.

17  Q.  -- that he came down?

18  A.  The grass, the parkway.

19  Q.  This maneuver is called a takedown; is that right?

20  A.  Yes.

21  Q.  You didn't have any OC spray on you at that time, right?

22  A.  No, I didn't.

23  Q.  You don't use OC spray, right?

24  A.  No.

25  Q.  Okay.  And you didn't have access to a taser gun at the
```

M. Hernandez - direct

54

1    time?

2    A.  No.

3    Q.  A taser.

4         So after you took him down, you just kind of rolled

5    him over, made him sit on his butt and escorted him back up to

6    his feet; is that right?

7         Let me break that down a little bit.

8    A.  Yeah.

9    Q.  After you took him down, you just rolled him over, right?

10   A.  After I took him down, I remember I kept my hand on his

11   back because he was trying to get back up to his feet.

12   Q.  And you rolled him over, right?

13   A.  No.  I --

14   Q.  You didn't roll him over?

15        MR. GAINER:  Your Honor, I'd like for the witness to

16   be able to finish his answer before counsel asks his next

17   question.

18        MR. SHAPIRO:  Well, I'd like to hear his answer, too,

19   your Honor, but I'd like to hear an answer to my question, not

20   his question.

21        THE COURT:  Go ahead.  Ask another question.

22        MR. SHAPIRO:  Thank you, your Honor.

23   BY MR. SHAPIRO:

24   Q.  After you took Mr. -- Armando Hernandez down, you just

25   kind of rolled him over, didn't you?

M. Hernandez - direct

55

1   A.  Yes.

2   Q.  And you made him sit on his butt, right?

3   A.  Yes.

4   Q.  And then you escorted him back up to his feet; isn't that

5   right?

6   A.  Yes.

7   Q.  And when you brought Armando to his feet, it was your

8   intention to arrest him at that point; isn't that right?

9   A.  At that point, yes.

10  Q.  Okay.  And it was your intention to arrest him because of

11  the obscenities, because he was in the street, and because he

12  did not comply with your verbal direction, correct?

13  A.  I could have also charged him with numerous other charges

14  in addition to that one that you just mentioned, but yes.

15  Q.  Well, I actually didn't mention the charge that you

16  ultimately charged him with, the reckless conduct charge.  I

17  just -- I just asked you the reason, your intent to arrest him

18  was because of the obscenities, right?

19  A.  Yes.

20  Q.  And because he was in the street, right?

21  A.  Yes.

22  Q.  All right.  You didn't see him -- and once again, you

23  didn't see him in the street but you testified that your

24  partner, Officer McClain, saw him in the street?

25  A.  Yes.

M. Hernandez - direct

56

1    Q.   Okay.  So based on what you understood her to see, your

2    understanding of what she saw, you were going to arrest him

3    for being in the street; is that right?

4    A.   Yes.

5    Q.   Okay.  And because he did not comply with your verbal

6    direction to remove his hands from his pocket, right?

7    A.   I'm sorry.  I don't understand what you're asking.

8    Q.   Okay.  You had three -- you intended to arrest him because

9    of the obscenities, because he was in the street, and because

10   he didn't comply with your verbal direction to remove his

11   hands from his pocket; isn't that right?

12            Obscenities, in the street, failure to comply --

13   A.   Yes.

14   Q.   -- with your directions to take his hands out of his

15   pockets, right?

16   A.   Yes.

17   Q.   Three things.  And let's go back a little bit, Officer.

18   You said you could have charged him with numerous other things

19   like battery; is that right?

20   A.   Like aggravated battery to a police officer.

21   Q.   To a police officer.

22   A.   Aggravated assault to a police officer.

23   Q.   And you later decided not to do that because you wanted to

24   give the guy a break; is that right?

25   A.   Ultimately, yes.

M. Hernandez - direct

57

1   Q.   Ultimately.  And he -- you testified that he just grazed

2   your pant leg when he mule kicked you, right?

3   A.   Yes.

4   Q.   Okay.  And you didn't notice any marks on his face when

5   you stood him up after the takedown, right?

6   A.   I didn't notice any marks.

7   Q.   You didn't notice any blood on his face, did you?

8   A.   No, I didn't.

9   Q.   You only saw dirt and grass on his face around his

10  forehead area; is that right?

11  A.   Yes, and his shirt.

12  Q.   And his shirt?

13  A.   Yes.  I think there was dirt on his shirt.

14  Q.   And you helped brush him off after you got him up?

15  A.   My partner did.

16  Q.   Your partner did?

17  A.   Yes.

18  Q.   You didn't?

19  A.   No.

20  Q.   Okay.  And but you later saw some redness in his forehead

21  area and maybe around his cheeks; is that right?

22  A.   Once we got into the lockup and the lighting was better,

23  yes.

24  Q.   So you didn't see that at the scene?

25  A.   No.

M. Hernandez - direct

1   Q.  You only saw that back at the lockup?

2   A.  Yes.

3   Q.  All right.  And you didn't see any blood, though, at any

4   time, did you?

5   A.  I never saw any blood.

6   Q.  Okay.  And you didn't see any bruising?

7   A.  Just redness but no bruising.

8   Q.  Just redness, no bruising?

9   A.  No.

10  Q.  And it just looked like minor abrasions to you around his

11  forehead area; is that right?

12  A.  Yes.

13  Q.  And you didn't remember anything on his nose, did you?

14  A.  No, I don't remember anything on his nose.

15  Q.  And you don't remember anything on his cheeks, right?

16  A.  I thought in my dep I said a little bit of redness in his

17  cheek.  But yeah, I remember a little bit of forehead and I

18  remember something around his cheek or face area.

19  Q.  You do remember something on his cheeks?

20  A.  Yes.

21  Q.  All right.  Turn to Page 77, counsel, Lines 8 through 9.

22          Okay.  Did you give an answer to this -- do you

23  remember this question and giving an answer to the following

24  question:

25          "Did you see anything on his cheeks?"  Line 8.

M. Hernandez - direct

59

1          "Answer:  I don't remember.  For some reason, the

2      forehead area stuck out in my mind."

3   A.  Yes, yes.

4   Q.  Okay.  So you don't remember seeing anything on his cheeks

5   at that time, right?

6   A.  I thought I remember a little bit of redness on one of his

7   cheeks.

8   Q.  Okay.  So now you remember?

9   A.  I'm just saying that I do -- I do remember a little bit of

10  redness on his cheeks.

11  Q.  Okay.

12  A.  One of his cheeks.

13  Q.  But you -- you still didn't see any blood, though, right?

14  A.  No.

15  Q.  And you never saw any blood on his shirt?

16  A.  No.

17  Q.  You never saw any blood in his mouth?

18  A.  No.

19  Q.  You never saw any blood on him at all, right?

20  A.  No, I didn't.

21  Q.  And you think Armando said no when you asked if he wanted

22  to go to the hospital; is that correct?

23  A.  Yeah, I think he said no.  I know my partner asked when we

24  were in the vehicle, and I'm pretty sure he said no.

25  Q.  Okay.  So someone asked him if he wanted to go to the

1    hospital, right?

2    A.  Numerous people asked him if he wanted to go to the

3    hospital.

4    Q.  Okay.  Were you one of them?

5    A.  No.

6    Q.  Okay.  Did you hear -- did you hear your partner ask him

7    if he wanted to go to the hospital?

8    A.  Yes.

9    Q.  Okay.  And that's because of the redness you saw on his

10   forehead; is that right?

11            MR. GAINER:  Objection, calls for speculation.

12            MR. SHAPIRO:  Well, withdrawn.

13            THE COURT:  Well, yes, he --

14            MR. SHAPIRO:  Withdrawn.

15   BY MR. SHAPIRO:

16   Q.  And you later said that Mr. Hernandez suffered, quote,

17   minor swelling to his forehead; is that right?

18   A.  Yes.

19   Q.  In your arrest report you said that, in your incident

20   narrative, right?

21   A.  Yes, I believe so.

22   Q.  By the way, in your incident narrative you didn't say

23   anything about him balling his fists up, did you?

24   A.  I don't recall.

25   Q.  Okay.  And the arrest report doesn't contain any

M. Hernandez - direct

61

1   inaccuracies, does it?

2   A.   Are you talking about the --

3   Q.   The incident report, the incident narrative.

4   A.   The narrative of the report is a summary of the events

5   that took place.

6   Q.   Okay.  So it's a summary but --

7   A.   It's a summary.

8   Q.   So it doesn't include everything?

9   A.   No.  It's just a summary.

10  Q.   Okay.  But anything that's in the summary wouldn't be

11  inaccurate, would it?

12  A.   No, nothing in the summary.

13  Q.   And you signed it, right, signed the arrest report, the

14  incident narrative?

15  A.   The arrest report?  The arrest report is electronically.

16  I didn't sign the arrest report.

17  Q.   You didn't sign the arrest report?

18  A.   No.

19  Q.   Even electronically?

20  A.   Well, our pass codes, I guess -- yes, I guess the pass

21  codes are considered electronic signing, I guess.

22  Q.   Okay.  And by electronically signing it, you declared and

23  affirmed under penalty of perjury that the facts stated in the

24  incident narrative were accurate to the best of your

25  knowledge, information, and belief, correct?

M. Hernandez - direct

62

1   A.  Yes.

2   Q.  All right.

3        Okay.  All right.  Officer Hernandez, I want to show

4   you what's already been marked and admitted in evidence as

5   Plaintiff's Exhibit No. 13.  Can you take a look at that and

6   let me know when you're finished?

7   A.  Okay.

8   Q.  Okay.  And does Exhibit 13 accurately depict the bruising

9   and swelling -- I'm sorry, strike that -- the redness to his

10  forehead that evening?

11  A.  No.

12  Q.  It does not?

13  A.  No.

14  Q.  Okay.  And Exhibit 13 also appears to depict some redness

15  and scratches on his nose, does it not?

16  A.  That's what the picture depicts, yes.

17  Q.  The picture depicts.  And does that not truly and

18  accurately depict how Mr. Hernandez or Armando Hernandez

19  looked that evening?

20  A.  Not from what I observed.

21  Q.  So he did not look like this when you observed him?

22  A.  No, he did not.

23  Q.  Even the bruising, the redness on his forehead, right?

24  A.  It was a lot more minor than that.

25  Q.  Okay.  And let me show you what's been marked and admitted

1    in evidence as Plaintiff's Exhibit No. 50 and ask you to take

2    a look at that.

3            What does that depict?

4    A.   The inside of his lower lip.

5    Q.   Okay.  And it's bloody, isn't it?

6    A.   In the picture, it is.

7    Q.   Okay.  And it wasn't bloody on that night?

8    A.   No.

9    Q.   Okay.  There's no blood dripping from his mouth at that

10   time?

11   A.   I didn't see any blood dripping from him at all.

12   Q.   Okay.  Let me show you what's been marked and admitted in

13   evidence as Plaintiff's Exhibit No. 16 and ask you to take a

14   look at that.

15           Does that appear to be the back of Armando's neck?

16   A.   It looks like the back of someone's neck.  I can't see

17   Armando's face in that picture at all.

18   Q.   That's true.  Were there any -- were there any scratches

19   or marks on the back of Armando Hernandez's neck --

20   A.   I never --

21   Q.   -- on that evening?

22   A.   -- observed any scratches on his neck.

23   Q.   Okay.

24           MR. GAINER:  Your Honor, I'm not sure the jury ought

25   to be -- have those pictures right now.

M. Hernandez - direct

 1            THE COURT:  Is there any reason to -- they've already

 2    looked at them.

 3            MR. SHAPIRO:  Oh, they were in the jury box already.

 4            THE COURT:  They should be removed.

 5            MR. SHAPIRO:  Oh, okay.

 6            THE COURT:  After you publish them, they should be --

 7            MR. SHAPIRO:  I was just -- I was just putting them

 8    back where they were.

 9    BY MR. SHAPIRO:

10    Q.  And let me show you what's already been marked and

11    admitted -- I don't know about marked but admitted in evidence

12    as Plaintiff's Exhibit 49, I believe it was.

13            Do you recognize this shirt, Officer Hernandez?

14    A.  It looks like a white T-shirt.

15    Q.  Okay.  Do you recognize this as the T-shirt that Armando

16    Hernandez was swearing that night?

17    A.  I don't know if he was wearing that shirt or not.

18    Q.  Does -- does the -- did -- the bloodstains on this shirt,

19    was that the way his shirt appeared to you that evening?

20    A.  I don't recall ever seeing any blood on him or his shirt.

21    Q.  Okay.  So this did not -- this did not look like the shirt

22    that he was wearing on the night of the incident, is that

23    right, or the morning of the incident?

24    A.  Again, I don't know whose shirt that belongs to.

25    Q.  Okay.  But his shirt did not look like this on the morning

M. Hernandez - direct

65

 1    of the incident?

 2    A.  I don't remember what his shirt looked like.

 3              MR. GAINER:  Asked and answered.

 4              MR. SHAPIRO:  I don't think he did.

 5              THE COURT:  Well, he did now.

 6              MR. SHAPIRO:  Thank you, your Honor.

 7    BY MR. SHAPIRO:

 8    Q.  And let me show you what's already been marked and

 9    admitted into evidence as Plaintiff's Exhibit No. 50.

10              Do you recognize these, sir?

11    A.  I recognize them to be a pair of shorts.

12    Q.  Okay.  You don't recognize them to be the pair of shorts

13    that Armando Hernandez was wearing on the morning of July

14    22nd, 2012?

15    A.  I don't recall what he was wearing.

16    Q.  Okay.  Do you recall the -- any blood spatter on the

17    shorts indicated here?

18    A.  No, I don't.

19    Q.  Okay.  You were not injured that night, were you?

20    A.  No, I wasn't.

21    Q.  You weren't injured by the mule kicking or anything else

22    that Mr. Hernandez did, right?

23    A.  No, I wasn't.

24    Q.  And your partner wasn't injured either, was she?

25    A.  No, she wasn't.

M. Hernandez - direct

66

1   Q.  And you decided to charge Armando with reckless conduct

2   that evening, later that evening, right?

3   A.  Later that evening, yes.

4   Q.  Okay.  And you understood that by charging Armando with a

5   misdemeanor that he'd have to hire a lawyer, right?

6   A.  Yes, yes.

7   Q.  And that he would have to go to court and fight the

8   allegations, correct?

9   A.  Yes.

10  Q.  And you understand he can be potentially sentenced up to a

11  year in jail for a misdemeanor; isn't that right?

12  A.  Possibly.

13  Q.  Okay.  That's the maximum penalty for it, right?

14  A.  I believe it's the maximum, yes.

15  Q.  Okay.  But you never went to court on that charge, did

16  you?

17  A.  I was never notified to go to court on that charge.

18  Q.  I understand.  Well, you could have gone in your computer

19  system and see what court notifications were sent to you,

20  couldn't you have?

21  A.  I could have and I do on a regular basis.

22  Q.  Okay.  But you didn't for this case, did you?

23  A.  I don't -- when this case was over, I -- it just fell off

24  my radar.  I didn't recall anything else after this case was

25  over.

M. Hernandez - direct

1   Q.   Okay.

2   A.   What I can tell you is that I do check my courts

3   periodically.  And at the beginning of every single roll call,

4   the first thing we go over in roll call are all of our court

5   notifications that are distributed to us by our sergeant.

6   Q.   Okay.  And did you, in fact, check your court

7   notifications, take the initiative to check your court

8   notifications yourself to see what court date was assigned for

9   this reckless conduct charge?

10  A.   I do it all the time.  I check my courts all the time.

11  Q.   Okay.  Did you do it this time?

12  A.   On July -- at the end of July of 2012, I'm sure I did

13  because I always do it.

14  Q.   Okay.  And so is it your testimony here today that because

15  you always do it that you would have checked and it wasn't in

16  the system?

17  A.   Yes.  I never seen it in the system.

18          MR. SHAPIRO:  One second.

19     (Pause.)

20  BY MR. SHAPIRO:

21  Q.   All right.  Officer Hernandez, let me show you what's been

22  marked as Plaintiff's Exhibit No. 64 and ask you to take a

23  look at this.  64, I think counsel has it.

24          Let me know when you're finished looking at it.

25  A.   Okay.

M. Hernandez - direct

68

```
 1   Q.  Can I have it back, please?

 2            Isn't -- isn't this a CLEAR notification for the

 3   Armando Hernandez case, Officer?

 4   A.  It's a court notification summary report.

 5   Q.  Okay.  Wouldn't this indicate that -- and isn't that your

 6   name under the court notification summary report, Mark J.

 7   Hernandez?

 8   A.  That is my name.

 9   Q.  J is your middle initial?

10   A.  Yes, it is.

11   Q.  Okay.  So wouldn't that indicate -- that would indicate

12   that Armando Hernandez's case was, in fact, in the system,

13   wouldn't it?

14   A.  That would --

15            MR. GAINER:  Objection to foundation.

16            MR. SHAPIRO:  Well --

17            THE COURT:  Overruled.  He can explain what it is or

18   what he understands it is.

19            MR. SHAPIRO:  Okay.  Thank you, your Honor.

20   BY MR. SHAPIRO:

21   Q.  All right.  What do you understand this to be, Officer

22   Hernandez?

23   A.  I understand that to be a court notification summary

24   report that's generated by a computer.

25   Q.  Okay.
```

1  A.  There's nowhere on that report that states when that

2  notification was ever generated.

3  Q.  Okay.  So your testimony is that you were never, in fact,

4  actually notified of the court date; is that right?

5  A.  That's correct.

6  Q.  And you didn't pick the court date yourself?

7  A.  I did pick the court date myself.

8  Q.  You did pick the court date yourself?

9  A.  I pick it -- our misdemeanor courts are on -- they're

10  assigned to us throughout the year.

11  Q.  On a court key date, right?

12  A.  That's correct, court key date.

13  Q.  A, B, C, D, E, F, G, right?

14  A.  Yes, sir.

15  Q.  And so you have designated court keys in which you appear

16  on all your assigned dates, right?

17  A.  Yes, sir.

18  Q.  So you have more than one case up on a given court key,

19  right?

20  A.  Sometimes, yes.

21  Q.  Sometimes you only have one?

22  A.  Sometimes I have one.  Sometimes I have five or six.

23  Q.  Okay.  So this case was set for your next court key date

24  on August 17th of 2012, wasn't it?

25  A.  Yes.

M. Hernandez - direct

1    Q.  All right.  And that's the date, in fact, that appears on

2    the court notification summary report, isn't it?  Take a look.

3    A.  Let me see.

4          Yes, it is, August 17th.

5    Q.  Why don't you leave that up there.

6          THE COURT:  Are you pretty close to finishing?

7          MR. SHAPIRO:  Very close, your Honor, yes, very

8    close.  I'll move it along.  Thank you.  I was looking at the

9    time myself.  Thank you, your Honor.  I know it's the witching

10   hour.

11   BY MR. SHAPIRO:

12   Q.  And because you failed to -- and you didn't appear on that

13   court date of August 17th, did you?

14         MR. GAINER:  Asked and answered.

15         THE COURT:  He already testified to that.

16   BY MR. SHAPIRO:

17   Q.  Okay.  Because you failed to appear for the court date,

18   the reckless conduct charge against Armando was dismissed,

19   wasn't it?

20   A.  I'm not sure what happened to it.

21   Q.  You don't know?

22   A.  I later found out that it was SOL'd but --

23   Q.  Okay.  That it was SOL'd, right?

24   A.  Yes.

25   Q.  And SOL stands for stricken off with leave to reinstate;

M. Hernandez - direct

71

1   is that right?

2   A.  I believe that's what it stands for.

3   Q.  Okay.  But you never tried to have the charges reinstated

4   against Armando, did you, after it was SOL'd?

5   A.  No, I didn't.

6   Q.  Okay.  But you know you can have charges reinstated after

7   an SOL, don't you?

8   A.  Yes, yes.

9        MR. SHAPIRO:  Okay.  One second, your Honor.  I

10  apologize.  I'm very close to being finished.

11    (Pause.)

12  BY MR. SHAPIRO:

13  Q.  Okay.  Officer Hernandez, let me show you what's been

14  marked as Plaintiff's Exhibit 4.

15        The misdemeanor complaint, counsel.

16        I ask you to take a look at this.  Let me know when

17  you're finished.

18  A.  Okay.

19  Q.  Is that your signature on the complaint?

20  A.  That's my name.  I actually asked my partner to sign it

21  for me.

22  Q.  Sign it for you.  So would the -- by your partner signing

23  for you, would that attest to -- would that suffice as your

24  signature to the facts alleged in the misdemeanor complaint?

25        Why don't you take a look.

M. Hernandez - direct

1  A.  Can you repeat that question?

2  Q.  Sure.  Let me rephrase it.  So by her signing for you, you

3  would be swearing to the allegations in the misdemeanor

4  complaint, wouldn't you?

5  A.  Yes.

6  Q.  Okay.  And the misdemeanor complaint says, Armando

7  Hernandez knowingly and intentionally performed actions which

8  could reasonably be expected to cause bodily injuries to

9  others; to wit, walking in and out of traffic, acting

10 belligerent, and shouting profanities.

11        You yourself didn't witness him walking in and out of

12 traffic, did you?

13        MR. GAINER:  Objection, your Honor.  I think --

14        THE COURT:  Objection sustained.  We've been through

15 that.

16        MR. SHAPIRO:  No further questions, your Honor.

17        THE COURT:  All right.  We'll have the

18 cross-examination in the morning.  10:00 tomorrow morning,

19 members of the jury.  Have a nice evening.  Please don't

20 discuss the case and don't get on social networks.

21   (Proceedings adjourned at 5:02 p.m. to 10:00 a.m.)

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3    ARMANDO HERNANDEZ,                )
                                        )
 4              Plaintiff,              )
                                        )
 5              v.                      )   No. 13 CV 00153
                                        )
 6    CHICAGO POLICE OFFICER HERNANDEZ,)    Chicago, Illinois
      et al.,                           )   May 28, 2014
 7                                      )   10:10 a.m.
                Defendants.             )
 8

 9                   EXCERPT TRANSCRIPT OF PROCEEDINGS

10         BEFORE THE HONORABLE HARRY D. LEINENWEBER AND A JURY

11    APPEARANCES:

12    For the Plaintiff:          ROBINSON SHAPIRO & SCHWARTZ, LLC
                                  BY:  MR. JAMES A. SHAPIRO
13                                Suite 1750
                                  208 South LaSalle Street
14                                Chicago, Illinois 60604
                                  (312) 782-4615
15                                jshapiro@rss-lawyers.com

16                                SHILLER PREYAR LAW OFFICES
                                  BY:  MS. MARY J. GRIEB
17                                Suite B401
                                  1100 West Cermak Road
18                                Chicago, Illinois 60608
                                  (312) 226-4590
19                                maryjgrieb@gmail.com

20

21

22

23

24

25
```

```
 1   For the Defendants:          JOHNSON & BELL, LTD.
                                  BY:  MR. BRIAN P. GAINER
 2                                     MS. ALEXANDRIA L. BELL
                                  Suite 2700
 3                                33 West Monroe Street
                                  Chicago, Illinois 60603
 4                                (312) 372-0770
                                  gainerb@jbltd.com
 5                                bella@jbltd.com

 6   Court Reporter:             Judith A. Walsh, CSR, RDR, CRR
                                 Official Court Reporter
 7                               219 S. Dearborn Street, Room 1944
                                 Chicago, Illinois 60604
 8                               (312) 702-8865
                                 judith_walsh@ilnd.uscourts.gov
 9

10

11   NOTE:  THIS IS AN EXCERPT OF PROCEEDINGS.  PAGE NUMBERING WILL

12   NOT CORRESPOND TO ANY COMPLETE TRIAL TRANSCRIPT THAT MAY BE

13   PREPARED.

14

15

16

17

18

19

20

21

22

23

24

25
```

Hernandez - cross

1    (Proceedings heard in open court:)

2         THE COURT:  Good morning, members of the jury.  We're

3    ready to proceed.

4         Officer, you're still under oath from yesterday.  You

5    understand that, sir?

6         THE WITNESS:  Yes, sir.

7         THE COURT:  Members of the jury, in order to move the

8    case along, we've decided to -- this gentleman is the

9    defendant in the case and would normally be expected to

10   testify after the plaintiff concludes his case, but in order

11   to save time, we're going to have both the so-called

12   cross-examination and as a direct examination as part of his

13   defense in the case also at the same time.

14        So that's acceptable to both sides, I take it?

15        MR. SHAPIRO:  It is, your Honor.

16        MR. GAINER:  Yes, your Honor.

17        THE COURT:  All right.  You may examine the witness.

18        MR. GAINER:  Thank you, your Honor.

19          OFFICER MARK HERNANDEZ, PREVIOUSLY SWORN

20                      CROSS-EXAMINATION

21   BY MR. GAINER:

22   Q.  Officer Hernandez, tell us a little bit about your

23   educational background.  Where did you go to school?

24   A.  I went to Mount Carmel High School.

25   Q.  Where is that?

Hernandez - cross

```
 1   A.   That's in Chicago, 64th and Dante.

 2   Q.   What year did you graduate?

 3   A.   1992.

 4   Q.   Did you go on to college?

 5   A.   Yes, I did.

 6   Q.   Where did you go to college?

 7   A.   I attended Ball State University.

 8   Q.   And where is that?

 9   A.   That's located in Muncie, Indiana.

10   Q.   And did you get a degree from there?

11   A.   Yes, I did.

12   Q.   What degree?

13   A.   I earned a bachelor's degree in telecommunications, and I

14   earned a minor in marketing.

15   Q.   Okay.  Do me a favor, Officer.  Just move the microphone a

16   little closer to your mouth --

17   A.   Sure.

18   Q.   -- or maybe scoot up a little bit so everyone can hear

19   you.  Great.  Thanks.

20            Are you married, sir?

21   A.   Yes, I am.

22   Q.   How long have you been married?

23   A.   Nine years.

24   Q.   How long have you been a police officer?

25   A.   Nine years.
```

Hernandez - cross

1  Q.  And tell the ladies and gentlemen of the jury your current

2  assignment.

3  A.  I'm assigned to the 7th District.  It's also known as the

4  Englewood district.  Right now I'm on a tactical team which

5  involves, we're in plainclothes.  We drive an unmarked

6  vehicle.

7          And our assignment for that is we answer in-progress

8  calls.  We go to a man with gun calls.  We go to shootings.

9  We go to homicides.  We do a lot of follow-up investigations

10 on shootings and homicides.  And what that entails is

11 strategies to anticipate possible retaliation from shootings

12 and to -- ultimately to prevent further violence from those

13 shootings and homicides.

14 Q.  Now, I just slipped up.  Tell the ladies of the jury what

15 the boundaries of the 7th District are.

16 A.  Well, the boundaries are from 55th, which is also Garfield

17 Boulevard, it goes east -- I'm sorry.  It goes south to 75th

18 Street and then the Dan Ryan and then that goes west to

19 Hamilton.

20 Q.  How long have you been assigned to a tactical team in the

21 7th District?

22 A.  About five years now.

23 Q.  On July 22nd, 2012, were you assigned to a tactical team?

24 A.  Yes, I was.

25 Q.  On that date, were your duties and responsibilities

Hernandez - cross

```
 1   generally the same as they are now?

 2   A.  Yes, they are.  Yes, they were.

 3   Q.  Where is the 7th District station located?

 4   A.  63rd and Loomis.

 5   Q.  Now, the area about 70th and 69th and Ashland, is that

 6   located in the Englewood district?

 7   A.  Yes, it is.

 8   Q.  And just so everyone is clear, when I say "7th District,"

 9   is the 7th District and the Englewood district, are that the

10   same thing?

11   A.  They're the same thing, yes.

12   Q.  So 70th and Ashland is part of your district?

13   A.  Yes, it is.

14   Q.  Have you worked in that area before?

15   A.  Yes.

16   Q.  Describe for the jury that area, please.

17   A.  69th and Ashland, it's an extremely busy intersection.  It

18   has a 24-hour currency exchange.  Directly next to that is a

19   24-hour sandwich shop.  It also has a liquor store on the

20   other corner.

21        It has bus stops that run north, south, east, and

22   west.  And the bus stops run 24/7.  There's multiple people

23   out there at all hours of the day, all hours of the night.

24   Q.  Have you made arrests in that area before, sir?

25   A.  I've made numerous arrests in that area.
```

1  Q.  In your experience as a police officer, can you tell the

2  jury about the crime rate in that area?

3  A.  It's high narcotic crime.  It's a lot of robberies, a lot

4  of strong-arm robberies at that corner.  There's people out

5  there just selling their own things illegally like bootleg

6  CDs, bootleg DVDs, selling loose cigarettes out of the cartons

7  or packs individually.

8  Q.  Now, let's move forward to July 22nd, 2012 at about 3:40

9  a.m.  Obviously based on what we heard yesterday, you were

10  working that day or that morning, right?

11  A.  Correct.

12  Q.  And what time did your shift start for that shift?

13  A.  My shift started at 6:00 p.m. the day before.

14  Q.  So that would be 6:00 p.m. on July 21st?

15  A.  Yes, sir.

16  Q.  And what time was your shift supposed to end for that

17  shift?

18  A.  3:00 in the morning.

19  Q.  And as we heard yesterday, you were still at work at about

20  3:40, right?

21  A.  Yes, I was.

22  Q.  Why were you at work at 3:40 in the morning on July 22nd,

23  2012?

24  A.  Well, on that particular night, it was an exceptionally

25  busy night than normal.  There were multiple people shot in

Hernandez - cross

1   that vicinity.  I know there was a homicide in that area.

2   There was a large volume of calls, shots fired calls, man with

3   gun calls, assist the police calls.

4          So because of that high volume of calls, our deputy

5   chief went to our sergeant and basically said, "Hey, can you

6   find some volunteers to stay a little late after their tour of

7   duty?"

8   Q.  And did you volunteer to stay late?

9   A.  My partner and I discussed it and we said, you know,

10  "We'll stay late.  We'll stay for however long you need us."

11  Q.  Now, after you volunteered to stay late, were you assigned

12  to any specific area in the district?

13  A.  Yes, we were.

14  Q.  What area?

15  A.  The vicinity of 69th and Ashland.

16  Q.  Now, we talked yesterday or you talked yesterday about the

17  fact that Officer McClain is your partner, right?

18  A.  Yes.

19  Q.  How long has Officer McClain been your partner?

20  A.  About five, six years now.

21  Q.  And on that particular night, she was your partner?

22  A.  Yes, she was.

23  Q.  Were you guys working in a police vehicle?

24  A.  Yes, we were.

25  Q.  Now, was that police vehicle a marked vehicle or an

Hernandez - cross

1    unmarked vehicle?

2    A.  It was an unmarked vehicle.

3    Q.  And what does that mean, "unmarked"?

4    A.  It means that the vehicle is -- has no police markings on

5    it whatsoever.  It was, that vehicle we were in was all black.

6    However, it had spotlights on both the passenger side, the

7    driver's side.  And it has blue lights but the blue lights are

8    internally which means that they're on the inside of the front

9    windshield.

10         We have lights on the inside of the rear doors.  And

11   then on the rear window we also have another set of -- sorry,

12   another set of blue lights in the back.

13   Q.  Did you hear the testimony yesterday about how the license

14   plate applies to whether a car is marked or unmarked?

15   A.  Yes, I did.

16   Q.  Okay.  Now, you've just described for the ladies and

17   gentlemen -- for the ladies of the jury what an unmarked car

18   is.  Is there any difference between the license plate on a

19   marked car and an unmarked car?

20   A.  No, there isn't.  The license plate on an unmarked car is

21   the exact same license plate on a marked car.

22   Q.  On this particular night, who was driving?

23   A.  I was driving.

24   Q.  Now, when you first saw the plaintiff as you testified

25   yesterday, you saw him walking on Ashland, right?

Hernandez - cross

1    A.   Yes.

2    Q.   And you said yesterday that he was on the east side of the

3    street, right?

4    A.   Yes.

5    Q.   What direction were you traveling in?

6    A.   We were traveling south.

7    Q.   Okay.  And when -- and what direction was he traveling in?

8    A.   He was going north.

9    Q.   And when you first saw him, what was he doing?

10   A.   He was walking with his fists balled up, swinging his

11   arms, and he was by the curb area.  And he was shouting

12   profanities and racial slurs at passing motorists.  And I

13   remember observing the vehicles slowing down.

14   Q.   Okay.  When you got closer to him, you testified yesterday

15   that you were able to get a little bit closer to him as you

16   were traveling south, right?

17   A.   Yes.

18   Q.   And at that point, you testified you were able to hear

19   what he was saying?

20   A.   Yes.

21   Q.   And what was he saying when you were able to make out his

22   words?

23   A.   He was saying, "fuck you," "N" words to passing motorists.

24   Q.   Okay.  And did you try to get his attention then?

25   A.   I did.

Hernandez - cross

1   Q.  How did you do that?

2   A.  I was -- I said to him, I said, "Hey, what are you doing?

3   What's going on?"

4   Q.  And when you said that, where were you?

5   A.  I was -- I was still in the southbound lanes but I was

6   next to him.  I was parallel with him.

7   Q.  And when you said that to him, did he respond?

8   A.  Yes, he did.

9   Q.  What did he say?

10  A.  He said, "Fuck you, N word," looked right directly at me

11  and my partner.

12  Q.  And what did you think when you heard him say that?

13  A.  I was confused.

14  Q.  Why were you confused?

15  A.  Because no one has ever said that to me before.  And it

16  was just, all the circumstances and his behavior just

17  didn't -- didn't make sense to me.

18  Q.  What happened next?

19  A.  Once -- once he said that, we figured that, you know, we

20  don't know what's going on.  We want to try to figure out

21  what's going on.  We activated our emergency lights.

22          And I remember waiting for traffic to continue going

23  northbound.  I was waiting for a clear area to make my U-turn,

24  look in my rearview mirrors, things like that.  And then I did

25  the U-turn.  And then I came up on the grass in the parkway

Hernandez - cross

```
 1   where Mr. Hernandez was standing.

 2   Q.  Please describe all of the things that led you to make

 3   that U-turn and pull up on the grass where Mr. Hernandez was

 4   standing.

 5   A.  His aggressiveness, his belligerent acts, his shouting at

 6   the passing vehicles, his fists balled up, the racial slurs in

 7   a predominantly African-American neighborhood.  And it was --

 8   we also figured it was potentially dangerous for the guy, so

 9   we wanted to talk to him.

10   Q.  At that point had you seen him walking in the street?

11   A.  I did not see him walking in the street, but my partner

12   did.

13   Q.  All right.  And when did you learn that your partner saw

14   him walking in the street?

15   A.  When we were on scene, when Sergeant Boyle -- when

16   Sergeant Boyle arrived on scene when we were talking to

17   Mr. Hernandez.

18   Q.  Okay.  And describe the circumstances about how you

19   learned that.  What happened that made you learn that?

20   A.  Well, when we had Armando Hernandez on the vehicle,

21   Sergeant Boyle saw us and then he got out of the car to --

22           MR. SHAPIRO:  Objection, your Honor.  This is

23   speculation.

24           THE COURT:  The objection is sustained as to what

25   somebody else saw.
```

Hernandez - cross

 1   BY MR. GAINER:

 2   Q.  Okay.  Limit the answer to my question as to what you saw

 3   and you heard, not what other people saw and heard.  And

 4   please continue.

 5   A.  I heard Officer McClain relate to Sergeant Boyle that this

 6   guy was in the street --

 7          MR. SHAPIRO:  Objection, your Honor.  Hearsay.

 8          MR. GAINER:  Your Honor, it's for effect on the

 9   listener.

10          THE COURT:  All right.  Not for the truth.

11          MR. GAINER:  Exactly.  Thank you.

12   BY MR. GAINER:

13   Q.  Continue, please.

14   A.  While we had Armando on the car, I heard my partner state

15   to Officer -- my partner, Officer McClain, state to Sergeant

16   Boyle how Mr. Hernandez was in the middle of the street and

17   how he was causing traffic to slow down and swerve to get out

18   of his way.

19   Q.  Why didn't you see him doing that?

20   A.  Because I was driving and I was -- I didn't want us to get

21   into an accident.  I was getting ready to make a U-turn in the

22   middle of a busy street.

23   Q.  Once you made that U-turn and pulled up over to by where

24   Mr. Hernandez was standing, what happened?

25   A.  Well, once we pulled up, Mr. Hernandez was standing there.

Hernandez - cross

86

1   And we noticed his hands were in his pocket.  His hands were

2   in his pocket.  My partner said, "Take your hands out of your

3   pocket."

4          He said, "No."

5          We approached him.  And I said, "Take your hands out

6   of your pocket."

7          And he looked at both of us and said, "No.  I'll do

8   whatever the fuck I want to do.  Leave me alone."

9   Q.  Okay.  The first time that your partner said, "get your

10  hands out of your pocket," were you and your partner still

11  seated in the police car?

12  A.  Yeah, I believe we were still in the police car.

13  Q.  And then the second time that you or your partner said,

14  "get your hands out of your pocket," it sounds like you're

15  saying that's when you were getting out of the car?

16  A.  Yes.  We were approaching him.

17  Q.  Okay.  So you were walking toward him?

18  A.  Yes.

19  Q.  You were not yet standing next to him?

20  A.  We were about ten feet away from him.

21  Q.  Okay.  And is that when he looked at you and said --

22  A.  Yes.

23  Q.  -- "fuck you, I'll do whatever I want"?

24  A.  Yes.

25  Q.  After he said those things to you, what did you do?

Hernandez - cross

1   A.  At that point we -- I remember grabbing his -- with two

2   hands his right hand.  And my partner grabbed his left hand.

3   And we physically removed his hands out of his pocket.

4   Q.  And why did you do that?

5   A.  It was for safety.  It was a safety concern.  He was

6   agitated.  He was angry.  He was belligerent.  His eyes -- at

7   that point is when I noticed his eyes were glossed over.

8           And then now he's telling me, "Fuck you, I'll do

9   whatever I want.  I don't want to take my hands out of my

10  pocket."  To me that's a major safety concern for me and my

11  partner.

12  Q.  What were you concerned about?

13  A.  I was concerned about him having a weapon in his pocket,

14  either one of his pockets.

15  Q.  Now, yesterday you were asked some questions about the

16  same topic, right, the reasons why you decided you had safety

17  concerns related to Mr. Hernandez.

18          Do you remember those questions?

19  A.  Yes.

20  Q.  And yesterday counsel said to you, he read to you some

21  parts of your deposition and he said to you that the only

22  thing you said in your deposition was that you took his hands

23  out of his pockets because he wasn't complying with your

24  verbal commands.

25          Do you remember counsel saying that to you?

1   A.  Yes.

2   Q.  Actually in your deposition, you testified right after

3   that that you had safety concerns that led you to take his

4   hands out of your pockets, didn't you?

5   A.  Yes.

6   Q.  In your deposition, were you read this question -- or were

7   you asked this question and did you give this answer:  "Okay."

8           MR. SHAPIRO:  Do you have a page, please?

9           MR. GAINER:  Sure.  40, Line 8.

10  BY MR. GAINER:

11  Q.       "Okay.  Was one of the reasons to handcuff him just

12   for your safety and your partner's safety?

13           "Answer:  Absolutely, yes."

14           Do you remember being asked that question and do you

15  remember giving that answer?

16  A.  Yes, I do.

17  Q.  So you did testify at your deposition a year ago that you

18  had safety concerns and that led you to handcuff

19  Mr. Hernandez, right?

20  A.  Yes.

21  Q.  Once you got Armando Hernandez handcuffed, what did you do

22  next?

23  A.  We walked him over to the front of the vehicle in the

24  front of our car.

25  Q.  And what happened once you got to the car?

Hernandez - cross

1  A.  Once we got to the car, I created a little bit of distance

2  between myself and Mr. Hernandez.  And I had my hand here on

3  his lower back or forearm.  I don't remember.  And then he

4  began to mule kick.  He began to kick backwards on me and my

5  partner.

6  Q.  Prior to him mule kicking, did anyone else arrive at the

7  scene?

8  A.  Yes.  Well -- yes.  Prior to that, that's when Sergeant

9  Boyle arrived.  Our supervisor, Sergeant Boyle, that's when he

10  arrived on scene.

11  Q.  Okay.  And prior to him mule kicking, did anyone ask

12  Mr. Hernandez any questions?

13  A.  I remember my partner asking him questions.

14  Q.  Do you remember what she was asking?

15  A.  I don't recall what she was asking.

16  Q.  Did -- prior to him mule kicking, did he say anything

17  about anything?  I mean, and by him, I mean Armando Hernandez.

18  A.  I don't remember what he was saying.  I don't recall.

19  Q.  How many times did he kick at you?

20  A.  He kicked -- he kicked at us two to three times.

21  Q.  And what did you do in response to those kicks?

22  A.  I grabbed -- with my left hand, I grabbed his ankle while

23  it was still in motion kicking at me, grabbed his ankle.  With

24  my right hand, I grabbed his shoulder.  And I escorted him

25  down to the ground.

Hernandez - cross

1   Q.  And why did you do that?

2   A.  Well, at that point he was a threat.  He was kicking.  At

3   that point, he was out of control.  And I felt that that was

4   the safest thing to do, was to take him down and just gain

5   control of him.

6   Q.  When he -- when you took him to the ground, did you go to

7   the ground with him?

8   A.  Yes, I did.

9   Q.  Okay.  Describe how you did that.

10  A.  I came to -- we're faced this way.  And then we kind of

11  pivoted this way.  And I came down with my right knee, came

12  down to my right knee to try to cushion the fall as much as I

13  could.

14  Q.  Did your right knee touch the ground?

15  A.  Yes.

16  Q.  Just for the record so that I can kind of describe what

17  you just did, you were facing to your left and then you

18  pivoted to your right, kind of twisted your body and moved

19  your hands at the same time, right?

20  A.  Correct, yes.

21  Q.  And that was you describing how you took Armando Hernandez

22  from the standing position to the ground?

23  A.  Yes.

24  Q.  When you took him to the ground and he went to the ground,

25  was any part of your body other than your hand touching him?

1    A.   Just my hand.   That was it.

2    Q.   Did you ever kneel on him?

3    A.   No, I didn't.

4    Q.   Did you ever stand on him?

5    A.   No, I didn't.

6    Q.   Did you ever lie down on top of him?

7    A.   No, I didn't.

8    Q.   And why did you have your hand on his back once he was on

9    the ground?

10   A.   Because he was trying to get back up, so I kept my hand on

11   top of him.   And I remember saying, "Calm down.   Calm down."

12   Q.   When you went to the ground with your knee and

13   Mr. Hernandez, what surface were you on?

14   A.   Grass.

15   Q.   And what do you refer to that area as where he went to the

16   ground?

17   A.   The parkway.

18   Q.   How long was Mr. Hernandez on the ground?

19   A.   About five seconds.

20   Q.   How did he get up?

21   A.   Sergeant Boyle assisted me in rolling him back over to

22   his -- to his butt.   And then I was on his left side.   And

23   then Sergeant Boyle was on his right side.   And he was still

24   handcuffed, so we put our arms through and we both -- we did

25   one, two, three, and we both stood him up like that.

Hernandez - cross

1  Q.  While Armando Hernandez was on the ground, did you ever

2  see anyone kick him?

3  A.  No, I didn't.

4  Q.  Did you ever see anyone punch him?

5  A.  No, I didn't.

6  Q.  Did anyone ever kick Armando Hernandez while he was on the

7  ground?

8  A.  No.

9  Q.  Did anyone ever strike him in any way while he was on the

10  ground?

11  A.  No.

12  Q.  Once Armando Hernandez was brought to his feet, what

13  happened next?

14  A.  Once we brought him to his feet, I recall my partner

15  taking the dust or the grass and stuff off of his face and his

16  shirt.

17         And then I remember Sergeant Boyle starting to ask

18  him questions.  As I said, I don't recall what he was asking.

19  And then after that, we placed him in the back of our vehicle.

20  Q.  Up until this point in time, had you made any observations

21  about his demeanor --

22  A.  Yes.

23  Q.  -- aside from what you've already told us.

24  A.  I mean, besides being angry and belligerent and aggressive

25  and kicking at us, that's -- after we brought him up, he was

Hernandez - cross

1    then calm at that point.  And then once he was calm, that's

2    when we placed him in the vehicle.

3    Q.  Did you make any observations about his -- whether or not

4    you thought he was intoxicated?

5    A.  Well, yeah.  I observed his glossy eyes when we first

6    approached.  And then -- I mean, once he started kicking, that

7    was pretty much at the point where I'm like, I felt that he

8    had to have been -- he has to be intoxicated at this point.

9    Q.  When he was placed into the police car, did he say

10   anything?

11   A.  He was crying.  He started to cry.  And he started to say,

12   "I hate my life.  I hate my life."

13   Q.  What happened next?  He's in the car.  I assume that you

14   and your partner got in the car and drove to the station?

15   A.  Yes.

16   Q.  Do you recall anything else being said in the car on the

17   way to the station?

18   A.  I remember my partner asking him if he needs medical

19   attention.

20   Q.  Did you -- do you remember him responding to that?

21   A.  I don't -- he never said yes.  He just continued to say,

22   "I hate my life."

23   Q.  What happened once you arrived at the station?

24   A.  Once we arrived at the station, we brought him in, myself

25   and Sergeant Boyle.  We then took him to the holding facility

Hernandez - cross

1    within the 7th District lockup.

2    Q.  Okay.

3    A.  And my partner went into the tac office.

4    Q.  And once in the holding facility, what did you do?

5    A.  Well, we asked him to remove his shoelaces and to remove

6    his belt.

7    Q.  And why did you do that?

8    A.  Well, number one, it's protocol to have all your belts and

9    shoelaces removed from you.  And also he was -- it was another

10   safety concern because he just kept saying, "I hate my life.

11   I hate my life."  And we didn't want him to hurt himself in

12   lockup.

13   Q.  So did he remove his shoelaces and his belt?

14   A.  No.

15   Q.  When you asked him to do those things, was he

16   unhandcuffed?

17   A.  Yes.

18   Q.  What happened once he refused to remove his shoelaces and

19   his belt?

20   A.  He -- he just wouldn't do it, so I unbuckled his belt.

21   And he was just -- just sitting there.  And I was trying to

22   take his belt off.  And when somebody doesn't help you take

23   his belt off, it's not really the easiest thing.

24           So I remember putting him on the bench.  And he was

25   laying down.  And I had to maneuver him to go on his left side

Hernandez - cross

95

1   so I can get the left part of his belt off, and then I

2   maneuvered him to the right so I can get the right side of his

3   belt off.

4           And then we physically removed his shoes.  And we had

5   to -- we removed his shoelaces out manually, my sergeant and

6   myself.

7   Q.  When he was -- when you were doing that, when you were

8   removing his belt, was he sitting down?

9   A.  He was sitting down and then he went to the -- he went to

10  the lying down position on the concrete, on the bench.

11  Q.  Okay.  So he --

12  A.  But initially he was sitting down.

13  Q.  Okay.  But he wasn't on the floor?

14  A.  No, no.

15  Q.  Did you ever throw him to the floor?

16  A.  No.

17  Q.  Did you ever throw him anywhere inside that holding cell?

18  A.  No, I did not.

19  Q.  Did you ever strike him in the holding cell?

20  A.  No, I did not.

21  Q.  Did you ever call him any names, tell him he was on camera

22  or anything like that that you heard yesterday?

23  A.  No, I didn't.

24  Q.  Did you ever see Sergeant Boyle do any of that?

25  A.  No, I didn't.

Hernandez - cross

1   Q.  Did Armando Hernandez in the police station ever complain

2   to you that you were just beating him up or throwing him down

3   or anything?  Did he ever say anything to you about

4   mistreatment?

5   A.  No, he didn't.

6   Q.  While you guys were in the holding cell after you were

7   removing his belt or after you removed his belt, did you try

8   to talk to Armando Hernandez?

9   A.  I know Sergeant Boyle was asking him questions while I was

10  removing his belt but we -- at that point, we figured it was

11  best to just let him sit in the cell and just be alone with

12  his thoughts.  He was alone.  Nobody else was in there with

13  him, and just kind of, just let him vent, let him calm down a

14  little bit.

15  Q.  Sir, when you were in the holding cell with him before you

16  left him to let him cool off, did you notice any injuries to

17  him?

18  A.  Yeah, I noticed the redness or abrasions on his forehead

19  and something on his cheek.

20  Q.  Yesterday you were asked questions about that very

21  subject, redness on his forehead and redness on his cheeks.

22  And you were told by counsel that you never said in your

23  deposition that he had redness on his cheeks.  Do you remember

24  that?

25  A.  I do remember that.

1    Q.  But you did, in fact, testify to that in your deposition,

2    didn't you?

3    A.  Yes, I did.

4    Q.  Page 67, Line 2, sir, were you asked this question and did

5    you give this answer at your deposition:

6           "Where did you see redness?"  That was the question,

7    "Where did you see redness?"

8           "Answer:  Just in his face like in the forehead area,

9     maybe around the cheeks."

10          Were you asked that question and did you give that

11   answer at your deposition?

12   A.  Yes, I did.

13   Q.  So you did testify at your deposition that he had redness

14   around his cheeks?

15   A.  Yes, I did.

16   Q.  When you left the cell, you left him to cool off a bit,

17   where did you go?

18   A.  Sergeant Boyle and I, we went back into the tac office.

19   Q.  All right.  And who was in the tactical office when you

20   went in there?

21   A.  My partner, Sergeant -- I mean, Officer McClain.

22   Q.  Okay.  And what was Officer McClain doing when you walked

23   in there?

24   A.  I noticed she was on the phone.

25   Q.  Did she tell you who she was talking to when she got off

1   the phone?

2   A.   When she got off the phone, she told me who she was

3   talking to, yes.

4   Q.   And who did she tell you she was talking to?

5   A.   She was talking to Armando Hernandez's girlfriend or wife.

6   I'm not sure what the relationship was at the time.

7   Q.   Did you learn what was said during that conversation?

8   A.   Yes.

9   Q.   And what did you learn?

10   A.   Officer McClain told me that she just got off the phone

11   with his girlfriend or wife.  And she said that they both

12   had -- they had an argument and she was trying to call him and

13   she couldn't get ahold of him and she was worried about him

14   but once she talked to Officer McClain, then she felt better

15   that at least he was safe.

16   Q.   And then after you had that conversation with Officer

17   McClain, what did you do?

18   A.   Sergeant Boyle and I, we went back in the lockup to talk

19   to Mr. Hernandez.

20   Q.   And what did you tell Mr. Hernandez?

21   A.   I walked in and I told him, I said, "Look, we just -- we

22   just talked to your girlfriend.  We know you guys had an

23   argument tonight."

24   Q.   And what did Mr. Hernandez say in response to that?

25   A.   He let out a deep breath.  He was like, "Huh."  And he

Hernandez - cross

1    started crying and crying.  He was crying so much, his face

2    was getting puffy.  His face was getting red.

3            And he just -- he vented.  He vented to us.  He said

4    how, "I'm not a man.  I can't hold a job.  I can't support my

5    family.  I can't even -- I can't even get my family out of

6    this crummy neighborhood that we live in."

7            He just kept going over and over again.  And we just

8    let him vent.

9    Q.  And what did you think about that, those things he was

10   saying?

11   A.  Well, at least it was clear at that point now, it's clear

12   what his problem -- what the deal was, what was going on.  And

13   at that point, I felt bad.  I felt bad for him.  I felt bad

14   that he's going through a rough time in his life and he's

15   going through some rough times, so...

16   Q.  At some point then did you make a decision about what to

17   charge him with?

18   A.  Yes.

19   Q.  And what did ultimately charge him with?

20   A.  We ultimately charged him with reckless conduct.

21   Q.  Were there other crimes based on his conduct that you

22   could have charged him with?

23   A.  Yes, there were.

24   Q.  What other crimes?

25   A.  Aggravated battery to a police officer, aggravated assault

Hernandez - cross

1   to a police officer, resisting arrest, and reckless conduct.

2   Q.  Why did you choose to charge him with reckless conduct

3   only?

4   A.  Because reckless conduct is the lowest charge -- not the

5   lowest but it's a lower charge of a misdemeanor offense.  We

6   weren't out to ruin his life.  We weren't out to make things

7   worse on him, any more worse than what he was clearly

8   obviously going through.

9          So this is why we used our discretion.  My partner

10  and my sergeant and myself, we were all in agreement on that.

11  And we said we're just going to charge him with the

12  misdemeanor and that's it.

13  Q.  After the paperwork was done and he was processed, where

14  did he go next, Armando Hernandez?

15  A.  Well, my sergeant and myself again took him out of the

16  holding cell, and we escorted him into the lockup.  And the

17  lockup is where you get fingerprinted and photographed.

18  Q.  And then once you took him into the lockup and turned him

19  over to the people in the lockup, did you ever see him again

20  that night?

21  A.  I never saw him again after that.

22  Q.  At any point that you were in his presence that night, did

23  Armando Hernandez say that he wanted or needed medical

24  attention?

25  A.  He never once said that.

Hernandez - cross

1   Q.  You were asked some questions yesterday about the criminal

2   complaint in this case.  Do you remember those questions?

3   A.  Yes.

4   Q.  And you testified that your partner signed your name on

5   that complaint, right?

6   A.  Yes.

7   Q.  Can you please tell the jury -- strike that.

8           Why did your partner sign your name on the complaint

9   that night?

10  A.  Well, we -- we had a lot of paperwork to do.  And I asked

11  her, I said, "Hey, can you just go ahead and sign my name for

12  me," which is not unusual.  We do that a lot.  That's -- we're

13  allowed to do that.

14  Q.  Did she have your permission to do that?

15  A.  Yes, she did.

16  Q.  Did she sign it in your presence?

17  A.  Yes, she did.

18  Q.  Did you review that document before she signed it for you?

19  A.  Yes, I did.

20  Q.  Now, you said you had a lot of paperwork to do that night.

21  The paperwork that you did, do you know what time it was

22  submitted?

23  A.  It was like 5:20 in the morning.

24  Q.  How long had you been working when you submitted that

25  paperwork?

Hernandez - cross

1   A.  Almost 12 hours at that point.

2   Q.  You were asked some questions about the TRR report, the

3   tactical response report.  Can you please tell the jury what

4   period of time the TRR report you were asked about applies to?

5   A.  It applies to the time when Armando Hernandez began

6   kicking at me and my partner.

7   Q.  Okay.  So you were asked some questions yesterday about

8   stiffening and why the stiffening box on the TRR wasn't

9   checked even though you testified that Armando Hernandez was

10  stiffening his arms while you were handcuffing him.

11          Do you remember those questions?

12  A.  Yes.

13  Q.  And explain to the jury why the stiffening box wasn't

14  checked for that period of time.

15  A.  Because at the time he was kicking me, he wasn't -- he

16  wasn't stiffening so the -- like I said, the TRR report is

17  just the actions that I took when Armando began kicking.  And

18  he wasn't stiffening at the point he was kicking.

19  Q.  You were also asked some questions yesterday about

20  Plaintiff's Exhibit No. 64, which is the court notification

21  summary report.  Do you remember those questions?

22  A.  Yes.

23  Q.  That report that you looked at yesterday which I have a

24  copy of it here if you'd like to look at it again -- actually,

25  why don't I give it to you.  This is Plaintiff's Exhibit

Hernandez - cross

1    No. 64.

2              Now, you were asked questions about this report

3    yesterday and you identified it and you said what it was.  Is

4    there anything on that document that indicates that you

5    received this court notification for August 17th, 2012?

6    A.  No, it doesn't.  It doesn't say -- there's nowhere on this

7    report that says when and if I ever received this court

8    notification.

9    Q.  Okay.  I'm going to take that back from you for one

10   second.

11             Okay.  One last question about that.  Is there

12   anything on that document that indicates when that report was

13   generated?

14   A.  No, it doesn't.

15   Q.  Okay.  So you can't tell from looking at that whether that

16   was generated before August 17th, 2012, or after, right?

17   A.  Right.

18             MR. GAINER:  Okay.  Thank you.

19             Can I have one moment, please, your Honor?

20             THE COURT:  All right.

21             MR. GAINER:  Thank you.

22     (Pause.)

23   BY MR. GAINER:

24   Q.  Officer, just one more or a couple more questions.  I hate

25   to limit myself.

M. Hernandez - redirect

1      Let's go back for a minute to when you stood Armando

2 Hernandez to his feet out on the street, you and Sergeant

3 Boyle as you testified.  Describe how he looked.

4 A.  I don't -- I don't recall how he -- I mean, I remember

5 seeing some dirt and stuff on his face and on his clothes.  I

6 didn't see any redness at the time.

7 Q.  Did you see blood at the time?

8 A.  I didn't see any blood either.

9        MR. GAINER:  No further questions, your Honor.

10        THE COURT:  Anything further?

11        MR. SHAPIRO:  Yes, your Honor.  Thank you.

12              REDIRECT EXAMINATION

13 BY MR. SHAPIRO:

14 Q.  You didn't see any redness at the time, Officer Hernandez,

15 right?

16 A.  At which time?

17 Q.  At the time you stood him up from off the ground after you

18 took him -- after you escorted him to the ground, right?

19 A.  Correct.

20 Q.  You only saw the redness later?

21 A.  Correct.

22 Q.  Okay.  But Officer McClain, you testified that Officer

23 McClain asked him if he needed medical attention while he was

24 in the squad car, right?

25 A.  Yes.

M. Hernandez - redirect

1   Q.  Okay.  That would tend to indicate that she thought he was

2   injured, correct?

3           MR. GAINER:  Objection, calls for speculation.

4           MR. SHAPIRO:  Withdrawn.

5   BY MR. SHAPIRO:

6   Q.  Did you think that he was injured at the time that he was

7   in the squad car?

8   A.  I don't know.  That's why we asked if he needed medical

9   attention.  We're not sure.  We're not doctors.  That's why we

10  ask them.  We don't know how they're feeling.

11  Q.  Did you ask him whether he needed medical attention?

12  A.  No.  My partner did.

13  Q.  Okay.  You heard your partner do it, right?

14  A.  Yes.

15  Q.  What was your understanding of why your partner would have

16  asked him if he needed medical attention?

17          MR. GAINER:  Objection, calls for speculation.

18          THE COURT:  The objection is sustained.

19  BY MR. SHAPIRO:

20  Q.  Okay.  Officer Hernandez, you indicated that nothing in

21  the CLEAR report indicates when the court notification was

22  generated; is that right?

23  A.  That's correct.

24  Q.  Okay.  But it does indicate that at some point at least,

25  the court notification was in the system, doesn't it?

M. Hernandez - redirect

1   A.   It shows that it was generated by a computer --

2   Q.   Okay.

3   A.   -- in the computer system.

4   Q.   Okay.  Is it -- have you ever seen the computer system

5   generate such a report after the court date as opposed to

6   before the court date?

7            MR. GAINER:  Objection, foundation.

8            THE COURT:  Overruled.

9   BY MR. SHAPIRO:

10  Q.   You can answer.

11  A.   Can you repeat it?

12  Q.   Have you ever seen a CLEAR report like that, a court

13  notification summary, generated after the court date as

14  opposed to before the court date?

15  A.   After the court date?

16  Q.   After August 17th.

17  A.   Yes.  I can go back to my court dates probably up to

18  three, four years ago --

19  Q.   Okay.

20  A.   -- and it can all be on the computer system.  It stores.

21  Q.   And I believe that you testified on direct that you could

22  have gone into the system and found out when the court date

23  was, right?

24            MR. GAINER:  Objection.  That mischaracterizes his

25  testimony, your Honor.

M. Hernandez - redirect

```
 1                MR. SHAPIRO:  I don't think it does, your Honor.

 2                THE COURT:  All right.  He can answer.

 3    BY MR. SHAPIRO:

 4    Q.  You can answer.

 5    A.  Can you repeat the question?

 6    Q.  Sure.  There was nothing that would have prevented you

 7    from going into the system and finding out when the court date

 8    was, right?

 9    A.  Yeah, I could go back and check it.

10    Q.  Okay.

11    A.  I can check any court date I want.

12    Q.  And in any event, it was on your court key date, wasn't

13    it?

14    A.  Yes.

15    Q.  Okay.  And but you didn't go to court on your court key

16    date, did you?

17    A.  I was never notified to go to court on my court key date.

18                THE COURT:  I think you went through this on

19    your direct.

20                MR. SHAPIRO:  I did, your Honor, but counsel just

21    brought it up again on cross.

22                THE COURT:  I know, but don't go over the same stuff.

23                MR. SHAPIRO:  I understand, your Honor.  Thank you.

24    I'll move on.

25                THE COURT:  All right.  Thank you.
```

M. Hernandez - redirect

1   BY MR. SHAPIRO:

2   Q.  Okay.  And Mr. Gainer asked you about the signing of the

3   criminal complaint for reckless conduct.  Do you remember

4   those questions?

5   A.  Yes.

6   Q.  Okay.  And you testified that she signed on your behalf;

7   is that right?

8   A.  Yes.

9   Q.  But that you reviewed the complaint before she signed it;

10  is that right?

11  A.  Yes.

12  Q.  Okay.  And so you also reviewed the part where it said

13  that he was walking in and out of traffic; isn't that right?

14  A.  Yes.

15  Q.  Okay.  So you had her sign it, sign your name even though

16  you didn't personally witness him walking in and out of

17  traffic, right?

18          MR. GAINER:  Objection, your Honor.  I think

19  unfortunately this calls for a brief sidebar.

20    (Proceedings heard at sidebar:)

21          MR. GAINER:  The doctrine of collective probable

22  cause is very clear.  It's been misrepresented now twice, once

23  yesterday and once today.  Whatever Officer McClain sees is

24  attributed to Officer Hernandez because they are working

25  together and that's how the doctrine of collective --

M. Hernandez - redirect

109

```
 1          THE COURT:  It's my understanding that you can --
 2  they can rely upon hearsay.  I mean, they do it all the time.
 3  So it seems to me --
 4          MR. SHAPIRO:  They can but my next question is, why
 5  didn't he have Officer McClain sign it in her name.
 6          THE COURT:  All right.  You can ask that.
 7          MR. SHAPIRO:  That was my next question.
 8    (Proceedings heard in open court:)
 9  BY MR. SHAPIRO:
10  Q.  Okay.  So Officer Hernandez, if you didn't witness Armando
11  Hernandez walking in and out of traffic, why didn't you have
12  Officer McClain sign the complaint in her name rather than
13  yours?
14  A.  It's just the way we did it.  I don't know.  We just -- I
15  asked her to sign my name.  We're both arresting officers.
16  And it's not uncommon for her to sign my name, for me to sign
17  her name.
18  Q.  Okay.
19  A.  She related to me later what her observation was.
20  Q.  But there was no reason why she couldn't have signed the
21  complaint in her name rather than your name, correct?
22          MR. GAINER:  Asked and answered, your Honor.
23          THE COURT:  Yes.  Objection sustained.
24  BY MR. SHAPIRO:
25  Q.  Okay.  Okay.  And Mr. Gainer, Officer Hernandez, asked you
```

M. Hernandez - redirect

110

 1   some questions about the redness and abrasions on

 2   Mr. Armando -- on Armando Hernandez's forehead and cheeks.  Do

 3   you remember that line of questioning?

 4   A.  Yes.

 5   Q.  Okay.  And again, Page 67, counsel, Lines 3 to 4.

 6         And you testified, you told Mr. Gainer, "just in his

 7   face, like in the forehead area, maybe around the cheeks,"

 8   didn't you?

 9   A.  Yes.

10   Q.  Okay.  You said "maybe around the cheeks," right?

11         MR. GAINER:  Objection, your Honor.  We've covered

12   this ground quite --

13         THE COURT:  Yes, I think you did.

14         MR. SHAPIRO:  Well, but -- your Honor, if I may have

15   a moment.

16   BY MR. SHAPIRO:

17   Q.  But then later you were asked:  "Did you see any

18   abrasions?  Did you see anything?"  Page 77, Lines 8 through

19   9.

20         You said, you were asked:

21         "Did you see anything on his cheeks?

22         "Answer:  I don't remember.  For some reason, the

23     forehead area stuck out in my mind."

24         Do you remember being asked that question and giving

25   that answer?

M. Hernandez - redirect

```
 1              MR. GAINER:  Objection.  This was used yesterday.

 2              THE COURT:  Yes, I think that's true.

 3              MR. GAINER:  It's not impeachment.

 4              THE COURT:  The objection is sustained.

 5   BY MR. SHAPIRO:

 6   Q.  And you also testified at your deposition, Officer

 7   Hernandez, that your upper -- that, I'm sorry, Armando's upper

 8   torso hit the ground first, did you not?

 9   A.  Yes.

10   Q.  Okay.  And yet later he had an abrasion to his forehead

11   and cheeks, did he not?

12   A.  Yes.

13   Q.  Okay.  So does that not indicate to you that his face, his

14   face must have hit the ground as well as his upper torso?

15              MR. GAINER:  Calls for speculation, argumentative.

16              THE COURT:  Overruled.  He can answer.

17   BY MR. SHAPIRO:

18   Q.  You can answer.

19   A.  Can you repeat it?

20   Q.  If there were abrasions on his forehead and cheeks --

21   cheek, does that not indicate that his face hit the ground in

22   addition to his upper torso?

23   A.  It's his upper torso, sure.

24   Q.  You mean, you're including his face in with his upper

25   torso?
```

M. Hernandez - redirect

112

1   A.   You -- I believe you asked me, did I ever see his face hit

2   the ground.  And my answer was no.  I saw his upper torso.

3   Q.   And yet there were abrasions on his forehead and cheek; is

4   that right?

5   A.   Yes, there were.

6   Q.   And doesn't that mean to you that his face must have hit

7   the ground as well as his upper torso?  That's just my

8   question.

9   A.   Yes.

10  Q.   But you just didn't see his face hit the ground?

11  A.   I didn't see his --

12          MR. GAINER:  Asked and answered, your Honor.

13          THE COURT:  Objection sustained.  Let's move on.

14  BY MR. SHAPIRO:

15  Q.   And Mr. Gainer asked you about saying that you cuffed him

16  for your own -- officer safety; is that right?

17  A.   Correct.

18  Q.   Okay.  But in addition, you also said that you cuffed him

19  because he wasn't complying with taking his hands out of his

20  pockets, didn't you?

21  A.   Yes, because it was a safety concern.

22  Q.   I understand.  And you never swept Armando Hernandez's

23  legs out from under him?

24  A.   No, I didn't.

25  Q.   You just grabbed him by the ankle?

M. Hernandez - redirect

113

1    A.  Yes.

2    Q.  With your left hand?

3    A.  Yes.

4    Q.  And you grabbed him by the neck or his back with your

5    right hand?

6    A.  Or shoulder, I believe, back shoulder.

7    Q.  Shoulder or back with your right hand?

8    A.  Correct.

9    Q.  And then you escorted him to the ground?

10   A.  Correct.

11          THE COURT:  You went through all this yesterday --

12          MR. SHAPIRO:  I did, your Honor.

13          THE COURT:  -- at great length.

14          MR. SHAPIRO:  But -- I understand, your Honor, but

15   counsel just went into it again.

16          THE COURT:  Why go into it a third time?

17          MR. SHAPIRO:  Well, because I'm trying to rebut what

18   counsel just said.  I apologize, your Honor.  I'll try to move

19   on.

20   BY MR. SHAPIRO:

21   Q.  You also testified that the license plate on an unmarked

22   car is exactly the same as a marked car?

23   A.  Yes.

24   Q.  Okay.  So there's an "M" on the license plate of a marked

25   car and an unmarked car?

M. Hernandez - redirect

114

1   A.  Yes.

2   Q.  Okay.  There's no "MP" on an unmarked car, is that it?

3   A.  There's "M" plates and there's "MP" plates, but they're

4   municipal plates.  And they're used -- they're used on both

5   vehicles.

6   Q.  Okay.  Both "M" and "MP" plates are used on both vehicles?

7   A.  Municipal plates are used on both vehicles, the marked

8   cars and the unmarked cars.

9   Q.  I'm just trying to ask you -- well, let me just ask you

10  this.  What -- what did the license plate on the unmarked SUV

11  say that night?

12  A.  I don't know.

13  Q.  You don't know whether it was an "M" or an "MP"?

14  A.  I don't recall.  They're interchange -- no, I don't

15  recall.

16  Q.  But it could have been either an "M" or an "MP;" is that

17  right?

18  A.  It --

19          MR. GAINER:  Objection, asked and answered.

20          MR. SHAPIRO:  I don't think I did get an answer, your

21  Honor.

22          THE COURT:  Yes, you did.  You've been through all of

23  this at length.

24  BY MR. SHAPIRO:

25  Q.  Okay.  Officer Hernandez, you've made dozens of arrests

M. Hernandez - redirect

1  for aggravated battery of a police officer, didn't you --

2  haven't you?

3  A.  Yes.

4  Q.  Okay.  And you've made dozens of arrests for aggravated

5  assault to a police officer, haven't you?

6  A.  Yes.

7  Q.  And you know that when that charge is made, when those

8  felony charges are made, an evidence technician is usually

9  called in, isn't it?

10        MR. GAINER:  Objection.  Beyond the scope, your

11  Honor.

12        THE COURT:  I -- yes, I think so.  Let's -- let's

13  wrap this up.

14        MR. SHAPIRO:  I understand, your Honor.  I'm trying

15  but there's some important points I need to get out to that I

16  think were within the scope.  I'll get to my point very

17  quickly.

18  BY MR. SHAPIRO:

19  Q.  So you would have had to call in an evidence technician --

20        MR. GAINER:  Same objection.

21  BY MR. SHAPIRO:

22  Q.  -- if you had charged him with a felony; is that correct?

23        MR. GAINER:  Same objection.

24        THE COURT:  Objection sustained.

25  BY MR. SHAPIRO:

M. Hernandez - redirect

1   Q.  You would have had to call in a detective for a felony,

2   wouldn't you have?

3           MR. GAINER:  Same objection.

4           THE COURT:  Objection sustained.  I think we're

5   getting far afield.

6   BY MR. SHAPIRO:

7   Q.  And I believe you testified yesterday, Officer Hernandez,

8   that Armando merely grazed your pant leg, your pants, rather,

9   when he mule kicked you; is that right?

10          MR. GAINER:  This is again beyond the scope, your

11  Honor.  And I think that this is ground that's been covered

12  quite a bit.

13          THE COURT:  You covered all this at great length

14  yesterday.  Sustained.

15          MR. SHAPIRO:  I have, your Honor, but this is to

16  rebut the cross.

17          THE COURT:  But you're redirect more or less.  This

18  is an area that was covered by you in your direct and covered

19  by -- on cross but that you shouldn't go back over it just

20  because he covered it.

21          MR. SHAPIRO:  Okay.  Then I have no further

22  questions, your Honor.

23          THE COURT:  All right.  You can step down.

24    (Witness excused.)

25          THE COURT:  Call your next witness, please.

McClain - direct

1        MR. SHAPIRO:  The plaintiff calls Officer Joy

2   McClain.

3        THE COURT:  All right.  Please raise your right hand.

4     (Witness sworn.)

5        THE COURT:  Please be seated.

6        You may question the witness.

7        MR. SHAPIRO:  Thank you, your Honor.

8       OFFICER JOY McCLAIN, PLAINTIFF'S WITNESS, SWORN

9                    DIRECT EXAMINATION

10  BY MR. SHAPIRO:

11  Q.  Okay.  You're Officer Joy McClain; is that right?

12  A.  Yes, sir.

13  Q.  McClain is spelled M-c capital C-l-a-i-n?

14  A.  It is.

15  Q.  And Joy is common spelling like in happiness?

16  A.  Yes.

17  Q.  Okay.  And you're a Chicago police officer, right?

18  A.  Correct.

19  Q.  And you've been a police officer for seven or eight years;

20  is that right?

21  A.  Yes, eight.

22  Q.  Eight years now.  And turning your attention to the

23  morning of July 22nd, 2012, Officer Hernandez was with you

24  driving northbound on Ashland Avenue between 69th and 71st

25  Street; is that right?

McClain - direct

1    A.  We were actually traveling south.

2    Q.  You were traveling -- you were traveling southbound on

3    Ashland?

4    A.  Correct.

5    Q.  And Mr. Armando Hernandez was walking northbound on

6    Ashland; is that right?

7    A.  Correct.

8    Q.  One second.

9         Actually, didn't you -- didn't you say in your

10   deposition that you were driving north on Ashland?

11   A.  Yes, I did.

12   Q.  Was that a mistake?

13   A.  That was a mistake on my part.  We were actually on 69th.

14   We were turning south on to Ashland so that when I first

15   observed Mr. Hernandez, we were facing south.

16   Q.  And then when you did the U-turn, when your partner did

17   the U-turn, then you were facing north?

18   A.  Correct.

19   Q.  I got it.  And it's an all-black neighborhood where you

20   were and it was a rough day, right?

21   A.  Yes.

22   Q.  You saw Armando Hernandez walking in the middle of the

23   street and on to the sidewalk?

24   A.  When I first observed him, he was on the east side of the

25   sidewalk.  His back was towards me.

McClain - direct

1  Q.  All right.  Officer McClain, it's just a yes or no answer.

2  Okay.  You saw Armando Hernandez walking in the middle of the

3  street and on to the sidewalk; isn't that right?

4  A.  Yes, sir --

5          MR. GAINER:  Your Honor, I just object to the

6  argumentative nature of that question.  I believe that the

7  officer was answering the question before she was cut off.

8          MR. SHAPIRO:  Your Honor --

9          THE COURT:  Well, he wants a specific -- I guess the

10  answer is that no, he was not in the street, he was -- maybe

11  ask her where he was.

12          MR. SHAPIRO:  I thought she said yes.

13  BY MR. SHAPIRO:

14  Q.  Officer Hernandez -- I'm sorry.  Officer McClain, I

15  apologize, Armando Hernandez was walking in the middle of the

16  street and on to the sidewalk; isn't that right?

17  A.  I did observe that.

18  Q.  Okay.  And he was swearing and yelling the "N" word

19  multiple times, right?

20  A.  Correct.

21  Q.  And you asked yourself, "is that a Hispanic guy shouting

22  this stuff"?

23  A.  I did but it was when he was -- when we first -- when I

24  first observed him --

25  Q.  Officer McClain, I just want a yes or no answer.  Okay.

McClain - direct

1    Just yes or no answers.

2            MR. GAINER:  Your Honor --

3            MR. SHAPIRO:  I'm reading these questions directly --

4    I'm cutting off the witness, your Honor, because these

5    questions are directly from her deposition, and I just want a

6    yes or no answer.

7            MR. GAINER:  I'm not sure how she's supposed to know

8    that when he asked her that question.  She's trying to answer

9    the question.

10           MR. SHAPIRO:  Well, then I can impeach her with it,

11   your Honor.  I just want a yes or no answer.

12           THE COURT:  She said I did.  Okay.  Let's ask

13   questions.  Limit your question -- if it calls for a yes or

14   no, give it a yes or no and it can be clarified later.

15           MR. SHAPIRO:  Thank you, your Honor.

16   BY MR. SHAPIRO:

17   Q.  So you asked yourself, is that -- yes or no, "is that an

18   Hispanic guy shouting this stuff;" yes or no?

19   A.  Yes, I did.

20   Q.  And at 69th and Ashland on the coldest night in the world,

21   there will be 100 people out there and they're all male

22   blacks; isn't that right?

23   A.  I stated that at my deposition, yes, but there's also

24   females out there.

25   Q.  There's females out there in addition to the all-male

McClain - direct

1  blacks?

2  A.  There's a lot of people out at 69th and Ashland no matter

3  what time of year it is.

4  Q.  Okay.  But they're all black; isn't that right?

5  A.  Predominantly, yes.

6  Q.  Except for the store owners, right?

7  A.  Correct.

8  Q.  And so you were very concerned for Armando's safety,

9  weren't you?

10  A.  Yes, I was.

11  Q.  Because he was an Hispanic guy yelling epithets in an

12  all-black neighborhood, right?

13  A.  And he was causing traffic disorder around him.  He was

14  walking in and out of the street on to the sidewalk shouting

15  the things he was saying.  He shouted "nigger" at the top of

16  his lungs four to five times.

17  Q.  Thank you, Officer McClain.  You've answered my question.

18        And he was doing that about four or five times

19  according to your testimony --

20  A.  That I heard.

21  Q.  -- right?

22  A.  Yes.

23  Q.  Okay.  Swerving in and out of street, moving from the

24  sidewalk to the street and back again about four or five

25  times, right?

1   A.  Causing vehicles to swerve.

2   Q.  And he was flailing his arms in the middle of the street?

3   A.  His hands were balled in like a fist.  And he looked

4   disgruntled.  And he was like --

5   Q.  Okay.  Officer McClain, but my question was simply, he was

6   flailing his arms in the middle of the street, wasn't he?

7   A.  Yes.

8   Q.  Okay.  And you saw about two or three cars swerving to

9   avoid hitting him, right?

10  A.  Yes, I did.

11  Q.  And he was between 69th and 70th Streets at that time,

12  right?

13  A.  Yes, he was.

14  Q.  And you approached him?

15  A.  Coming southbound.

16  Q.  Okay.  Coming southbound after you turned around?

17  A.  No, we didn't turn around yet.

18  Q.  You didn't turn around.

19  A.  No.  We were still south when Mark slowed the car down.

20  Q.  Okay.  And so you didn't approach him?

21          MR. GAINER:  Objection to the mischaracterization of

22  that testimony.

23          MR. SHAPIRO:  She --

24          THE COURT:  The answer I guess would be -- it would

25  be kind of hard to answer that yes or no.

McClain - direct

123

```
 1  BY MR. SHAPIRO:

 2  Q.  You ultimately approached Armando Hernandez, didn't you?

 3  A.  Correct, in our vehicle.

 4  Q.  Okay.  And then he -- in your vehicle.  And you never

 5  approached him on foot?

 6  A.  We did.

 7  Q.  Okay.  Later, right?

 8  A.  Correct.

 9  Q.  And then Armando shoved his hands in his pockets as

10  quickly as he could?

11  A.  Yes.

12  Q.  And you asked him if he was okay, didn't you?

13  A.  Yes, because he's disgruntled and he's shouting the things

14  he's saying and he keeps walking in and out of traffic.

15  Q.  Okay.  And he told you to fuck off, right?

16  A.  Yes.

17  Q.  And you told him to get his hands out of his pockets,

18  didn't you?

19  A.  Yes.

20  Q.  And --

21  A.  It was a safety concern for me and my partner.

22  Q.  You've answered the question, Officer McClain.  Thank you.

23  I'm sure once again your attorney will elicit that from you

24  when he gets a chance.  I just want you to answer my questions

25  yes or no.  They're directly from your deposition.
```

McClain - direct

```
 1              Then he told you to fuck off again, didn't he?
 2    A.  Correct.
 3    Q.  All right.  And you were angry about that, weren't you?
 4    A.  I was not angry.
 5    Q.  You weren't upset --
 6    A.  No.
 7    Q.  -- that he told you to fuck off?
 8    A.  No.
 9    Q.  Okay.
10    A.  I was concerned about the way he was acting.
11    Q.  Okay.  You weren't intending to arrest him at that time,
12    at that point, were you?
13    A.  No.
14    Q.  And you just wanted to talk to him, right?
15    A.  Yes, to see what his problem was and why he was shouting
16    "nigger" in the middle of Ashland and causing traffic
17    disorder.  He could have got himself hurt or anyone driving
18    hurt.
19    Q.  Thank you, Officer McClain, for volunteering that.  You
20    wanted to talk to him because you didn't want him to get
21    killed at 69th and Ashland, right?
22    A.  That's true.
23    Q.  Because you thought they would have beaten him to death,
24    right?
25    A.  I don't know what was going to happen, but that's what I
```

McClain - direct

1    thought.

2    Q.  I understand.  That's all I'm asking you, is what you

3    thought.

4    A.  Correct.

5    Q.  Right?

6    A.  Correct.

7    Q.  You didn't want him getting hurt, right?

8    A.  No.

9    Q.  Because it's your job to serve and protect, correct?

10   A.  It is.

11   Q.  Okay.  And then you tried to grab his arms and pull them

12   out of his pockets, right?

13   A.  When we stopped him and he refused to take his arms out of

14   his pockets, we didn't know what he had.  And he was

15   disgruntled.

16   Q.  I understand, Officer McClain.  But my question was merely

17   that when he refused to take his hands out of his pockets and

18   said, "fuck you, I don't have to," you tried to grab his arms

19   and pull them out of his pockets, didn't you?

20          MR. GAINER:  Your Honor, I just want to object.  If

21   he's going to jump around in time, then she should be able to

22   explain when things happened chronologically.

23          THE COURT:  Apparently he's going on the deposition.

24          MR. SHAPIRO:  I'm going straight from the deposition,

25   your Honor.

McClain - direct

1          THE COURT:  He can proceed the way he wishes.

2          MR. SHAPIRO:  Thank you, your Honor.

3     BY MR. SHAPIRO:

4     Q.  But Armando stiffened up and wouldn't get his hands out of

5     his pockets; isn't that right?

6     A.  Correct.

7     Q.  All right.  And so you and Officer Hernandez took him to

8     the front of the car?

9     A.  Yes.

10    Q.  And you grabbed Armando's left arm?

11    A.  Yes, with both hands.

12    Q.  With both hands.  And Officer Hernandez grabs Armando's

13    right arm, right?

14    A.  Yes.

15    Q.  And then you got the cuffs on him?

16    A.  I didn't -- I don't remember who put the cuffs on.  All I

17    know is I was trying to get his left arm out of his left

18    pocket.

19    Q.  Okay.  So you don't remember who put the cuffs on him, you

20    or Officer Hernandez?

21    A.  No, I do not.

22    Q.  Okay.  And then he tried to kick you; is that right?

23    A.  When we bent him over trying to get the cuffs on, telling

24    him to calm down and ask him what's wrong with him, that's

25    when he proceeded to mule kick.

1   Q.  Okay.  And did he strike you when he mule kicked you?

2   A.  He grazed my shin.  I felt contact but I never had any

3   markings or anything.

4   Q.  Okay.  You felt contact with your shin?

5   A.  Yes.

6   Q.  Not your pant?

7   A.  My pant --

8   Q.  Pants?

9   A.  If it's going to hit my shin, it's going to hit my pants.

10  Q.  Okay.  But you felt his kick on your shin itself?

11  A.  Yes.

12  Q.  Okay.  Were you injured?

13  A.  No.  It was like a graze.  It wasn't like I got completely

14  kicked.

15  Q.  Okay.  So he didn't kick you directly in your shin but

16  grazed you off to the side of your shin, is that what

17  happened?

18  A.  He kicked me like about six inches above my foot, like I

19  felt it.

20  Q.  So but he never tried to head butt you, did he?

21  A.  No, he did not.

22  Q.  And he never threatened you that night, did he?

23  A.  No.

24  Q.  And he never took a swing at you, did he?

25  A.  No, he did not.

McClain - direct

128

```
 1    Q.  You never saw him take a swing at your partner, did you?

 2    A.  No, I did not.

 3    Q.  He didn't try to run away either, did he?

 4    A.  He was -- when he was cuffed, the reason why we were

 5    holding him down --

 6    Q.  Officer McClain --

 7    A.  -- his chest --

 8    Q.  -- my question was simply, he never tried to run away, did

 9    he; yes or no?

10            MR. GAINER:  Objection, cutting off the witness.

11            MR. SHAPIRO:  I am cutting off the witness, your

12    Honor, because --

13            MR. GAINER:  Argumentative.

14            THE COURT:  Well, I don't know if she can answer that

15    specifically yes or no.

16            MR. SHAPIRO:  My question was simple, your Honor,

17    whether he didn't try to run -- he didn't try to run away.

18    It's a yes or no question.

19            MR. GAINER:  And my response to that, your Honor, is

20    that it's not a yes or no question, and she should be allowed

21    to provide her answer.

22            MR. SHAPIRO:  It was a yes or no question in her

23    deposition, your Honor.  I think she can answer it yes or no

24    here today.

25            THE COURT:  If you can answer yes or no, do so.
```

McClain - direct

1   Otherwise say you can't answer yes or no.

2   BY MR. SHAPIRO:

3   Q.  Yes or no, Officer McClain, he didn't try to run away?

4   A.  He didn't try to run away.

5   Q.  Okay.  He was just stiff, wasn't he?

6   A.  He was stiff.  His arms were stiff when we were trying to

7   cuff him.

8   Q.  And after you got him in cuffs, Sergeant Boyle pulled up,

9   right?

10  A.  Yes, he did.

11  Q.  And at this point you had your right hand on Armando's

12  back while he was bent over the hood of your car, right?

13  A.  Yes.

14  Q.  And Officer Hernandez then grabbed one of Armando's feet

15  and they spun out and fell in unison to the ground, right?

16  A.  Yes.

17  Q.  And Armando hit the grass?

18  A.  Yes.

19  Q.  The front of his face hit the grass and he slid, right?

20  A.  Right.  As Mark guided him to the ground, they fell in

21  unison.  And Mark's knee went down.  And I observed --

22  Q.  Okay.  Officer McClain --

23  A.  -- Mr. Hernandez's face --

24  Q.  -- once again, I didn't ask for an explanation.  I just

25  asked you a simple question from your deposition whether the

McClain - direct

1    front of his face hit the grass and he slid.  Isn't that what

2    you said?

3    A.  Yes.

4    Q.  Okay.  And you never kicked Armando, did you?

5    A.  No.

6    Q.  And you never put a knee on him?

7    A.  No.

8    Q.  And then you helped him up off the ground, right?

9    A.  I didn't.

10   Q.  You didn't?

11          Page 50, counsel, Lines 23 and 24.

12          "Question:  When you say calmed down" -- strike that.

13          Okay.  Yes.

14          "Question:  When you say he calmed down, what was he

15    doing that made you think that:

16          "Answer:  He stopped stiffening up.  We helped him

17    up, brushed him off, and we put him in the back of our squad

18    car."

19   A.  Okay.  I testified "we" because Sergeant Boyle and Officer

20   Hernandez were there.  And we're a team.  So I didn't put

21   hands on him except to dust him off.

22   Q.  Okay.  So by "we," you didn't mean you and Officer

23   Hernandez, you meant Sergeant Boyle and Officer Hernandez?

24   A.  Yes.  But we're a team, so I consider us "we."

25   Q.  I understand.  Thank you for the explanation.

McClain - direct

1        And so he had some grass on his face that you brushed

2   off, correct?

3   A.  Correct.

4   Q.  And he looked fine except he looked drunk, right?

5   A.  He had redness on his face.  I could smell hard liquor on

6   his breath, and his eyes were glossy.

7   Q.  Okay.  He had redness on his face in part from the

8   abrasion on his -- because in part because of the abrasion on

9   his forehead; isn't that right?

10       MR. GAINER:  Calls for speculation.

11       THE COURT:  Overruled.

12  BY THE WITNESS:

13  A.  I noticed redness on his face --

14  BY MR. SHAPIRO:

15  Q.  Okay.

16  A.  -- when we first went to get his hands out of his pockets.

17  Q.  Where on his face?

18  A.  His cheeks, like he was crying.

19  Q.  Okay.  Did you notice the abrasion on his forehead?

20  A.  I noticed a light, maybe, mark on his forehead.

21  Q.  Was that -- was that from the grass on his forehead?

22  A.  It could have been.

23  Q.  And you didn't -- actually you didn't see any scrapes or

24  abrasions at that point, did you?

25  A.  All I saw was redness.

McClain - direct

 1   Q.  Okay.  And redness around his eyes?

 2   A.  Around his eyes and his cheeks.

 3   Q.  And his cheeks.  Okay.  And you didn't see any blood at

 4   that point, did you?

 5   A.  I saw no blood.

 6   Q.  Okay.  And you saw no blood later when you got him out of

 7   the squad car into the police station, did you?

 8   A.  I saw no blood.

 9   Q.  You never saw any blood?

10   A.  No.

11   Q.  Okay.  And you never saw any blood on his shirt either?

12   A.  I don't recall any blood.

13   Q.  Okay.  Let me show you what's marked as Plaintiff's

14   Exhibit 49, I think it is, if I have the numbers right

15   finally.

16          Do you recognize this shirt, Officer McClain?

17   A.  No.

18   Q.  Okay.  You don't recognize this as the shirt that Armando

19   Hernandez was wearing that night?

20   A.  I know he was wearing a white T-shirt.

21   Q.  Okay.  But you don't know whether this one is it?

22   A.  No.

23   Q.  Okay.  Do you recognize these as the shorts that Armando

24   Hernandez was wearing that night?

25   A.  No, I do not.

McClain - direct

133

 1   Q.  You do not.

 2          And you never noticed any swelling to Armando's

 3   forehead at any time on July 22nd, did you?

 4   A.  No.

 5   Q.  You didn't notice any swelling to his right eye that

 6   night?

 7   A.  No, just redness.

 8   Q.  You didn't notice any scratches on Armando, did you?

 9   A.  No, I did not.

10   Q.  But you asked him if he wanted to go to the hospital,

11   didn't you?

12   A.  Yes.

13   Q.  Okay.  You charged him with reckless conduct?

14   A.  Yes.

15   Q.  It's a criminal charge, isn't it?

16   A.  Yes, it is.

17   Q.  He would have to go to court, wouldn't he?

18   A.  Yes.

19   Q.  He could potentially face up to a year in jail?

20   A.  Yes.

21   Q.  Now, you found out later that Armando did, in fact, go to

22   the hospital, right?

23   A.  Yes.

24   Q.  And you keep track of your court dates by looking it up on

25   the computer at the station, don't you?

McClain - direct

1   A.  I do.

2   Q.  And you keep -- you also keep a personal calendar of when

3   you have to go to court after you look it up in the computer,

4   right?

5   A.  Yes, I do.

6   Q.  You put it in your FOP book, right?

7   A.  Yes.

8   Q.  And the reckless conduct charge got dropped or expunged,

9   didn't it?

10  A.  From what I know, yes.

11  Q.  Okay.  And when a case is SOL'd, it means the case is

12  dropped, doesn't it?

13  A.  Yes.

14  Q.  It means the case got thrown out?

15  A.  Yes, but it could also mean it could be reinstated.

16  Q.  Okay.  And so yes, you've heard before that SOL stands for

17  stricken off with leave to reinstate, right?

18  A.  Correct.

19  Q.  Okay.  You understand, as you testified, that if there's

20  leave to reinstate a case, it can be brought back against a

21  defendant, right?

22  A.  Correct.

23  Q.  And but the reckless conduct charge was never brought back

24  against Armando, was it?

25  A.  No, it wasn't.

McClain - cross

135

```
 1              MR. SHAPIRO:  May I have one minute, your Honor?
 2        (Pause.)
 3              MR. SHAPIRO:  No further questions, your Honor.
 4              THE COURT:  Cross-examine, Ms. Bell.
 5                          CROSS-EXAMINATION
 6    BY MS. BELL:
 7    Q.  Officer McClain, I'll try to be very brief.  So let's go
 8    straight to it.  Where were you when you first observed
 9    Armando Hernandez?
10    A.  We were coming south on Ashland.  We were right on 69th,
11    like we were facing south on Ashland at 69th.
12    Q.  And what is the first thing did you see?
13    A.  I saw Mr. Hernandez on the east side of the sidewalk with
14    his back toward me.
15    Q.  How did Armando Hernandez appear to you at that time?
16    A.  At that time it just looked like a person standing there.
17    Q.  And what other observations did you make?
18    A.  As we approached, I heard someone shouting racial slurs,
19    the "N" word, and mother-fucking and obscenities.  And then I
20    observed Mr. Hernandez walk into the street.  And there was a
21    car coming.  And he caused the car to swerve.
22              And he's in the street like with his fists balled
23    shouting, "Mother-fucking niggers.  Mother-fucking niggers."
24    And then he jammed his hands in his pockets.  Then he'd walk
25    on the sidewalk.  Then he walked back out on the street.
```

McClain - cross

1   Q.  And what did you think -- what did you think about the

2   situation at that time?

3   A.  That's when I was like, is that a Hispanic guy shouting

4   stuff in the middle of a predominantly African-American

5   neighborhood on a busy street.

6   Q.  And what did you do next?

7   A.  We approached.  And he was in the street.  And we're like,

8   "Are you okay?"

9   Q.  What did Armando -- did Armando Hernandez respond?

10  A.  He goes, "Fuck you and these niggers."

11  Q.  Did that make you angry?

12  A.  No, it didn't make me angry.  I was in shock.  I didn't

13  get -- expect to hear that coming from a Hispanic guy in the

14  middle of an African-American neighborhood on a busy hot

15  summer day.  We were concerned for his safety.  We were

16  concerned for the drivers's safety who were swerving around

17  him.

18  Q.  Just to be clear, when Armando Hernandez said that to you,

19  describe to me, how were you dressed?

20  A.  Oh, we were in -- I was in a T-shirt, khaki pants.  I had

21  my police vest on with my star on my right side, my name tag

22  on my left.  I had my radio here.  And we were in the unmarked

23  squad car.

24  Q.  Thank you.  So after he said that, what happened?

25  A.  Me and Mark looked at each other.  And we decided to make

McClain - cross

1  a U-turn because he proceeded to walk back to the sidewalk.

2  Mark ignited the lights.  And I'm looking back to see where

3  he's at.  He went back in the street with his arms out,

4  "mother fucking" and shouting "nigger."  And one or two more

5  cars swerved to avoid him, to avoid hitting him.

6          Then that's when Mark completed the U-turn.  And he

7  was on my right side on the sidewalk.

8  Q.  And up to this point, how many times did you hear

9  Mr. Hernandez shout the "N" word?

10  A.  Four or five times.

11  Q.  And also up to this point before you parked your car, how

12  many cars did you see swerve around and the traffic slow down?

13  A.  From the time we turned?

14  Q.  Correct.

15  A.  Two.

16  Q.  To the time when you parked your car.

17  A.  Two when we turned.

18  Q.  And just to be clear, when did you see Armando Hernandez

19  going in and out of the traffic, out of the street?  When did

20  you see that?  Just tell me one more time.

21  A.  When we were first coming up south, I seen him go in and

22  out twice causing two cars to swerve.  Then when we -- Mark

23  was making the U-turn.  I looked back in the windows, and I

24  saw him do it again while he's flailing his arms, while he's

25  shouting "nigger" and more profanities.

1   Q.  So just to be clear, that was before you guys stopped

2   Mr. Hernandez, correct?

3   A.  Yes.

4   Q.  Please tell us what happened next.

5   A.  We pulled up to Mr. Hernandez.  And he was directly

6   outside my door on the sidewalk.  And I go, "Get your hands

7   out of your pockets."

8   Q.  Did he say anything in response after you asked him to

9   take his hands out of his pockets?

10  A.  He said, "Fuck you."

11  Q.  What did you do after that?

12  A.  I -- I was like -- I was shocked.  And I'm like, "Sir, get

13  your hands out of your pockets."

14          And I jumped out of the car.  And I grabbed his left

15  arm because he would not remove his hands out of his pockets

16  and he was stiff.

17  Q.  Why were you asking him to get his hands out of his

18  pockets?

19  A.  Because the area we work, it's pretty, you know, dangerous

20  and it's officer safety.  He was disgruntled.  He was -- you

21  could tell he was glossy-eyed.  He was angry.

22          And there was a reason why he was putting his fists

23  in his pockets.  I don't know if he had a weapon.  It was -- I

24  was concerned with my safety, my partner's safety.  And I was

25  really close to him.

McClain - cross

1    Q.  Were you angry after he -- after you asked him to take his

2    hands out of his pockets and he didn't?

3    A.  I was -- I wasn't angry.  I was concerned.

4    Q.  Okay.  So what happened after you ordered him to take his

5    hands out of his pockets?

6    A.  He wouldn't, so I grabbed his left arm.  And I proceeded

7    to -- me and Mark brought him to the front of the car.  And we

8    proceeded to get his arms out.

9    Q.  Okay.  Once at the car, what happened?

10   A.  Once what?

11   Q.  Once you were at the hood of the car, what happened?

12   A.  I noticed the redness in his face.  I noticed the

13   glossiness in his eyes.  And I smelled hard liquor on his

14   breath.  So I knew he had been drinking.

15        But the whole time we're at the front, we're trying

16   to -- well, about, I'd say, three seconds it took while he was

17   stiffening his arms, me to get his left arm out.  He's a lot

18   stronger than me.  So I eventually got his left arm out while

19   Mark got his right.  And I don't remember who cuffed him.

20   Q.  So once you were able to finally cuff Mr. Hernandez, what

21   happened next?

22   A.  He -- I was asking him, "What's wrong?  What's wrong?"

23   And he wouldn't tell me.

24        And we lean him over.  I forgot to add that.  When we

25   were cuffing him, we leaned him over to get his hands back.

McClain - cross

1  And then he proceeded to kick at us.  And he grazed my shin

2  kind of making contact.  And I'm like, "Mark, he's kicking

3  me."

4          And then I believe he kicked Mark.  And that's when

5  Mark grabbed his foot and his shoulder and they went to the

6  ground.

7  Q.  Let me stop you for a second.  You mentioned at some

8  time -- at some point that you were trying to ask him some

9  questions.  Did you hear any coherent response from

10  Mr. Hernandez that would explain the situation of what was

11  happening?

12  A.  No.  He was just saying "fuck you" and swearing.

13  Q.  And prior to Officer Hernandez, your partner, taking --

14  escorting Mr. Hernandez to the ground, did any other police

15  officer show up on the scene?

16  A.  Yes.  Sergeant Boyle pulled up.

17  Q.  So Officer McClain, just again to be clear, at what point

18  did Sergeant Boyle, your supervisor, came to the scene?

19  A.  Right before Armando -- Armando started kicking.

20  Q.  Okay.  And can you tell me, once Sergeant Boyle came to

21  the scene, did you have any conversations with your

22  supervisor?

23  A.  I know I was explaining to him what he did, what Armando

24  did.

25  Q.  Can you please tell us, if you recall, what exactly did

1    you tell Sergeant Boyle?

2         MR. SHAPIRO:  Objection, your Honor, hearsay.  It's

3    an out-of-court statement offered for the truth.

4         THE COURT:  Well, what's the purpose of it?

5         MS. BELL:  Your Honor, I'm trying to establish, first

6    of all, what Officer Hernandez heard as a collective knowledge

7    and also what effect on Sergeant Boyle as he was proceeding

8    with the scene as he did after what Officer McClain told him.

9         THE COURT:  Well, not for the truth, she may answer.

10        MS. BELL:  Thank you, your Honor.

11   BY MS. BELL:

12   Q.  Go ahead.

13   A.  Not verbatim but I know I told Boyle that he was walking

14   in and out of the street causing traffic to swerve.

15   Q.  Okay.

16   A.  And we were going to lock him up for reckless conduct.

17   Q.  So after your partner, Officer Hernandez, escorted

18   Mr. Hernandez to the ground, what happened next?

19   A.  After he escorted him to the ground, we -- Sergeant Boyle

20   calmed him down along with me and Officer Hernandez.  They sat

21   him up, and they picked him up off the ground together.

22   Q.  And again just to be clear, did you assist in any way your

23   partner in escorting Mr. Hernandez to the ground?

24   A.  I did not.

25   Q.  Where were you at that time?

McClain - cross

1   A.  I was just standing to the left of Mr. Hernandez and to

2   the left of Mark.  And it just -- the way they fell was to the

3   right.  So it was just away from me.  And really Mark had

4   ahold of him.  He helped cushion his fall the best he could

5   because he was handcuffed but the fact that he was kicking was

6   a danger to me and Mark.

7   Q.  I understand.  While Mr. Hernandez was on the ground, you

8   heard him testify yesterday that you -- his testimony is that

9   you kicked him on the side of his torso or ribs area.

10          Did you kick him at any time while he was laying on

11  the ground?

12  A.  I didn't kick him at all.

13  Q.  Did you see anyone on the scene at that time whether it's

14  Sergeant Boyle or your partner, Officer Hernandez, kick him on

15  the side of his torso or rib area?

16  A.  No.

17  Q.  So after Armando Hernandez was brought up to his feet,

18  what observations did you make about Mr. Hernandez?

19  A.  He just had grass on his face.  He had the redness on his

20  cheeks.  But I don't know if that was from crying or the fall.

21  He had grass on his chest.  And I dusted him off.

22  Q.  Did he appear -- it sounds like you were pretty close to

23  him, right, after he was stood up and right after the fall.

24          Did you observe any injuries on him?

25  A.  I did not.  He may have a little like something on his

McClain - cross

1    forehead but it wasn't great.  It was just like -- mostly I

2    observed the redness in his cheeks, the glossiness in his

3    eyes, and the hard liquor on his breath.

4    Q.  Did you see any blood on his face?

5    A.  I did not see any blood.

6    Q.  Did you see any blood in his mouth?

7    A.  No.

8    Q.  Moving on, so after he was brought to his feet, what did

9    you guys do next?

10   A.  We walked him over to the police car.  And I ran his name

11   with his ID on our police computer.

12   Q.  Okay.  So once he was in your car, where you guys were

13   going?

14   A.  Oh, we were heading to the police station.

15   Q.  While you were driving to the police station, did anyone

16   talk to Mr. Hernandez or did Mr. Hernandez talk to you in the

17   car?

18   A.  First he's, you know, crouched over saying, "I hate my

19   life.  I hate my life."

20          And I'm like, "Do you need to go to the hospital?"

21   Q.  Why did you ask him that?

22   A.  Everyone I lock up personally, I always ask if they have

23   to go to the hospital because that's what lockup is going to

24   ask them.  If they need to go to the hospital, we'll take them

25   right away.  Like we would have took -- in this instance if he

McClain - cross

144

1    said yes, we would have took him to the hospital.

2    Q.  So that's something that you always do?

3    A.  I always ask.

4    Q.  So once you arrived at the station, what happened?

5    A.  We -- I went with Officer Hernandez and Sergeant Boyle.

6    We walked him into the hallway.  And then the entrance of the

7    processing room is on our left.  You got to scan in.

8          We opened the door.  And Officer Hernandez, Sergeant

9    Boyle, and Mr. Hernandez went into the processing room.  I was

10   at the door.  And I asked, "Are you sure you don't want to go

11   to the hospital" one more time.

12   Q.  And what did he say?

13   A.  "No, I do not want to go to the fucking hospital."

14   Q.  Let me ask you this.  At that point when you brought him

15   to the processing room, did he complain to you that he was in

16   pain?

17   A.  He did not.

18   Q.  Did he at any time from the time still on the scene until

19   after this point when you brought him to the processing room,

20   did he ever ask that he needed medical attention?

21   A.  No.

22   Q.  Okay.  What happened next after that?

23   A.  I went to the tactical office.  And I noticed his phone

24   was ringing.  And I'm like, maybe it's someone who knows why

25   he's acting like this.  In my mind, that's what I'm thinking.

McClain - cross

1   Q.  So let me stop you right there.  How many times was the

2   phone ringing before you picked it up?

3   A.  It must have rang five times every time someone was

4   calling.  I don't know who was calling.  It was just

5   constantly going off.

6   Q.  So at some point, you decided to pick up the call?

7   A.  Yes.  Maybe it's someone who could fill me in on what

8   happened.

9   Q.  Let me stop you for a second there.  So my question is, I

10  just wanted to be clear on that, you picked up the phone.  It

11  was ringing for a while.  Why did you decide to pick up the

12  phone?

13  A.  Because I figured it was someone who knew Armando and knew

14  what was wrong with him so we could get insight on why he was

15  acting the way he was acting.

16  Q.  So it sounds like to me at this point, you were still

17  trying to figure out what was going on?

18  A.  Right, right, why was he acting like this.

19  Q.  Okay.  So after you picked up the phone, who did you hear

20  on the other line?

21  A.  It was his girlfriend or his wife.

22  Q.  Okay.  What did she say to you and what did you say -- did

23  you say to her?

24  A.  She sounded upset.  And I'm like -- she's like, "Oh, my

25  God.  Who is this?"

1      I'm like, "This is Officer McClain of the 7th

2   District.  Do you know Armando Hernandez?"

3      She's like, "Yes.  He's my husband" or boyfriend.  I

4   don't remember.  And she's like, "We got into a fight."

5      I'm like, "Well, he's with us."  And I don't know

6   verbatim what I said but, "He's safe."

7      And she's like, "Oh, thank God, he's safe.  We had a

8   fight.  He was upset when he left the house."

9      So that gave me insight as to why he was acting the

10  way he was acting.

11  Q.  Okay.  After you had this conversation with

12  Mr. Hernandez's girlfriend or wife, at that time you didn't

13  know, what happened next?

14  A.  Officer Hernandez and Sergeant Boyle came into the tac

15  office while I was still on the phone with her.  And then I

16  hung up.  And I told them, "That was his wife or girlfriend."

17      And I filled them in, you know, that they'd got in a

18  fight, he was disgruntled when he left the house.  And she

19  didn't know where he was.

20  Q.  And then what happened?

21  A.  Sergeant Boyle and Officer Hernandez went in the lockup

22  while I started the paperwork.

23  Q.  Okay.  And at some point that evening, you, your partner,

24  Officer Hernandez, and then Sergeant Boyle charged

25  Mr. Hernandez with a charge of reckless conduct, correct?

McClain - cross

1  A.  Correct.

2  Q.  Please tell us, what other charges could you have charged

3  him with based on the conduct of that night?

4  A.  We could have charged him with assault to police officer

5  because he kicked at us, agg assault to police officer because

6  he made contact with me.  We could have charged him -- we

7  charged him with the reckless conduct because that was what he

8  was doing.  He was causing traffic disorder.  He could have

9  caused injury to himself or the people driving their cars.

10 Q.  And then so at the end of that night, what did you end up

11 charging Mr. Hernandez with?

12 A.  Just the reckless conduct.

13 Q.  And why did you charge him just with the reckless conduct?

14 A.  He was a guy who had a bad day.  He -- you know, we felt

15 for him.  We didn't know why he was acting the way he was

16 acting.  Initially we're just going to find out what was wrong

17 with him.

18          And it's just, he had a bad day.  He's not working.

19 He's out of a job.  He's -- he's like a disappointment to his

20 family.  I mean, this guy's day was bad enough.  And once we

21 found out what happened, we felt for the guy.

22          You know, it's hard to get a job when you have a

23 conviction.  So we weren't going to charge him with a felony

24 because he had a bad day.

25 Q.  I understand.  Officer McClain, just one final question.

1   That night on July 22nd of 2012, did you see anything that

2   your partner, Officer Hernandez, did that you deemed to be

3   unreasonable?

4           MR. SHAPIRO:  Objection, your Honor.

5           MS. BELL:  I'll strike that.  I'll rephrase it.

6   BY MS. BELL:

7   Q.  Did you see your partner use any force that night that you

8   believe to be unreasonable?

9   A.  No, not at all.

10          MS. BELL:  Just one moment, your Honor.

11          THE COURT:  Anything -- okay.

12          MR. SHAPIRO:  Thank you, your Honor.

13          MS. BELL:  Just one final question.  I'm not finished

14  yet.

15  BY MS. BELL:

16  Q.  Officer McClain, one final question.  At what point did

17  you believe you had probable cause to arrest Mr. Hernandez?

18  A.  As soon as he was walking in and out of the street causing

19  traffic disorder.

20          MS. BELL:  I have nothing further.

21          MR. SHAPIRO:  Briefly as I can, your Honor.

22          THE COURT:  Brief.

23          MR. SHAPIRO:  Yes.

24          THE COURT:  How long?

25          MR. SHAPIRO:  Maybe five minutes if that.

McClain - redirect

149

```
 1          THE COURT:  We'll take a ten-minute recess at this

 2    point.

 3       (Recess.)

 4          THE COURT:  You may give your redirect.

 5          MR. SHAPIRO:  Thank you, your Honor, briefly.

 6                    REDIRECT EXAMINATION

 7    BY MR. SHAPIRO:

 8    Q.  Officer McClain, you testified, you told Ms. Bell that you

 9    spoke to Armando's wife on the phone when you answered the

10    phone, right?

11    A.  Yes.

12    Q.  Did you tell her that your partner took him to the ground?

13    A.  No, I did not.

14    Q.  You also testified that Armando was screaming "nigger"

15    four or five times at 69th and Ashland; is that right?

16    A.  Not 69th and Ashland.  In the vicinity.

17    Q.  In the vicinity of 69th and Ashland?

18    A.  Yes.

19    Q.  Okay.  And you testified that there were at least 100 male

20    blacks there at any given time, right?

21    A.  At 69th and Ashland.

22    Q.  Okay.  This wasn't at 69th and Ashland?

23    A.  He was between -- he was closer to 69th, but we were

24    between 69th and 70th and Ashland.

25    Q.  In any event, none of the 100 or so male blacks tried to
```

McClain - redirect

1   attack him, did they?

2   A.  Thank God they didn't hear him.

3   Q.  They didn't hear -- you know that they didn't hear him?

4   A.  I can't tell you what they -- anyone heard, but all -- my

5   focus was on, was Mr. Hernandez.

6           MR. SHAPIRO:  Your Honor, I'd object to the

7   speculation as to what they heard or --

8           MR. GAINER:  He asked her to speculate --

9           MR. SHAPIRO:  -- or didn't hear -- I didn't, your

10  Honor.

11          THE COURT:  I'll let it stand.

12          MR. SHAPIRO:  She volunteered that.

13  BY MR. SHAPIRO:

14  Q.  And they didn't try to kill him either?

15  A.  Not -- no.

16  Q.  Okay.  You were worried about that, right?

17  A.  If he made it to 69th Street, yes.

18  Q.  Okay.  But none of that ever took place, right?

19  A.  No.

20          MR. GAINER:  Asked and answered.

21  BY MR. SHAPIRO:

22  Q.  All right.  And you testified that at least two or three

23  cars slowed down and swerved; is that right?

24  A.  Correct.

25  Q.  All right.  Do you recall the race of the people in those

1    cars?

2    A.  No, I do not.

3    Q.  You don't know if they were black or white?

4    A.  No, I do not.

5    Q.  Or Hispanic?

6    A.  No.

7    Q.  Okay.  And you testified, you told Ms. Bell that you were

8    going to charge him with reckless conduct after he was causing

9    traffic to swerve; is that right?

10   A.  We could charge him with reckless conduct.

11   Q.  You could.  But you didn't -- you testified that you were

12   going to charge him with reckless conduct, didn't you?

13          MR. GAINER:  That mischaracterizes her testimony,

14   your Honor.

15          MR. SHAPIRO:  I don't believe so, your Honor.

16          THE COURT:  I'll let her do more than yes or no.

17   BY THE WITNESS:

18   A.  In the long run, we did charge him with reckless conduct,

19   but we could have charged him with other things.

20   BY MR. SHAPIRO:

21   Q.  I understand, Officer McClain.  But you said you made the

22   decision to charge him with reckless conduct at the scene, not

23   later at the lockup, right -- at the station, I should say?

24          MR. GAINER:  That mischaracterizes her testimony.

25          THE COURT:  Overruled.  I'll let her answer.

McClain - redirect

152

1   BY MR. SHAPIRO:

2   Q.  You can answer.

3   A.  In my head, I did.

4   Q.  In your head, you did, you made the decision.  Okay.

5       And you testified that you didn't charge him with

6   aggravated assault or aggravated battery or any of the

7   felonies, right?

8   A.  No.

9   Q.  Because he was having a bad day, right?

10  A.  Yes.

11  Q.  Is that right?

12      And his day got a lot worse when your partner slammed

13  his face to the ground, didn't it?

14      MR. GAINER:  Objection, argumentative.

15      THE COURT:  Objection sustained.

16      MR. SHAPIRO:  No further questions, your Honor.

17      THE COURT:  You can step down.

18  (Witness excused.)

19      THE COURT:  Call your next witness.

20      MR. SHAPIRO:  Plaintiff calls Sergeant Boyle.

21      MR. GAINER:  I'll get him.

22      THE COURT:  Okay.

23  (Pause.)

24      THE COURT:  Please raise your right hand.

25  (Witness sworn.)

1     THE COURT:  Please be seated.

2         You may question the witness, Mr. Shapiro.

3         MR. SHAPIRO:  Thank you, your Honor.

4       SERGEANT PATRICK BOYLE, PLAINTIFF'S WITNESS, SWORN

5                      DIRECT EXAMINATION

6  BY MR. SHAPIRO:

7  Q.  You're Sergeant Patrick Boyle; is that right?

8  A.  Yes.

9  Q.  B-o- -- spelled B-o-y-l-e?

10 A.  Correct.

11 Q.  And first name Patrick, common spelling, right?

12 A.  Correct.

13 Q.  Okay.  And you're on the same team as Officers McClain and

14 Hernandez, are you not?

15 A.  Up until Sunday two weeks ago, that's correct.

16 Q.  Okay.  You were their sergeant -- back on July 22nd, 2012,

17 you were on the same team as they were, right?

18 A.  Yes.

19 Q.  The same tac team, right?

20 A.  Yes.

21 Q.  You were their supervisor, right?

22 A.  Yes.

23 Q.  You're a sergeant, right?

24 A.  Yes.

25 Q.  And you were a sergeant back then, correct?

Boyle - direct

1    A.   Yes.

2    Q.   Okay.  So -- strike that.

3            And part of the same team, you socialized with

4    Officers McClain and Hernandez, did you not, outside of work?

5    A.   Outside of work, we've had a couple of occasions, every

6    year we have like, for instance, a Christmas party for the

7    district.  And then we've also had Christmas parties for our

8    own tactical unit among the other team members aside from the

9    district Christmas party.  And just a couple of other events,

10   I think a wedding that I can remember.

11   Q.   Okay.

12   A.   But other than that, nothing.

13   Q.   You've been to one of their weddings?

14   A.   Not to one of theirs but for another officer that we work

15   with.

16   Q.   Okay.  Been to ball games with them?

17   A.   Not that I can specifically recall.

18   Q.   No Sox games?

19            MR. GAINER:  Asked and answered.

20            MR. SHAPIRO:  Well, your Honor, I asked about ball

21   games, and then Sox games is a little bit different.  I'm

22   trying to refresh his recollection.

23            Anyway, I'll withdraw the question, your Honor.

24   BY MR. SHAPIRO:

25   Q.   What about watch parties?  Have you ever been to watch

Boyle - direct

 1   parties with them?

 2   A.  No, not that -- other than the parties I described, the

 3   holiday events and that sort of thing.

 4   Q.  Fundraisers?

 5   A.  There may have been one like back in 2006, come to think

 6   of it, for an officer on our watch on afternoons.

 7   Q.  In any event, you were friendly with Officers McClain and

 8   Hernandez, were you not?

 9   A.  For the most part, yes.

10   Q.  Okay.  And Armando Hernandez was -- this is Armando

11   Hernandez.  I'll call him Armando so as not to confuse him

12   with Officer Hernandez, Sergeant Boyle, if that's okay.

13           Armando Hernandez was handcuffed when you first

14   approached him, was he not?

15   A.  Yes.

16   Q.  And you then saw Officer Hernandez take Armando Hernandez

17   down to the ground to get better control of him, didn't you?

18   A.  Yes.

19   Q.  You didn't know what had brought him to that part of the

20   city, did you?

21   A.  Speaking about Armando?

22   Q.  Armando Hernandez, yeah.

23   A.  No.  As a matter of fact, I didn't.

24   Q.  Okay.  You kind of figured he was not from the area,

25   right?

Boyle - direct

1    A.  More or less, yes.

2    Q.  Okay.  And by that, you meant an Hispanic guy in an

3    African-American neighborhood?

4    A.  Generally speaking, yes.

5    Q.  You didn't know that he actually lived in that

6    neighborhood, did you?

7    A.  I had no idea.

8    Q.  Okay.  And you thought he was intoxicated, right?

9    A.  That, I did.  When I first saw Mr. Hernandez, it just --

10   from my experience as a law enforcement officer, I tend to

11   recognize traits and behaviors of people that have been

12   drinking.  So that was my assessment.

13   Q.  Okay.  And right after you got there, you talked to the

14   officers, and Armando Hernandez started thrashing around; is

15   that right?

16   A.  He did.  As a matter of fact, from what I recall, he --

17   Q.  Well, thank you, Sergeant Boyle, for volunteering.  But my

18   only question was whether Armando Hernandez started thrashing

19   around.  I think you've answered my question.  Okay.

20          MR. GAINER:  Your Honor, I think that the witness

21   should be allowed to answer this question.  He was trying to

22   answer it before he was cut off.

23          MR. SHAPIRO:  Your Honor, it's a simple yes or no

24   question.  Again these questions are right out of his

25   deposition.  And they require simply a yes or no answer.  If

Boyle - direct

157

1    Mr. Gainer wants to elicit more information from him, then I

2    think he can.

3              THE COURT:  Let's go.  Let's keep going.

4              MR. SHAPIRO:  Thank you, your Honor.

5    BY MR. SHAPIRO:

6    Q.  And it seemed as though Armando Hernandez pushed his chest

7    up against the vehicle and tried to use his chest to do

8    something with his legs; is that right?

9    A.  Yes.

10   Q.  Okay.  And it was at that point that Officer Hernandez

11   took him to the ground, correct?

12   A.  Yes.

13   Q.  And you called the maneuver a hip toss, didn't you?

14   A.  I did.

15   Q.  Okay.  And by that you meant that Officer Hernandez simply

16   rolled Armando Hernandez over his hip and got him to the

17   ground with his face facing down; is that correct?

18   A.  Correct.

19   Q.  And then he just held him there and in position until

20   Armando stopped kicking about, correct?

21   A.  Yes.

22   Q.  And you saw Mr. Hernandez, Armando Hernandez, I should

23   say, go to the ground, didn't you?

24   A.  Yes, I did.

25   Q.  But you didn't see his face hit the ground, right?

Boyle - direct

1    A.  No, I did not.

2    Q.  You personally never saw Armando walking in and out of

3    traffic, did you?

4    A.  No, I did not.

5    Q.  And you personally never heard Armando shouting

6    obscenities at anyone, correct?

7    A.  No, I didn't.

8    Q.  You never saw Armando take a swing at either officer, did

9    you?

10   A.  No, I didn't.

11   Q.  And you never -- and he never tried to take a swing at you

12   either; is that correct?

13   A.  That's correct.

14   Q.  All right.  And he wasn't trying to pull away when you

15   were bringing him to the patrol vehicle, was he?

16   A.  No.

17   Q.  And as you were bringing him to the patrol vehicle, you

18   didn't see any injuries to him, correct?

19   A.  Correct.

20   Q.  And you didn't see any marks on his forehead?

21   A.  Correct.

22   Q.  You didn't see any blood?

23   A.  Correct.

24   Q.  It was only much later when you were escorting him from

25   your prisoner processing area to your lockup that you saw some

Boyle - direct

1    redness to one side of his face; is that right?

2    A.  That's right.

3    Q.  And neither one of your officers had gotten hurt that

4    night, that morning, had they?

5    A.  No.

6    Q.  And although Officer Hernandez did tell you that he got

7    kicked, did he not?

8    A.  Yes, he did.  And when he told me that, I had asked

9    Officer Hernandez to pull up his pant leg so that I could see,

10   you know, if he had any injury because --

11   Q.  I was just getting to that, Sergeant Boyle --

12   A.  Okay.

13   Q.  -- if I may.

14          So he told you that he -- you didn't see any marks on

15   his leg when Officer Hernandez showed you; isn't that right?

16   A.  Correct.

17   Q.  Okay.  And now going back to the incident, they described,

18   "they" meaning Officers McClain and Hernandez, described

19   Armando as being in the middle of Ashland Avenue or in the

20   northbound lanes of Ashland Avenue, didn't they?

21   A.  Yes.

22   Q.  And by "they," you mean both of them said that to you,

23   didn't you?

24   A.  Yes.

25   Q.  Okay.  And you didn't see any marks on Armando Hernandez

Boyle - direct

1   during his interview with Lieutenant Gushes, did you?

2   A.   At that point I think is when I recalled seeing the

3   redness to the side of his head.

4   Q.   You did see redness on the side of his head during the

5   interview with Lieutenant Gushes?

6   A.   I think it was around that time, yes.

7   Q.   Okay.  Do you remember giving a deposition in this case,

8   Sergeant Boyle?

9   A.   Yes.

10  Q.   And do you remember a court reporter being present just

11  like there is here today?

12  A.   Yes.

13  Q.   And you remember being sworn to tell the truth, the whole

14  truth, and nothing but the truth just as Judge Leinenweber did

15  here for you today?

16  A.   Yes.

17  Q.   Okay.  And do you remember being asked this question and

18  giving this answer?

19          I'm sorry.  Counsel, Page 54, Lines 18 through 20:

20          "At that time did you see any marks on Mr. Hernandez?

21          "Answer:  No, I don't think so."

22          MR. GAINER:  Objection.  There's really no context of

23  what "at that time" is.

24          MR. SHAPIRO:  Let me -- thank you, counsel.  Let me

25  go back to that.

Boyle - direct

161

1   BY MR. SHAPIRO:

2   Q.   You were -- earlier in your deposition, you testified that

3   you were present when Lieutenant Gushes interviewed

4   Mr. Hernandez; is that correct?

5   A.   Yes.

6   Q.   Okay.  And you remember Lieutenant Gushes escorting the

7   prisoner to the prisoner processing area where Armando

8   Hernandez is being detained; is that right?

9   A.   I'd really have to examine the document --

10  Q.   Okay.

11  A.   -- to really tell you.

12  Q.   You were -- you were asked the following question and gave

13  the following answers, Lines 6 through 11:

14          "And was he cooperative during the interview?"

15  A.   If --

16  Q.   And then you answered:

17          "He answered her questions.  She asked if he was

18   okay.  And she asked him what was going on.  And he gave her

19   an answer in language I can understand versus our encounter

20   on the street."

21          Do you remember being asked that question, giving

22  that answer?

23  A.   Yes.

24  Q.   Okay.  And then the next question:

25          "When she asked if he was okay, what did he say?

Boyle - direct

```
 1              "Answer:  Yeah."
 2           Do you remember giving that answer, yeah, he was
 3   okay, meaning he was okay?  Do you recall that?
 4   A.  Yes.
 5   Q.  Okay.  And then you were asked the question:
 6              "At any time did you see any marks on Mr. Hernandez?
 7              "Answer:  No, I don't think so."
 8           At that time, did you see any marks on
 9   Mr. Hernandez?
10   A.  Well, as I testified a moment ago when you asked, I don't
11   remember -- what I remember is, I think it was at that point
12   in time where I remembered seeing the redness on his head at
13   some point when he was at the police station in the police
14   processing room for arrest in the 7th District.
15   Q.  Okay.  So now you remember that you saw redness on his
16   face when he was -- during the interview with Lieutenant
17   Gushes?
18              MR. GAINER:  That mischaracterizes his testimony.
19              MR. SHAPIRO:  I don't think it does, your Honor.
20              THE COURT:  Overruled.
21   BY MR. SHAPIRO:
22   Q.  You can answer, Sergeant Boyle.
23   A.  In -- I'm trying to answer your question as opposed to --
24   you know, from being on the street with Mr. Hernandez versus
25   being in our processing area in the 7th District.
```

Boyle - direct

1   Q.  I'm just asking you about in the processing area with

2   Lieutenant Gushes during that time.

3   A.  Well, whether or not it was with Lieutenant Gushes, the

4   fact remains, I remember seeing the redness on his head back

5   in the 7th District processing room.

6   Q.  Okay.  You're just not sure during the interview with

7   Lieutenant Gushes; is that right?

8   A.  Correct.

9   Q.  Okay.  And so at some point, you later saw redness to the

10  side of his face, some redness and swelling, almost like

11  irritation; is that right?

12  A.  Yes.

13  Q.  And part of your job is to read off court notifications,

14  isn't it?

15  A.  Yes.

16  Q.  And so you read off a court notification for the reckless

17  conduct charge on August 17th, 2012?

18  A.  That, I don't remember specifically that case in

19  particular.

20  Q.  You don't remember reading off a court notification for

21  the reckless conduct charge; is that right?

22  A.  That's correct.

23  Q.  Okay.  Do you remember not reading it off?

24  A.  No.  I don't remember one way or the other.

25          MR. SHAPIRO:  Okay.  If I may have one minute, your

Boyle - cross

164

1    Honor.

2           THE COURT:  All right.

3      (Pause.)

4           MR. SHAPIRO:  No further questions, your Honor.

5           THE COURT:  Cross-examine.

6                    CROSS-EXAMINATION

7    BY MS. BELL:

8    Q.  Good afternoon, Sergeant Boyle.  Sir, what is your

9    educational background?

10   A.  I have a bachelor's degree from Loyola University, and I

11   have a bachelor of business administration.  I graduated there

12   in 1993.

13   Q.  And did you serve in the military?

14   A.  Yes, I did.

15   Q.  Where in the military, which branch?

16   A.  In the United States Army and in the Army National Guard.

17   Q.  And how long were you in the military?

18   A.  For a total of 16 years, from 1991 until just -- 1990

19   until 2005.

20   Q.  And what discharge did you receive?

21   A.  I was honorably discharged.

22   Q.  What year were you promoted to sergeant?

23   A.  On the Chicago police department, I got promoted to

24   sergeant in 2005.

25   Q.  And how long had you been a supervisor, sergeant of the

Boyle - cross

1  tactical team where Officer Hernandez and McClain were team

2  members?

3  A.  I was a supervisor in the 7th District for a total of nine

4  years.  For eight and a half of those years, I was a tactical

5  team supervisor.

6  Q.  Sir, let's take you to July 21st of 2012.  Can you please

7  tell us, what time did you begin your shift?

8  A.  I believe our shift at that time started at 1800 hours, or

9  6:00 at night.

10  Q.  And were you supposed to -- what time were you scheduled

11  to clock out?

12  A.  3:00 in the morning.

13  Q.  Okay.  Sir, that night, it has been testimony already of

14  Officer McClain and Officer Hernandez is that night they were,

15  in fact, working past their end shift time.

16          Can you please tell us, why were they working past

17  3:00 a.m. in the morning on July 22nd?

18  A.  Sure.  At that -- on that particular day, there was --

19  there's some incident of violence between two opposing street

20  gangs.  And our commanding officer asked us to stay late.  He

21  asked me if I could poll my officers to see who, in fact,

22  could stay and work late just in a particular area between

23  where the conflict was going on.

24  Q.  Do you recall asking Officer Hernandez and Officer McClain

25  to stay late?

Boyle - cross

1    A.  I did.

2    Q.  What did they say after you asked them to volunteer?

3    A.  They volunteered to stay late and work with me.

4    Q.  Sir, at some point on July 22nd of 2012, you came upon the

5    scene of the arrest of Armando Hernandez, correct?

6    A.  Yes.

7    Q.  Can you please tell us, is it unusual for a sergeant to --

8    well, strike that question.

9            Please tell us what, were you doing at that time?

10   A.  I was on patrol in the area that was designated by my

11   commanding officer within the gang conflict area.

12   Q.  Is it unusual for you as a sergeant of the tactical team

13   to be on a regular patrol?

14   A.  Not at all.

15   Q.  How often do you go on regular patrols?

16   A.  Just depending on the day and the circumstances.  Over 50

17   percent of my tour I spend outside on the street either

18   working by myself or with the other officers on the team.

19   Q.  So that particular night at that particular time, you were

20   on patrol in that area, correct?

21   A.  Yes.

22   Q.  And why was that?

23   A.  I was directly supervising, directing a patrol mission to

24   counter the gang violence that we were encountering in the

25   district.

Boyle - cross

1   Q.   Please tell us, what did you see the first time that you

2   observed -- what brought your attention to that particular

3   scene?

4   A.   I remember driving north on Ashland Avenue.  And I saw

5   what I recognized as one of our tac team vehicles.  And the

6   closer I got, I slowed down, and I immediately recognized

7   Officer Hernandez and Officer McClain with an individual

8   stopped on the side of the road.

9   Q.   And what happened next?

10  A.   I pulled my car to the front of where they were parked,

11  and I got out.  And I approached Officer McClain initially

12  from what I remember and started to ask her about, you know,

13  what was going on.

14  Q.   What did Officer McClain tell you in response to your

15  question what was going on?

16  A.   She explained to me that they'd stopped Mr. Armando -- who

17  I now know as Armando Hernandez after they observed him

18  walking down in the middle of Ashland Avenue shouting

19  profanities, using words such as -- shouting the word

20  "nigger," you know, which as she continued to explain what

21  actions they took after that.

22  Q.   I understand.  What observations, if any, did you make

23  about Armando Hernandez at that time?

24  A.   When I first saw Mr. Hernandez, it appeared -- as I

25  testified before, he looked as though he appeared to be

Boyle - cross

1    intoxicated.

2    Q.  What made you to believe that?  Explain a little bit

3    further.

4    A.  Well, he was -- he was speaking.  He was trying to say

5    some things.  And I couldn't quite comprehend what he was

6    trying to say as if kind of a mumbled or slurred speech.

7    Okay.  And the closer I got to him, I could see some redness

8    and that in his eyes, a little bit of a smell as though you

9    would smell a person who had been drinking.

10          So those -- with those indicators, that's immediately

11   what I started thinking when I was making an assessment of

12   Mr. Hernandez.

13   Q.  And I'm sorry.  I interrupted you about intoxication.  So

14   what other observations did you make about Mr. Hernandez at

15   that time?

16   A.  He was -- the words he was trying to say, like I said, I

17   couldn't quite comprehend what he was trying to say.  But he

18   had a very like hostile and angry tone of voice.  And he

19   seemed to be just really upset as well.

20          I said he had redness in his eyes, but his eyes were

21   also kind of like swollen and almost teared or really glossy

22   as if he was genuinely upset about something.

23   Q.  Did you have an understanding at that time what was going

24   on with Mr. Hernandez, why he was behaving the way he did?

25   A.  No, not at all.

Boyle - cross

1   Q.  What was going through your mind at that time?

2   A.  Well, as time progressed and the longer I got to observe

3   Mr. Hernandez's behavior, I really started to be concerned

4   that, you know, he's obviously more upset than -- you know,

5   the more I'm around him, the more he seems to be upset.  So

6   there's something obviously of great concern to him.

7           And I became concerned because I thought maybe he may

8   have been involved in some type of incident where someone may

9   have either needed help or needed -- or someone got hurt, you

10  know.  So it seemed to be more tragic than just being

11  intoxicated and alone out in the Englewood area.

12  Q.  I see.  So at that time when you observed Armando

13  Hernandez, was he already -- I'm just trying to establish and

14  kind of put it in a context for us.  Was he already cuffed at

15  that point?

16  A.  Yes, he was.

17  Q.  Okay.  So what happened as -- after Officer McClain told

18  you as to what went on before you came in?  What happened next

19  after you had the conversation with Officer McClain?

20  A.  Then I recognized as Mr. Hernandez was near the front of

21  the police vehicle, he started thrashing around, just kind of

22  twisting his body around and saying more things again.  I

23  couldn't quite understand everything he was saying.

24          So Officer McClain and I, I remember going closer to

25  him at that point.  And then that's when he started, he pushed

Boyle - cross

1    his chest against the front of the police vehicle, started

2    kicking to the rear with his feet towards Officer Hernandez.

3    Q.  Sergeant Boyle, how many times did you see Mr. Hernandez

4    kick his feet?

5    A.  It was a couple of times.  I'm not quite sure exactly.

6    Q.  And what happened next?

7    A.  With that, I remember hearing Officer McClain say, "Mark,

8    he's kicking.  Mark, he's kicking."

9           And with that, Officer Hernandez then took him to the

10   ground.

11   Q.  Did you assist Officer Hernandez in any way taking

12   Mr. Hernandez to the ground?

13   A.  Not to take him to the ground, but I definitely assisted

14   by standing guard, you know, ready to -- and prepared to

15   assist Hernandez with, you know, any help he might need.

16   Q.  Describe to us how did Mr. Hernandez -- did Officer

17   Hernandez take Mr. Hernandez to the ground.

18   A.  I described it as a hip toss maneuver essentially where

19   you take someone off balance, off their center, and you rotate

20   them over your center of balance and move to the side, one

21   side or the other, in order to take them off balance and take

22   them to the ground in a controlled sort of manner.

23   Q.  After Officer Hernandezes escorted Mr. Hernandez to the

24   ground, did you see him at any -- did you see Officer

25   Hernandez at any time kneel on Mr. Hernandez?

Boyle - cross

1    A.   Pardon me?

2    Q.   Knee him in his back or try to kind of lay on top of

3    Mr. Hernandez, did you see Officer Hernandez at any time do

4    that?

5    A.   No.

6    Q.   After Mr. Hernandez was on the ground, did you see at any

7    time Officer McClain hit Mr. Hernandez around his rib area or

8    torso area?

9    A.   No.

10   Q.   What about Officer Hernandez, did he do any of those

11   things to Mr. Hernandez in your presence?

12   A.   No.

13   Q.   Did you do any of those things?

14   A.   No.

15   Q.   After Mr. Hernandez was escorted to the ground, what

16   happened next?

17   A.   I helped Officer Hernandez roll Mr. Hernandez to his back

18   side and then together, we lifted him.  We escorted him to his

19   feet to stand him up.

20   Q.   Sergeant Boyle, at that time, please describe Armando

21   Hernandez's appearance to us.

22   A.   Armando Hernandez, from what I recall, about 5 foot, 8,

23   maybe 180 pounds to 200 pounds.

24   Q.   And how did he appear to you at the time when you brought

25   him to his feet?  Describe his face, you know.  How did he

Boyle - cross

1   appear to you?

2   A.  Oh, sure.  When we brought him to his feet, he had some

3   grass and things kind of stuck to the side of his face and to

4   his shirt and his arm and that.  So that's what I remember.

5   Q.  Did he appear injured to you?

6   A.  No.

7   Q.  Did he at any time at that time ask for help?

8   A.  No.  As a matter of fact, he -- he started saying things,

9   "Just kill me now.  I just want to die.  Just -- let me go

10  die," things of that nature.

11  Q.  Did he ask you -- as a supervisor on the scene, did he

12  tell you that he wanted to go to the hospital?

13  A.  No.

14  Q.  So what happened after that, after you brought him up to

15  his feet?

16  A.  With that I asked Officer McClain to open the back door to

17  the police vehicle.  And Officer Hernandez and I escorted

18  Mr. Hernandez into the back seat of the police car.

19  Q.  And then what?

20  A.  And then I followed Officers McClain and Hernandez back to

21  the 7th --

22  Q.  Why did you do that?

23  A.  I followed them back to the police station because they

24  don't have, you know, a cage to separate prisoners from the

25  driver, front seat driver area.  So with a subject as we just

Boyle - cross

1   encountered that, you know, we might have a problem with, I

2   followed them just to make sure, if they had any kind of

3   problem, I was there to help them out right away.

4   Q.  Sergeant Boyle, just trying to figure out, at that point

5   before actually coming to the station, did you have an

6   understanding right there on the street what was happening

7   with Mr. Hernandez, what was going on?

8           Did you have an understanding at that time why he was

9   behaving the way he was?

10          MR. SHAPIRO:  Objection to the form of the question,

11  your Honor, compound.

12          MS. BELL:  Strike that, your Honor.  I'll ask a

13  simpler question.

14  BY MS. BELL:

15  Q.  Did you have an understanding why Mr. Hernandez was

16  behaving the way he did when you were on the street and before

17  you came to the station?

18  A.  No, I didn't.  And like I said before, the more time I

19  spent around Mr. Hernandez, the more my concern was that there

20  was something really wrong that had just happened.

21  Q.  Once at the station, what did you do?

22  A.  Once we got to the police station, I remember telling

23  Mr. Hernandez that everything was okay now.  And I gave him

24  basic instructions:  We're going to go into the police

25  station.  We're going to sit you down.  We're going to search

Boyle - cross

1   you and process you.  And please just cooperate with us.

2   You're being cooperative now.  We just want to figure out

3   what's going on with you, sort of thing.

4           And with that we escorted him into the -- Officer

5   Hernandez and I escorted him into the prisoner processing

6   room.

7   Q.  And once Mr. Hernandez was placed in the processing room,

8   what happened?

9   A.  After that, I went out into our tactical team office right

10  across the hallway from that room and started to ask Officer

11  McClain, you know, more about the incident and what she knew

12  prior to me getting there and that sort of thing.

13  Q.  And what did Officer McClain tell you?

14  A.  She told me the story again, how they came upon

15  Mr. Hernandez and that they observed him in Ashland Avenue

16  saying, using profanities and such which is -- at which point

17  they decided to stop him and check out and just see, you know,

18  what was going on with him.

19  Q.  Sergeant Boyle, Officer Hernandez testified that when

20  Mr. Hernandez was brought into the processing room, he had to

21  take his shoelaces off and a belt off.  Were you present at

22  that time?

23  A.  I was.

24  Q.  Can you please tell us whether you, at any time in that

25  processing room during your presence, did you observe Officer

Boyle - cross

1   Hernandez at any time throw Mr. Hernandez to the ground?

2   A.  Oh, no.

3   Q.  Did you observe Officer Hernandez at any time throw

4   Mr. Hernandez anywhere around the cell?

5   A.  No.

6   Q.  What happened next, sir?

7   A.  In the processing room?

8   Q.  No.  I'm sorry.  Let me -- I kind of took it out of order.

9   So after you had your conversation with Officer McClain and

10  she explained to you what went on on the street, what did you

11  do next?

12  A.  I then talked to Officer Hernandez when he came back in,

13  more of the same conversation but then I also -- as I

14  mentioned, I was concerned that Mr. Hernandez just may have

15  been involved in something that we just don't know about.

16          And so I thought to look -- look on our, what's

17  called our PCAD computer like the 911 center dispatches jobs

18  on.

19          And so I searched that database in our surrounding

20  communities to see if there was any kind of major incidents,

21  you know, perhaps with a description of Mr. Hernandez or

22  something, you know, to perhaps kind of make sense to me, you

23  know, why somebody would be so upset other than just being

24  intoxicated.

25  Q.  So it sounds like at this point, you were still trying to

Boyle - cross

 1  figure out what's going on?

 2  A.  Yes.

 3  Q.  So after you did that, what did you do next?

 4  A.  Well, I didn't find anything, you know, that really jumped

 5  out at me as maybe he would -- Mr. Hernandez was related to.

 6         So with that, I went back to our tactical team office

 7  where Officer McClain was.  And in the office we had some of

 8  Mr. Hernandez's personal effects on the desk.  And one of the

 9  things was his cell phone.  And, you know, after a few moments

10  the cell phone rang.  And I remember Officer McClain picking

11  up the phone and answering it.

12  Q.  Did you -- did you hear the conversation that Officer

13  McClain had with the person on the phone?

14  A.  Just a little bit, but I definitely asked Officer McClain

15  after the conversation to explain to me what happened or on

16  the phone conversation.

17  Q.  When you asked Officer McClain to tell you what was the

18  conversation about, what did she say?

19  A.  Officer McClain explained to me --

20         MR. SHAPIRO:  Objection, your Honor, hearsay.

21         MS. BELL:  Your Honor, I'm asking this question as to

22  effect on the listener and then later on --

23         THE COURT:  All right.  Not for the truth.

24         MS. BELL:  Not for the truth, correct, your Honor.

25  BY MS. BELL:

Boyle - cross

1   Q.  Go ahead and answer.

2   A.  Officer McClain explained to me that it was

3   Mr. Hernandez's either wife or girlfriend, I don't remember,

4   apparently called his phone to see where he was at and that

5   she had picked up the phone and answered it.

6           And what Officer McClain told me was that the

7   girlfriend explained that, you know, that he had been drinking

8   and that he was kind of -- you know, he was out of work and

9   down on his luck and she didn't know where he was.

10          So that kind of put my mind at ease at least to think

11  that initially I thought he might have been involved in some

12  kind of major incident, kind of put my mind at ease hearing,

13  you know, from his family or from his girlfriend that that's

14  not the case.

15  Q.  And after you talked to Officer McClain about the

16  conversation on the phone, what did you do?

17  A.  We then -- I then talked with Officer Hernandez again.

18  And so now we're -- we're looking to charge him with a

19  criminal offense but also to kind of delineate tasks, you

20  know, which officer was to perform which task and that sort of

21  thing.

22  Q.  At some point after having a conversation with Officer

23  McClain, did you go back to the processing room to talk to

24  Mr. Hernandez?

25  A.  Yes, I did.

Boyle - cross

1  Q.  Can you please tell us about that?

2  A.  I remember going back to the processing room with Officer

3  Hernandez.  And we had a conversation with Mr. Hernandez.  And

4  we told him -- I don't remember if it was Officer Hernandez or

5  I.  I told Mr. Hernandez that, you know, his girlfriend had

6  just called and, you know, told us kind of what's going on.

7  And we tried to get him to talk just about that.

8          And he essentially replied and agreed that, yeah, in

9  fact, he was out of work and he was feeling bad about that,

10 for not being able to provide for his family as he thought a

11 man should do.  So our conversation was generally about that.

12 Q.  And after you heard Mr. Hernandez's -- strike that.

13         After you heard what Mr. Hernandez said, how did that

14 make you feel?

15 A.  I -- it sounded reasonable to me.  You know, initially I

16 may have been more concerned than need be, but at least it

17 made sense.  You know, we heard from, you know, another person

18 that didn't know where he was, didn't know us, explain to us

19 what happened.

20         But then when we asked him about it, he agreed.  And

21 what he said made sense, that that's all that this was.

22 Q.  And then at some point after having that conversation, you

23 and Officer Hernandez and Officer McClain decided to charge

24 Mr. Hernandez with reckless conduct, correct?

25 A.  Yes.

Boyle - cross

1  Q.  Can you please tell us what -- what went into your

2  decision to charge him with reckless conduct, which is a

3  misdemeanor?

4  A.  Well, we were trying to look for the -- an appropriate

5  charge to arrest him for after, you know, their observations

6  of his actions on Ashland Avenue in traffic, putting himself

7  or others possibly in danger.  That was, in my best judgment,

8  the best and appropriate charge, was that misdemeanor offense,

9  reckless conduct.

10  Q.  Could you have charged him with other charges that night?

11  A.  Yes.

12  Q.  Which ones?

13  A.  Well, due to the fact that he had kicked Officer

14  Hernandez, that is aggravated battery to a police officer.

15  Just that act in and of itself, we could charge Mr. Hernandez

16  with a felony.

17  Q.  And why did you decide to charge -- why did you use

18  discretion that night to charge Mr. Hernandez with a

19  misdemeanor?

20  A.  After I learned, you know, the story or the background to

21  what was going on with Mr. Hernandez and events leading up to,

22  you know, our officers's encounter with him, it kind of made

23  sense that Mr. Hernandez was really just having a bad day and

24  he was intoxicated, down on his luck kind of thing.

25          You know, with that, you know, if he had an error in

Boyle - cross

1    judgment, bad day, you know, I'm not, you know, going to

2    exercise, you know, or pursue a felony charge, you know.  I'm

3    human.  I can understand, you know, we all have bad days and

4    such.  No one got hurt here.

5              So in my discretion, I thought it was best to charge

6    Mr. Hernandez with a misdemeanor as opposed to a felony which

7    has great consequences.

8    Q.  Sergeant Boyle, when was the last time that you saw

9    Mr. Hernandez that night?

10   A.  The last I remember, I think when we moved Mr. Hernandez

11   from the prisoner processing area in the 7th District to the

12   lockup area.  But beyond that, I don't really remember.

13   Q.  Let me back up for a second, Sergeant Boyle.  At some

14   point also throughout that night when Mr. Hernandez was

15   processed -- strike that.

16             Was there a watch commander on duty that night?

17   A.  Yes.

18   Q.  Who was the watch commander on duty that night?

19   A.  At the time we were processing Mr. Hernandez's arrest,

20   Lieutenant Eve Gushes was our watch commander.

21   Q.  At any point in time during that night, was -- Lieutenant

22   Gushes, did she have an opportunity to speak with

23   Mr. Hernandez?

24   A.  Yes.

25   Q.  Were you present at that time when Lieutenant Gushes

Boyle - cross

1    talked to Mr. Hernandez?

2    A.  Yes, I was.

3    Q.  Can you please tell us about the conversation that

4    Lieutenant Gushes had with Mr. Hernandez?

5    A.  Sure.  Lieutenant Gushes asked Mr. Hernandez if he was

6    okay.  And he said that he was or nodded yes.  And she asked

7    him a few more questions at that point.  And from that, I

8    escorted the lieutenant back out of the prisoner processing

9    area.

10   Q.  To the best of your recollection, did Mr. Hernandez at

11   that time when your watch commander was talking to him at the

12   processing room, did he at any time told her that he wanted to

13   go to the hospital?

14   A.  No.

15   Q.  Did he at any time told her that he was in pain?

16   A.  No.

17   Q.  Did he at any time in your presence told the watch

18   commander about any mistreatment that he received either on

19   the street or at the station?

20   A.  No.  As a matter of fact, just from what I remember, he

21   was more apologetic than anything else.

22   Q.  And then Sergeant Boyle, you just said a minute ago that

23   the last time that you saw him is when you were escorting

24   Mr. Hernandez to a lockup area, right?

25   A.  Yes.

Boyle - cross

1   Q.  Okay.  Correct.  Can you please tell me, though, at that

2   time when you were escorting Mr. Hernandez to a lockup, how

3   did he appear to you?

4   A.  From -- from what I had said before, he had some redness

5   on the side of his -- on the side of his face near his eye.

6   Q.  Anything else?

7   A.  Not that I remember.

8   Q.  Did you see any blood on his face?

9   A.  No.

10          MS. BELL:  Just a moment, your Honor -- actually, one

11   more question.

12   BY MS. BELL:

13   Q.  You remember the line of questioning about you being

14   friendly with Officer Hernandez and Officer McClain?

15   A.  Yes.

16   Q.  Does the fact that you are friendly with Officer Hernandez

17   and Officer McClain mean that you would lie for them on the

18   stand before this jury?

19   A.  Absolutely not.

20          MS. BELL:  One moment, your Honor.

21          THE COURT:  While you're -- okay.

22          MS. BELL:  Nothing further.

23          THE COURT:  Redirect.

24          MR. SHAPIRO:  Thank you, your Honor, briefly.

25                      REDIRECT EXAMINATION

Boyle - redirect

1    BY MR. SHAPIRO:

2    Q.  Sergeant Boyle, I believe you just testified that the --

3    Mr. Hernandez had redness on the side of his face near his

4    eye; is that right?

5    A.  Yes.

6    Q.  But you didn't see any red marks or swelling on his

7    forehead at that time?

8    A.  Well, in this area here around -- in the area around his

9    eye, on the side of his face.

10   Q.  You're pointing -- the record should reflect that you're

11   pointing to the right side -- to your -- to the right side of

12   his forehead, your right; is that correct?

13   A.  That's correct.  Whether it was the left or right side of

14   his head, I don't remember as of right how, but I remember it

15   was definitely this area here.

16   Q.  Okay.  You're pointing to your right side.  Do you now

17   know which side of the face it was on?

18   A.  Again, I don't remember which side of Mr. Hernandez's face

19   I observed the redness.  Just to indicate the area, I'm using

20   my right hand on the side of my face.

21   Q.  Okay.  So not necessarily the right side, it could be the

22   left side, it could be the right side, is that what you're

23   saying?

24          MR. GAINER:  Objection, asked and answered.

25          THE COURT:  Yes, he said that pretty clearly.

Boyle - redirect

184

         1         MR. SHAPIRO:  Well, I'm trying to determine, he's

         2    pointing --

         3         THE COURT:  He said he doesn't remember whether it

         4    was this side or that side.

         5    BY MR. SHAPIRO:

         6    Q.  But in any event, you're pointing above your eye around

         7    the forehead area coming down towards the temple.  Is that

         8    where it was, the redness was?

         9    A.  That's what I remember.

        10    Q.  Okay.  And you were -- you testified that you were

        11    concerned that Armando Hernandez may have been involved in an

        12    earlier incident; is that right?  Do you recall that

        13    testimony?

        14    A.  Yes.

        15    Q.  Okay.  As it turned out, there was no earlier domestic

        16    violence incident; is that right?

        17    A.  Correct.

        18    Q.  Okay.  You found later there was an argument with his

        19    wife; is that right?

        20    A.  Yes.

        21    Q.  Okay.  And there was no cage in Officer McClain and

        22    Officer Hernandez's squad car; is that right?

        23    A.  That's correct.

        24    Q.  And to your knowledge, Armando did not cause any problems

        25    in the squad car; is that right?

                      Boyle - redirect
                                                                185

1   A.  Not at all.

2   Q.  Okay.  And to charge him with aggravated battery or

3   aggravated assault to a police officer, the State's Attorney

4   would have had to approve charges for that; is that right?

5           MR. GAINER:  Objection, beyond the scope.

6           THE COURT:  Overruled.  He can answer.

7   BY MR. SHAPIRO:

8   Q.  You can answer.

9   A.  That's correct.

10  Q.  It would have to be approved by felony review, correct?

11  A.  Yes.

12          MR. SHAPIRO:  Okay.

13          THE COURT:  Is that it?

14          MR. SHAPIRO:  Nothing else, your Honor.

15          THE COURT:  You can step down.

16    (Witness excused.)

17          THE COURT:  We'll break now until 1:30.

18    (Proceedings recessed from 12:30 p.m. to 1:30 p.m.)

19

20

21

22

23

24

25

```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    ARMANDO HERNANDEZ,                  )
                                          )
 4              Plaintiff,                )
                                          )
 5              v.                        )   No. 13 CV 00153
                                          )
 6    CHICAGO POLICE OFFICER HERNANDEZ,)     Chicago, Illinois
      et al.,                             )   May 28, 2014
 7                                        )   1:30 p.m.
                Defendants.               )
 8

 9                  EXCERPT TRANSCRIPT OF PROCEEDINGS

10       BEFORE THE HONORABLE HARRY D. LEINENWEBER AND A JURY

11    APPEARANCES:

12    For the Plaintiff:          ROBINSON SHAPIRO & SCHWARTZ, LLC
                                  BY:  MR. JAMES A. SHAPIRO
13                                Suite 1750
                                  208 South LaSalle Street
14                                Chicago, Illinois 60604
                                  (312) 782-4615
15                                jshapiro@rss-lawyers.com

16                                SHILLER PREYAR LAW OFFICES
                                  BY:  MS. MARY J. GRIEB
17                                Suite B401
                                  1100 West Cermak Road
18                                Chicago, Illinois 60608
                                  (312) 226-4590
19                                maryjgrieb@gmail.com

20

21

22

23

24

25
```

```
 1   For the Defendants:          JOHNSON & BELL, LTD.
                                  BY:  MR. BRIAN P. GAINER
 2                                     MS. ALEXANDRIA L. BELL
                                  Suite 2700
 3                                33 West Monroe Street
                                  Chicago, Illinois 60603
 4                                (312) 372-0770
                                  gainerb@jbltd.com
 5                                bella@jbltd.com

 6   Court Reporter:             Judith A. Walsh, CSR, RDR, CRR
                                 Official Court Reporter
 7                               219 S. Dearborn Street, Room 1944
                                 Chicago, Illinois 60604
 8                               (312) 702-8865
                                 judith_walsh@ilnd.uscourts.gov

 9

10

11   NOTE:  THIS IS AN EXCERPT OF PROCEEDINGS.  PAGE NUMBERING WILL

12   NOT CORRESPOND TO ANY COMPLETE TRIAL TRANSCRIPT THAT MAY BE

13   PREPARED.

14

15

16

17

18

19

20

21

22

23

24

25
```

Gushes - direct

188

1     (Proceedings heard in open court:)

2          THE COURT:  You may call your next witness.

3          MR. SHAPIRO:  Thank you, your Honor.  At this time

4     the plaintiff would like to call Lieutenant Gushes, Eve

5     Gushes.

6          THE COURT:  All right.  Raise your right hand.

7     (Witness sworn.)

8          THE COURT:  You may question the witness.

9          MR. SHAPIRO:  Thank you, your Honor.

10         LIEUTENANT EVE GUSHES, PLAINTIFF'S WITNESS, SWORN

11                    DIRECT EXAMINATION

12    BY MR. SHAPIRO:

13    Q.  You're Lieutenant Eve Gushes; is that right?

14    A.  Yes, it is.

15    Q.  Spelled G-u-s-h-e-s?

16    A.  Yes.

17    Q.  First name, common spelling as in "Adam and"?

18    A.  Yes.

19    Q.  Okay.  And Lieutenant Gushes, you were the watch commander

20    for District 7; is that right?

21    A.  At the time of this incident, I was.

22    Q.  On July 22nd, 2012?

23    A.  Yes.

24    Q.  Okay.  And you had an opportunity to interview the

25    plaintiff in this case, Armando Hernandez, that night,

Gushes - direct

1    correct?

2    A.  Yes.

3    Q.  Okay.  And Mr. Hernandez told you that night during your

4    interview that the officers approached him to see if he was

5    okay; is that right?

6    A.  Yes.

7    Q.  You put that in your watch commander report, Box 75,

8    correct?

9    A.  I believe so.

10   Q.  Okay.  And that when the officers approached him to see if

11   he was okay, he told you he used poor judgment; isn't that

12   right?

13   A.  That is correct.

14   Q.  And that was in your watch commander report also in Box

15   75, right?

16   A.  Yes.

17   Q.  And those were his words to you, correct?

18   A.  Yes.

19   Q.  Okay.  And he further told you that he used poor judgment

20   and refused to cooperate with them, didn't he?

21   A.  Yes, he did.

22   Q.  And again those were his words, not yours, correct?

23   A.  That's correct.

24   Q.  And in fact, he did use poor judgment by failing to

25   comply, didn't he?

Gushes - direct

1   A.  Are you asking for my opinion?

2   Q.  Well, I'm asking -- I guess I am asking for your opinion,

3   Lieutenant Gushes, yes.

4   A.  It is my opinion that he used poor judgment, yes, sir.

5   Q.  Okay.  And he used poor judgment by failing to take his

6   hands out of his pocket when commanded to do so; isn't that

7   right?

8   A.  I believe he used poor judgment when he failed to comply

9   with the officers's actions.

10  Q.  Okay.  And one of the -- failed to comply with the

11  officers's actions or requests?

12  A.  I'm sorry.  With their requests.

13  Q.  Okay.  And one of those requests was for him to take his

14  hands out of his pockets, right?

15  A.  I'm not familiar with what requests they made of him --

16  Q.  Okay.

17  A.  -- so it wouldn't be fair for me to have to answer that.

18  Q.  Okay.  Because you weren't there at the scene, correct?

19  A.  That's correct.

20  Q.  All of this is secondhand from the officers and Armando,

21  right?

22  A.  That's correct.

23  Q.  Okay.  And but in your opinion, he did use poor judgment

24  by failing to comply, right?

25  A.  Yes.

Gushes - direct

191

1   Q.  And but he also admitted it, didn't he?

2   A.  Yes, he did.

3   Q.  Okay.  And Armando looked intoxicated to you, didn't he?

4   A.  Yes, he did.

5   Q.  In fact, he smelled of alcohol, didn't he?

6   A.  Yes, he did.

7   Q.  And his whole body language was that of like he had just

8   gotten beat, the world just overwhelmed him, right?

9   A.  That sounds about accurate, yes, sir.

10  Q.  Okay.  Does it sound about accurate, or is it accurate

11  based on what you said?

12  A.  I would say that that's pretty close to what I said in my

13  deposition without having it here for me to refer to, but yes.

14  Q.  Okay.  Would you like me to refresh your recollection from

15  the deposition?

16  A.  Sure.

17  Q.  Would you like to see it?  Okay.  Page 18, Lines -- I'm

18  sorry.  18 through 20 -- wait a second.  I'm sorry.  Page 16,

19  Lines 18 through 20.  I was getting confused between the line

20  and the page number.  I apologize.

21       Page 16, Lines 18 through 20, let me show you what's

22  your deposition, Page 18 on the bottom right-hand corner.  Let

23  me know when you're done, Lines 18 through 20.

24  A.  Lines 18 through 20.  Yes.

25  Q.  Okay.  Is that what you said?

1   A.  That is what I said.

2   Q.  Okay.  And you stand by those words, don't you?

3   A.  I do.

4   Q.  And the only thing you noticed on Mr. Hernandez when you

5   interviewed him was a slight abrasion on his forehead, right?

6   A.  That is correct.

7   Q.  You didn't see any blood on his face?

8   A.  No.

9   Q.  You didn't see any blood in his mouth?

10  A.  No.

11  Q.  You asked him how he got the slight abrasion on his

12  forehead, didn't you?

13  A.  I did.

14  Q.  And he told you the officers threw him to the ground and

15  he hit his head, correct?

16  A.  Yes.

17  Q.  Now, the neighborhood around 71st and Ashland is virtually

18  100 percent African-American; is that not right?

19  A.  That is correct.

20  Q.  Okay.  And so to see an Hispanic male at 71st and Ashland

21  in the middle of the street, that was something very much out

22  of the ordinary, wasn't it?

23          MR. GAINER:  Objection, foundation.  She wasn't

24  there, Judge.

25          THE COURT:  I don't think she was there.

Gushes - direct

1   BY MR. SHAPIRO:

2   Q.  Okay.  I understand.  But let me rephrase the question,

3   Lieutenant Gushes.  You testified that the neighborhood around

4   71st and Ashland is virtually 100 percent African-American.

5   You know that, right?

6   A.  Yes.

7   Q.  Okay.  So understanding that, with the understanding that

8   you weren't there, if hypothetically there were an Hispanic

9   male at 71st and Ashland in the middle of the street, that was

10  something very much -- that would be something very much out

11  of the ordinary, wouldn't it?

12          MR. GAINER:  Object to the form, foundation, calls

13  for speculation.

14          MR. SHAPIRO:  Your Honor, I think I --

15          THE COURT:  I'll let her answer.

16          MR. SHAPIRO:  Thank you, your Honor.

17          THE WITNESS:  Could you repeat the question, please?

18  BY MR. SHAPIRO:

19  Q.  Absolutely.  So if you were to see an Hispanic male at

20  71st and Ashland in the middle of the street, that would be

21  something very much out of the ordinary, wouldn't it?

22  A.  It would.

23  Q.  And your officers were very surprised to see him there,

24  weren't they?

25  A.  I can't answer for my officers, so the only thing I can

1    say is that I think they were more surprised by his actions

2    while he was in the street as opposed to him actually being

3    there.

4    Q.   Okay.  But your officers told you that they were very

5    surprised to see him there, weren't they, didn't they?

6    A.   They also told me that they were extremely surprised to

7    hear him shouting what he was shouting while he was on the

8    street, yes.

9    Q.   I understand that.  But my question is that they were

10   surprised -- that your officers were very surprised to see him

11   there at 71st and Ashland as an Hispanic in a 100 percent

12   black neighborhood; isn't that right?

13   A.   Yes.

14   Q.   Okay.  And Officer Hernandez told you that for his own

15   safety and in light of everything that was going on around

16   them that he was taking him into custody for that, correct?

17   A.   Yes.

18   Q.   Okay.  And Officer Hernandez also told you that he went to

19   place Armando -- Armando Hernandez into custody and that he

20   resisted him, right?

21   A.   Yes.

22   Q.   And then he told you he used an emergency takedown,

23   correct?

24   A.   Yes.

25   Q.   Is it your understanding that Officer Hernandez handcuffed

Gushes - direct

195

1    Armando Hernandez before or after the emergency takedown?

2    A.  I'm not sure.

3    Q.  Okay.  You don't know whether Armando was handcuffed

4    before he was taken down or not?

5    A.  No, sir, I --

6          MR. GAINER:  Asked and answered.

7    BY MR. SHAPIRO:

8    Q.  Withdrawn.  That's fair.

9          Okay.  Officer Hernandez told you that when Armando

10   hit the ground, he hit his head on the ground; isn't that

11   correct?

12   A.  Yes.

13   Q.  And Officer Hernandez also told you that Armando Hernandez

14   resisted his arrest by pulling away, jerking away and trying

15   to swing at him, right?

16   A.  Yes.

17   Q.  You socialize with Officer Hernandez outside of work, do

18   you not?

19   A.  I do.

20   Q.  Okay.  Fundraisers, Christmas parties, watch parties,

21   baseball games?

22   A.  Correct.

23   Q.  And when he -- and when Armando refused to cooperate with

24   them, he began kicking at them and refused to comply with

25   their directions, correct?

Gushes - cross

```
 1   A.  I did say that, yes.

 2   Q.  Okay.  And you concluded that Officer Hernandez's actions

 3   were in complete compliance with department procedures and

 4   directives, did you not?

 5   A.  I did.

 6   Q.  And the rationale for your conclusion was that Officer

 7   Hernandez used appropriate force according to department

 8   procedures and directives and the Illinois compiled statutes,

 9   correct?

10   A.  Yes.

11          MR. SHAPIRO:  No further questions, your Honor.

12   Thank you.

13          THE COURT:  Cross.

14          MR. GAINER:  Thank you, your Honor.

15                    CROSS-EXAMINATION

16   BY MR. GAINER:

17   Q.  Good afternoon, Lieutenant.

18   A.  Good afternoon.

19   Q.  Lieutenant, can you please tell us a bit about your

20   educational background?

21   A.  Yes.  I have a bachelor's degree from DePaul University in

22   education.  I have a master's degree in training and

23   development from Loyola University.  And I hold a doctorate

24   degree in education and curriculum and instruction with a

25   concentration on adult studies from Loyola University.
```

Gushes - cross

1   Q.   How long have you been a lieutenant of police?

2   A.   Almost 14 years.

3   Q.   And you are currently assigned to the 7th District, yes?

4   A.   I am.

5   Q.   How long have you been assigned to the 7th District?

6   A.   This will be my fourth year.

7   Q.   And counsel mentioned that you were the watch commander,

8   at least back on this particular day, you were the watch

9   commander.  Can you just describe what the watch commander is?

10  A.   The watch commander is the person who is responsible and

11  in charge of everyone who works a particular shift during the

12  day in the police station.

13  Q.   And why has it changed?  You said earlier that you were

14  the watch commander kind of implying that you're not now.

15  What has changed in your assignment?

16  A.   We've had some changes to department policy, and now we

17  have district station supervisors which are typically the rank

18  of sergeant and watch operations lieutenant.  So my job title

19  has changed, and I no longer approve probable cause on arrest

20  reports.  They are -- that has been delegated to a sergeant.

21  Q.   Now, this particular day, July 22nd, 2012, what time did

22  you start your shift?

23  A.   5:00 in the morning.

24  Q.   And on this particular day, as you've said already, you

25  came into contact with Armando Hernandez, correct?

Gushes - cross

1   A.   That's correct.

2   Q.   Why did you come in contact with Armando Hernandez?

3   A.   I needed to interview him in order to complete the watch

4   commander's portion of the tactical response report.

5   Q.   And where did you talk to him?

6   A.   I talked to him in the processing area of the 7th

7   District.

8   Q.   And who was with you when you talked to him?

9   A.   Sergeant Boyle.

10  Q.   And when you spoke to him, that's when he told you that he

11  used bad judgment and failed to comply with the police

12  officers's requests, right?

13  A.   That's correct.

14  Q.   And then did you -- did you take that information and

15  write it down?

16  A.   I did.

17  Q.   Where did you write it down?

18  A.   I recorded that in the watch commander's portion of the

19  tactical response report.

20  Q.   Did you make any observations of Mr. Hernandez that led

21  you to believe he was intoxicated?

22  A.   Yes.

23  Q.   And can you please describe those observations that you

24  made?

25  A.   His appearance was very disheveled.  He smelled very

Gushes - cross

1   strongly of alcohol.  And his general demeanor was that of

2   someone who in my experience has been -- was displaying

3   characteristics of someone who had been served or chosen to

4   drink an excessive amount of alcohol.

5   Q.  During your time with him, did you notice any blood on his

6   face or in his mouth?

7   A.  No.

8   Q.  Counsel read you a portion of your deposition about

9   describing the body language of Armando Hernandez.  Do you

10  remember that?

11  A.  I do.

12  Q.  And he read you a quote:  "His whole body language was

13  that of like he had just gotten beat, the world had just

14  overwhelmed him."

15          Those were your words from your deposition, right?

16  A.  They were.

17  Q.  I want to specifically focus on the portion of that quote,

18  "he had just gotten beat."  Can you describe what you mean by,

19  "he had just gotten beat"?

20  A.  Yes.  Mr. Hernandez had relayed to me that he had had an

21  argument with his girlfriend and that he was very despondent

22  over having had the argument.  He related to me that he just

23  felt like he was overwhelmed and he had the weight of the

24  world on his shoulders and that the world had just beaten him

25  up.

Gushes - cross

1    Q.  So is it fair to say that when you say "just gotten beat,"

2    you did not mean that he looked like he had just been beaten

3    up?

4    A.  Oh, no, not at all.  That's correct, sir.

5    Q.  Thank you.  You mentioned then when you were just

6    describing your responsibilities then as compared to now that

7    back then, part of your responsibilities were to approve

8    probable cause?

9    A.  Yes.

10   Q.  Okay.  And in this case with Armando Hernandez did you, in

11   fact, approve probable cause for reckless conduct?

12   A.  I did.

13          MR. SHAPIRO:  Objection, your Honor, relevance.

14          THE COURT:  Overruled.

15   BY MR. GAINER:

16   Q.  I'm sorry.  I didn't hear the answer.

17   A.  I did.

18   Q.  You were also asked another question by counsel about a

19   conversation or conversations you had with Officer Hernandez

20   about your encounter with Armando Hernandez.  Do you remember

21   those questions?

22   A.  I do.

23   Q.  And counsel read some things to you from your deposition

24   about the actions of Armando Hernandez when this incident was

25   taking place, right?

Gushes - cross

1   A.  Yes, he did.

2   Q.  First of all, to be clear, you were not present when this

3   incident happened, right?

4   A.  That is correct.

5   Q.  And then you were read some things about Armando Hernandez

6   and the things he was doing.  And one of those things was

7   swinging.  The question was, did Mark Hernandez tell you that

8   Armando Hernandez was swinging at him.  Do you remember that?

9   A.  I do.

10  Q.  Can you provide information about what was explained to

11  you by Officer Hernandez with regard to the swinging?

12  A.  Yes.  Officer Hernandez told me that he and Officer

13  McClain were attempting to handcuff him -- I'm sorry,

14  Defendant Hernandez --

15  Q.  It's hard.  You can call them Armando and Mark if it's

16  helpful.

17  A.  Armando and Mark.  My apologies.

18         And when he gave that order, Mr. Hernandez stiffened

19  and he put his hands in his pocket.  And he began to swing his

20  body, the upper torso of his body back and forth in order not

21  to comply.

22  Q.  So when you said "swinging," did you mean punching?

23  A.  No, no, not at all.  I meant that he was moving his

24  torso --

25         MR. SHAPIRO:  Objection, your Honor.

```
 1              THE WITNESS:  -- and --

 2              MR. SHAPIRO:  Objection.

 3              THE COURT:  What's the objection?

 4              MR. SHAPIRO:  Objection as leading and putting words

 5   into -- I realize it's cross, effectively cross, but putting

 6   words into the witness's mouth, mischaracterize the testimony.

 7              THE COURT:  Overruled.

 8   BY MR. GAINER:

 9   Q.  Please continue with your answer.

10   A.  No, it was my choice of words to use the word "swinging."

11   And by that I meant that he was moving his entire torso back

12   and forth, swinging it back and forth in order to avoid being

13   handcuffed.  That's what I meant.

14              MR. GAINER:  One moment please, your Honor.  I'm just

15   about finished, I think.

16      (Pause.)

17   BY MR. GAINER:

18   Q.  Lieutenant, at any point during your interaction with

19   Armando Hernandez, did he ever tell you that he needed medical

20   attention?

21   A.  No, he didn't.

22   Q.  Did he ever tell you that he was in pain?

23   A.  No.

24   Q.  Counsel asked you questions about being friendly with

25   Officers Hernandez and McClain.  Do you remember those
```

1    questions?

2    A.  I do.

3    Q.  And just because you're friends with them, would you come

4    into a federal court, sit on a witness stand and lie for them?

5    A.  Absolutely not.

6         MR. GAINER:  That's all the questions I have.  Thank

7    you.

8         THE COURT:  Anything further?

9         MR. SHAPIRO:  Very briefly, your Honor.

10                   REDIRECT EXAMINATION

11   BY MR. SHAPIRO:

12   Q.  Lieutenant Gushes, you just testified that when you said

13   "swinging" at your deposition that you meant swinging his

14   torso?

15        You have to answer out loud.

16   A.  Yes.

17   Q.  All right.  Not swinging his arms?

18   A.  That's correct.

19   Q.  Okay.  You didn't say swinging his torso in your

20   deposition, did you?

21   A.  No one asked me to clarify so no, I didn't.

22   Q.  Okay.  But you didn't see fit to state that, did you?

23   A.  No, sir, because that was my interpretation of what had

24   occurred, so I didn't feel a need to explain.

25   Q.  Okay.  So just the word "swinging" to you meant swinging

Gushes - redirect

1    his torso rather than swinging his fists; is that right?

2    A.   Right.

3              MR. GAINER:  Objection, asked and answered.

4              MR. SHAPIRO:  No further questions, your Honor.

5              THE COURT:  Step down.

6       (Witness excused.)

7       (Proceedings held which are not herein transcribed.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      *  *  *  *  *  *  *

 2                  C E R T I F I C A T E

 3           I, Judith A. Walsh, do hereby certify that the

 4     foregoing is a complete, true, and accurate excerpt transcript

 5     of the proceedings had in the above-entitled case before the

 6     Honorable HARRY D. LEINENWEBER, one of the judges of said

 7     Court, at Chicago, Illinois, on May 27 and May 28, 2014.

 8

 9     /s/ Judith A. Walsh, CSR, RDR, CRR          June 12, 2014

10     Official Court Reporter

11     United States District Court

12     Northern District of Illinois

13     Eastern Division

14

15

16

17

18

19

20

21

22

23

24

25
```